# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **SHELBY COUNTY GOVERNMENT**; **SHELBY COUNTY BOARD OF EDUCATION** operating as **MEMPHIS-SHELBY COUNTY SCHOOLS**, a public school district; **THE BOARD OF COUNTY COMMISSIONERS OF SHELBY COUNTY, TENNESSEE**; **MICHELLE ROBINSON MCKISSACK**, in her individual and official capacities; **NATALIE J. MCKINNEY**, in her individual and official capacities; **STEPHANIE P. LOVE**, in her individual and official capacities; **TAMARQUES PORTER**, in his individual and official capacities; **SABLE OTEY**, in her individual and official capacities and on behalf of her minor children **A.O.** and **R.O.**; **KEITH WILLIAMS**, in his individual and official capacities; **TOWANNA MURPHY**, in her individual and official capacities and on behalf of her minor child **E.R.**; **AMBER HUETT-GARCIA**, in her individual and official capacities; and **JOYCE DORSE COLEMAN**, in her individual and official capacities.<br><br>          Plaintiffs,<br><br>v.<br><br>**BILL LEE,** in his official capacity as Governor of the State of Tennessee; **LIZZETTE REYNOLDS,** in her official capacity as Commissioner of Education; **CAMERON SEXTON,** in his official capacity as Speaker of the Tennessee House of Representatives; **RANDY McNALLY**, in his official capacity as Lieutenant Governor and Speaker of the Tennessee Senate; and all members of the **EDUCATIONAL OVERSIGHT BOARD OF MEMPHIS-SHELBY COUNTY SCHOOLS** including **BILLY ORGEL**, in his official capacity; **SHANEA McKINNEY**, in her official capacity; **NISHA POWERS**, in her official capacity; **DEDRICK BRITTENUM JR.,** in his official capacity; **TYRONE BURROUGHS**, in his official capacity; **DORSEY HOPSON**, in his official capacity; **DAVID MANSOURI**, in his official capacity; **BEVERLY ROBERTSON**, in her official capacity; and **KAREN VOGELSANG**, in her official capacity.<br><br>          Defendants. | Case No. 3:26-cv-00835<br><br>Judge Waverly D. Crenshaw, Jr.<br><br>Magistrate Judge Jeffery S. Frensley |

# FIRST AMENDED VERIFIED COMPLAINT
# FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## PRELIMINARY STATEMENT

The voters of Shelby County, Tennessee elected the Memphis-Shelby County Board of Education ("the School Board" or "SCBOE") to govern their public schools. The School Board exercises authority over the annual budget, the superintendent, contracts, and educational policy for Memphis-Shelby County Schools ("MSCS")—the mechanism through which more than 110,000 children and their families have a voice in the most consequential local decisions affecting their daily lives.

Tennessee Public Chapter No. 1057 ("Public Chapter 1057") dismantles that structure. It creates a nine-member state-appointed oversight board with complete authority over the elected School Board: power to veto the Board's budget, approve or reject every contract above $50,000, hire and fire the superintendent, override charter-school decisions, and set district policy. The elected Board retains the title of office but none of the power granted to it by state law. When an elected body cannot adopt its own budget, hire its own superintendent, or approve its own contracts, it does not govern.

The legislation's reach extends further. Through a structural consequence identified on the House floor during final passage debate, Public Chapter 1057 regulates, subjugates, and subordinates the Shelby County Commission's independent fiscal authority to the Educational Oversight Board of Memphis-Shelby County Schools ("Oversight Board"). The Commission cannot adopt its own annual budget until the Oversight Board has approved the elected school board's proposed budget. If the Oversight Board vetoes that budget, the Commission's budget process is suspended. One legislator identified this consequence on the floor and characterized it

2

as "an oversight that was not well thought out." The majority did not dispute his characterization and did not correct it before enactment. Public Chapter 1057 thus displaces democratic governance over two separately constituted elected bodies—the School Board and the Shelby County Commission—through a single legislative act.

The question before the Court is whether the General Assembly may accomplish by targeted statute what it is not allowed to accomplish by direct command: the displacement of duly elected local governing bodies, using criteria engineered to reach those bodies alone, based on an incomplete benchmark audit, imposed without notice or hearing, and without any finding that democratic governance had failed and that state displacement was the least restrictive means of addressing that failure. The Tennessee Constitution, the United States Constitution, and basic principles of democratic accountability all require the same answer: No.

The legislative record forecloses the State's inevitable defense that this is a general law of statewide application. The Department of Education testified before the conference committee that only one school district satisfies four of the six trigger criteria simultaneously. A conference committee member stated on the House floor that Criteria 5 and 6 were added after the fact and specifically crafted to ensure only one district would qualify. He called those criteria unconstitutional, offering a minority report removing them and deploying a collaborative advisory model. The majority rejected that alternative 72 to 13.

The General Assembly's own appropriations confirm what the statutory text obscures: the 2026 Funded Amendments and Bills summary identifies Public Chapter 1057 by its official line-item description—"Memphis School Takeover." *See* **Exhibit 1**. That is not shorthand adopted by critics. It is the General Assembly's own fiscal documentation, alongside a $1,000,000 nonrecurring appropriation to implement it.

This is not Tennessee's first experiment displacing local governance of Memphis's schools. In 2012, the General Assembly created the Achievement School District (the "ASD") and deployed it almost exclusively against the same institution. The promise was academic transformation under state governance. After a decade and the expenditure of billions of dollars, independent research documented no sustained academic gains. The ASD was wound down. No official was held accountable. The General Assembly now proposes to repeat a similar experiment, against the same institution, partially on the basis of a forensic audit that was 25 percent complete when the bill was advanced. When asked on the House floor what he would do if the remaining 75 percent came back clean, the bill's primary sponsor did not answer.

Preliminary relief is of utmost importance. Once the Oversight Board is constituted and acts, the consequences cannot be undone. The democratic right of Shelby County's voters to elect representatives who actually govern cannot be restored through damages or retrospective relief.

**INTRODUCTION**

1. Tennessee is home to approximately 150 public school districts. Only one—Memphis-Shelby County Schools—has been singled out for governance takeover. Only one has had legislation engineered to strip its elected board of the power to adopt its own budget, hire its own superintendent, and approve its own contracts. That district serves a student population that is approximately 94 percent racial minorities.

2. Public Chapter 1057 creates a nine-member state-appointed Oversight Board with authority to approve or override MSCS's budget, approve or reject contracts of $50,000 or more, hire and fire the superintendent, and override charter school denials. The appointees—five chosen by the Governor, two by the Speaker of the House, and two by the Speaker of the Senate—are accountable to no voter in Shelby County. The General Assembly's own appropriations confirm

4

targeting: the Memphis School Takeover. *See* **Exhibit 1**. Speaker Cameron Sexton publicly declared the legislation a "total takeover of the Memphis-Shelby County school system."

3. Plaintiffs bring this action asserting seven counts: (1) violation of the Equal Protection Clause of the Fourteenth Amendment; (2) violation of the Equal Protection Clauses in Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution; (3) violation of the home rule requirement in Article XI, Section 9 of the Tennessee Constitution; (4) violation of the home rule requirement via functional displacement of local officials in Article XI, Section 9 of the Tennessee Constitution; (5) violation of the prohibition on retrospective laws in Article I, Section 20 of the Tennessee Constitution; (6) violation of the separation of powers doctrine in Article II, Sections 1 and 2 of the Tennessee Constitution; and (7) a request for declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201.

4. Plaintiffs seek preliminary injunctive relief to prevent an unconstitutional takeover from taking effect before this Court can reach the merits.

### JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. Plaintiffs assert claims under 42 U.S.C. § 1983 for violations of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. This Court has supplemental jurisdiction over Plaintiffs' Tennessee constitutional claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution. The state and federal claims all arise from the same legislative campaign targeting MSCS, share the same set of operative facts, the same defendants, and the same injury.

6. This Court has authority to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and to issue injunctive relief pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65.

7. Venue is proper in the Middle District of Tennessee, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in Davidson County, Tennessee, which falls within this District.

8. Suits against Defendants in their official capacities are authorized by the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), as set forth herein. Each Defendant has a specific, non-ministerial enforcement role in implementing Public Chapter 1057 sufficient to satisfy *Ex Parte Young*'s requirement of a sufficient connection to enforcement of the challenged law. The Eleventh Amendment does not bar prospective injunctive relief against state officers acting in violation of federal law.

## **PARTIES**

9. Plaintiff Shelby County Government is a local government operating in West Tennessee and organized under the laws of the State of Tennessee pursuant to Article X, Section 4 of the Tennessee Constitution and Title 5 of the Tennessee Code. Shelby County serves a population of approximately 910,000 residents and is the most populous county in Tennessee. Approximately 67.5 percent of Shelby County's population is comprised of racial minority groups (i.e., non-Hispanic White). Shelby County Government's principal offices are located at 160 North Main Street, Memphis, Tennessee 38103. The Shelby County Board of Commissioners is the County's locally elected legislative body, constituted pursuant to Tenn. Code Ann. §§ 5-5-101 *et seq*. Shelby County Government is the general-purpose local government responsible for administering public services and state-delegated functions within Shelby County, including public safety, administration of the court system, maintenance of county infrastructure, public

6

health services, and the assessment and collection of property taxes. Through these powers, Shelby County Government acts as the primary vehicle by which the residents of Shelby County exercise representative control over local governmental functions.

10.     Plaintiff Memphis-Shelby County Board of Education, operating as Memphis-Shelby County Schools, is a public school district organized under the laws of the State of Tennessee pursuant to Tenn. Code Ann. § 49-1-102. MSCS serves approximately 110,000 students in Shelby County, Tennessee. Its student population is comprised of approximately 94 percent racial minorities. MSCS is Tennessee's largest school district and one of the twenty largest public-school districts in the United States. MSCS's principal offices are located at 160 Glenn Rogers Sr. Street, Memphis, Tennessee 38112. The Board is the locally elected nine-member governing body of MSCS, constituted pursuant to Tenn. Code Ann. § 49-1-102(c). Members of the Board were elected by district voters to four-year staggered terms pursuant to Tenn. Code Ann. § 49-2-201(a)(1). The Board exercises absolute governing authority over MSCS, including adoption of the annual budget, approval of contracts, employment and dismissal of the superintendent, establishment of educational policy, and oversight of District operations. These functions constitute the substance of democratic school governance, the mechanism by which the voters of Shelby County exercise representative control over the education of their children.

11.     Plaintiff Board of County Commissioners of Shelby County is the county government of Shelby County, Tennessee, with its principal offices at 160 North Main Street, Memphis, Tennessee 38103. The Commission is a legislative body whose members are elected by district voters pursuant to Tenn. Code Ann. § 5-1-108, exercising independent fiscal authority over county funds, including the county school fund, pursuant to Tenn. Code Ann. §§ 5-9-401 *et seq*. The Commission's authority to appropriate and adopt the county budget is the primary mechanism

7

through which the elected representatives of Shelby County's taxpayers exercise democratic accountability over public education expenditures. Public Chapter 1057 subordinates that process to the unilateral approval of an unelected, state-appointed Oversight Board.

12.     Plaintiff Michelle Robinson McKissack is a duly elected member of the Memphis-Shelby County Board of Education representing District 1. She is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff McKissack brings this action in both her individual and official capacities.

13.     Plaintiff Natalie J. McKinney is a duly elected member of the Memphis-Shelby County Board of Education representing District 2 and serving as Board Chair. She is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff McKinney brings this action in both her individual and official capacities.

14.     Plaintiff Stephanie P. Love is a duly elected member of the Memphis-Shelby County Board of Education representing District 3. She is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff Love brings this action in both her individual and official capacities.

15.     Plaintiff Tamarques Porter is a duly elected member of the Memphis-Shelby County Board of Education representing District 4. He is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff Porter brings this action in both his individual and official capacities.

16.     Plaintiff Sable Otey is a duly elected member of the Memphis-Shelby County Board of Education representing District 5. She is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff Otey brings this action in both her individual and official capacities.

8

17. Plaintiff Sable Otey also brings claims on behalf of her minor children, A.O. and R.O. Ms. Otey's children are students within MSCS. A.O. is in Ninth Grade and R.O. is in Second Grade. Plaintiff Otey and her minor children are racial minorities.

18. Plaintiff Keith Williams is a duly elected member of the Memphis-Shelby County Board of Education representing District 6. He is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff Williams brings this action in both his individual and official capacities.

19. Plaintiff Towanna Murphy is a duly elected member of the Memphis-Shelby County Board of Education representing District 7. She is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff Murphy brings this action in both her individual and official capacities.

20. Plaintiff Towanna Murphy also brings claims on behalf of her minor child, E.R. Ms. Murphy's child is a student within MSCS. E.R. is in Sixth Grade. Plaintiff Murphey and her minor child are racial minorities.

21. Plaintiff Amber Huett-Garcia is a duly elected member of the Memphis-Shelby County Board of Education representing District 8. She is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff Huett-Garcia brings this action in both her individual and official capacities.

22. Plaintiff Joyce Dorse Coleman is a duly elected member of the Memphis-Shelby County Board of Education representing District 9 and serving as Vice Chair. She is a registered voter, resident, and taxpayer in Shelby County, Tennessee. Plaintiff Coleman brings this action in both her individual and official capacities.

9

23. Defendant Bill Lee is the Governor of the State of Tennessee. He is sued solely in his official capacity. Governor Lee signed Public Chapter 1057 into law and appointed five of the nine Oversight Board members, giving his appointees majority control over MSCS's budget, superintendent, and contracts. Governor Lee is an officer of the State engaged in implementing the challenged law and is subject to *Ex Parte Young* prospective relief.

24. Defendant Lizzette Reynolds is the Commissioner of Education of the State of Tennessee. She is sued solely in her official capacity. Under Public Chapter 1057, the Commissioner determines whether a Local Education Agency ("LEA") satisfies the triggering criteria and issues the written notice mandating establishment of an Oversight Board. Commissioner Reynolds serves as the primary administrative officer responsible for ongoing monitoring and administration of the challenged intervention, and Commissioner Reynolds has a direct and ongoing enforcement connection.

25. Defendant Cameron Sexton is the Speaker of the Tennessee House of Representatives. He is sued solely in his official capacity. Under Public Chapter 1057, Speaker Sexton appoints two of the nine members of the state-appointed Oversight Board. Defendant Speaker Sexton has an enforcement connection through his appointment authority over two Oversight Board members.

26. Defendant Randy McNally is the Lieutenant Governor and Speaker of the Tennessee Senate. He is sued solely in his official capacity. Under Public Chapter 1057, Lt. Gov. McNally appoints two of the nine members of the state-appointed Oversight Board. Defendant Lt. Gov. McNally has an enforcement connection through his appointment authority over two Oversight Board members.

27.     Defendant Billy Orgel is the Chair of the Educational Oversight Board of Memphis-Shelby County Schools. He is sued solely in his official capacity. Defendant Orgel was appointed to the Oversight Board by Defendant Lt. Gov. McNally pursuant to Public Chapter 1057. Defendant Orgel was appointed Chair of the Oversight Board by the other Oversight Board members on June 18, 2026.

28.     Defendant Shanea McKinney is Vice Chair of the Educational Oversight Board of Memphis-Shelby County Schools. She is sued solely in her official capacity. Defendant McKinney was appointed to the Oversight Board by Defendant Governor Lee pursuant to Public Chapter 1057. Defendant McKinney was appointed Vice Chair of the Oversight Board by the other Oversight Board members on June 18, 2026.

29.     Defendant Nisha Powers is a member of the Educational Oversight Board of Memphis-Shelby County Schools. She is sued solely in her official capacity. Defendant Powers was appointed to the Oversight Board by Defendant Governor Lee pursuant to Public Chapter 1057. Defendant Powers was appointed Secretary of the Oversight Board by the other Oversight Board members on June 18, 2026.

30.     Defendant Dedrick Brittenum Jr. is a member of the Educational Oversight Board of Memphis-Shelby County Schools. He is sued solely in his official capacity. Defendant Brittenum was appointed to the Oversight Board by Defendant Lt. Gov. McNally pursuant to Public Chapter 1057.

31.     Defendant Tyrone Burroughs is a member of the Educational Oversight Board of Memphis-Shelby County Schools. He is sued solely in his official capacity. Defendant Burroughs was appointed to the Oversight Board by Defendant Governor Lee pursuant to Public Chapter 1057.

32. Defendant Dorsey Hopson is a member of the Educational Oversight Board of Memphis-Shelby County Schools. He is sued solely in his official capacity. Defendant Hopson was appointed to the Oversight Board by Defendant Governor Lee pursuant to Public Chapter 1057.

33. Defendant David Mansouri is a member of the Educational Oversight Board of Memphis-Shelby County Schools. He is sued solely in his official capacity. Defendant Mansouri was appointed to the Oversight Board by Defendant Speaker Sexton pursuant to Public Chapter 1057.

34. Defendant Beverly Robertson is a member of the Educational Oversight Board of Memphis-Shelby County Schools. She is sued solely in her official capacity. Defendant Robertson was appointed to the Oversight Board by Defendant Governor Lee pursuant to Public Chapter 1057.

35. Defendant Karen Vogelsang is a member of the Educational Oversight Board of Memphis-Shelby County Schools. She is sued solely in her official capacity. Defendant Vogelsang was appointed to the Oversight Board by Defendant Speaker Sexton pursuant to Public Chapter 1057.

<b><u>FACTUAL ALLEGATIONS</u></b>

**I. MSCS, Its Students, and Its Elected Governance.**

36. MSCS serves approximately 110,000 students in Shelby County, Tennessee.

37. Its annual budget is approximately $1.8 billion.

38. The District employs more than 14,000 staff members.

39. The School Board exercises absolute authority over MSCS's budget, superintendent, contracts, real property, and educational policy—the single most consequential concentration of democratically accountable resource allocation in Shelby County government.

40. Plaintiff Sable Otey is a taxpaying resident of Shelby County.

41. Plaintiff Otey is a parent with two minor children, A.O. and R.O., attending schools in MSCS.

42. Plaintiff Otey and her children are racial minorities.

43. Plaintiff Towanna Murphy is a taxpaying resident of Shelby County.

44. Plaintiff Murphy is a parent with one minor child, E.R., attending school in MSCS.

45. Plaintiff Murphy and her child are racial minorities.

## II. A Pattern of Targeted State Intervention in Memphis's Schools.

46. Public Chapter 1057 is the latest episode in a decades-long pattern of state governance interventions targeting Memphis's schools.

47. In 2012, the General Assembly created the Achievement School District, a state-run entity designed to take control of the lowest-performing Tennessee schools.

48. In practice, the ASD operated almost exclusively in Memphis. Its goal was to move schools from the bottom 5 percent of statewide performance to the top 25 percent within five years.

49. After more than a decade, independent research documented no sustained academic improvement in ASD-controlled schools.

50. Under the State's own rating system, MSCS was a Level 5 district (the highest performance tier) while the ASD was Level 1 (the lowest)—the State was removing schools from a higher-performing governance environment and placing them in a lower-performing one at a cost of $2 billion in public funds.

51. The ASD was wound down by 2020. No state official was held accountable for its failures.

13

52. In 2013, following Memphis voters' 2011 approval of the surrender of the Memphis City Schools charter, Memphis City Schools and Shelby County Schools merged to form MSCS's predecessor entity, which was subsequently renamed to Memphis-Shelby County Schools.

53. In the years following, six suburban municipalities—Germantown, Collierville, Bartlett, Arlington, Lakeland, and Millington—formed separate school districts, withdrawing from MSCS and concentrating poverty and minority enrollment further within the District.

54. Thus, the structural conditions underlying MSCS's current performance profile are themselves the product of state policy choices, including the Tennessee Investment in Student Achievement ("TISA") funding formula that has not remedied the concentrated funding disadvantages produced by decades of resource disparity.

55. This sequence—the ASD's exclusive Memphis focus and failure without accountability, the merger, the suburban secessions concentrating poverty and minority enrollment in MSCS, and now Public Chapter 1057—constitutes a pattern of repeated state action restructuring governance of the school district serving Memphis without producing promised outcomes and without comparable action directed at majority-white districts.

**III. Public Chapter 1057: Structure, Authority, and Exclusive Application to MSCS.**

56. On January 13, 2026, Representative Mark White, the Chairman of the House Standing Committee of Education, and Senator Brent Taylor filed House Bill 662 and Senate Bill 714, which became Public Chapter 1057.

57. The statute creates an Oversight Board of nine members: five appointed by the Governor, two by the Speaker of the House, and two by the Speaker of the Senate.

58. Eight of the nine Oversight Board members must be Shelby County residents.

59. Not one Oversight Board member is elected by the voters of Shelby County.

60. The conference committee confirmed that no professional, educational, or experiential qualifications are required—the only criterion is county residency.

61. Members are removable at any time by their appointing authorities for any reason.

62. The conference committee further adopted a provision allowing the Speaker of the House to appoint one Oversight Board member from outside Shelby County, over Senator Raumesh Akbari's objection, who noted the asymmetry with the stated rationale of community representation.

63. No other Tennessee LEA oversight mechanism authorizes an appointing authority to name a board member with no connection to the affected community.

64. Under Public Chapter 1057, an Oversight Board is mandatory when an LEA satisfies four or more of six defined criteria: (1) Academic Proficiency—50 percent or more of students not proficient in both mathematics and English Language Arts on the most recently administered TCAP tests; (2) School Letter Grades—25 percent or more of schools received a D or F; (3) Chronic Absenteeism—25 percent or more of students chronically absent; (4) Persistent Priority School Designation—at least one school identified as a priority school for each of the preceding five consecutive years; (5) Financial Mismanagement—the Commissioner of Education determines that a comptroller-directed audit shows deficiencies in management or instances of fraud, waste, abuse, or financial mismanagement; and (6) Leadership Instability—the board employed more than two directors of schools on an interim basis in the preceding four years.

65. The Commissioner of Education makes the triggering determination.

66. As confirmed at the April 20, 2026 conference committee hearing, MSCS is the only LEA in Tennessee that currently satisfies all six criteria simultaneously, and Criteria 5 and 6 were specifically calibrated to ensure MSCS qualified.

15

67. The Oversight Board's authority is comprehensive:

    a. approve MSCS's annual budget before local adoption, with authority to reject or modify it;

    b. approve or reject all contracts at or above $50,000;

    c. hire, evaluate, and terminate the superintendent;

    d. override any MSCS Board decision to deny a charter school application;

    e. exercise authority over real property decisions;

    f. direct any action within the Board's authority or prohibit the Board from acting; and

    g. terminate any LEA employee, including the superintendent, with or without cause, with forfeiture of remaining contractual compensation upon termination for cause.

68. Additionally, the Oversight Board may appoint an executive committee or subcommittee with authority to act on its behalf, conduct meetings electronically, and hire up to three staff members or reassign LEA central office personnel to support board operations, with compensation drawn from LEA funds at the same rate as existing LEA employees.

69. The elected Board therefore exists in name only as it is stripped of the powers that define school governance .

70. The Oversight Board's initial term is four years, with mandatory automatic extension for an additional two years if the LEA continues to meet four or more criteria.

71. The conference committee rejected an amendment providing early-exit mechanism for an LEA that has sufficiently improved.

72. There is no mechanism for the elected Board to recover governing authority before the mandatory term expires, regardless of performance or improvement.

73. Public Chapter 1057 contains an anti-injunction tolling clause providing that if a court enjoins the Oversight Board's operation, the mandatory four-year period is paused and

resumes upon the injunction's lifting—ensuring the full four-year displacement is imposed regardless of how long judicial review takes.

74. The legislation expressly prohibits the Board from asserting any legal challenge to Oversight Board actions, stripping the institution of the resources needed for judicial review of potentially unlawful conduct.

75. Public Chapter 1057 establishes an "educational Oversight Board reserve fund" in the state treasury, with a nonrecurring appropriation of $500,000 to $1,000,000 for fiscal year 2026-2027.

76. The 2026 Funded Amendments and Bills summary labels the $1,000,000 appropriation "Memphis School Takeover." *See* **Exhibit 1**.

77. When a legislature funds an intervention under that heading, it has disclosed its own understanding that the facially neutral criteria are a vehicle for a predetermined target.

78. The Oversight Board held its first meeting on June 18, 2026 in Nashville, Tennessee.

79. At its inaugural meeting on June 18, 2026, the Oversight Board acknowledged that Public Chapter 1057 was unclear whether the Oversight Board is organized as a state board or local board.

80. The Oversight Board recognized that it must determine whether it is a state board or local board before resolving rulemaking obligations, communications infrastructure, and related public-access issues.

81. The Oversight Board further acknowledged that no official communications platform, including official email addresses for its members, had been established, creating

immediate uncertainty over how a state-appointed body exercising local governmental authority will maintain secure, transparent, and publicly accessible communications.

82. The Oversight Board also determined that it could not move forward without separate legal counsel, and that such legal representation likely would not be short-term.

83. The need for separate legal counsel is an immediate implementation cost created solely by Public Chapter 1057 and imposed in addition to the existing legal and administrative structures of MSCS and Shelby County.

84. The Oversight Board's funding mechanism is likewise unresolved. Oversight Board members discussed the need to coordinate with the Department of Finance and Administration and the Comptroller, to determine how state and local funds would be allocated, to determine whether the budget would need to be amended, and to identify the conduit through which local-government funds would be obtained.

85. These implementation issues confirm that Public Chapter 1057 immediately burdens local fiscal processes, diverts resources from local education governance to a state-appointed board, and forces Shelby County and MSCS to adjust their budgeting machinery to accommodate an intervention they did not request and cannot control.

86. The Oversight Board is set to officially assume its role on July 1, 2026.

87. At the June 18, 2026 meeting, the Oversight Board recognized that, while school decisions were being made at the end of June, it would not begin operating until July 1, 2026, providing the Oversight Board with only fifteen days to review, approve, or reject those decisions, requiring special-called meetings if necessary.

88. Public Chapter 1057 therefore produces immediate governance instability: elected officials must continue making time-sensitive school decisions while a newly constituted state-

appointed body prepares to review and potentially undo those decisions on an accelerated timetable and without the appropriate organizational infrastructure in place to do so.

**IV.    The Forensic Audit as Targeting Instrument.**

89.    A forensic audit of MSCS is being conducted by the Tennessee Comptroller that costs the State over $8 million.

90.    The forensic audit is being conducted by CliftonLarsenAllen LLP ("CLA").

91.    The forensic audit is directed exclusively at MSCS.

92.    The forensic audit is intended to be a sweeping, state-funded investigation into the MSCS's financial and operational management from fiscal years 2022 through 2024.

93.    Comptroller Jason Mumpower testified at the April 20, 2026 hearing that MSCS is the only LEA in Tennessee's history to have been subjected to a legislatively directed forensic audit.

94.    Despite that for years MSCS has been provided with clean audits, Comptroller Mumpower confirmed that no other forensic audit had been ordered for LEAs—including even those LEAs that produced documented, repeated, and extreme audit findings of financial mismanagement such as budget imbalances, IRS penalties, and capital asset discrepancies, like those documented in Polk County or Maury County.

95.    In early February 2026, Republican legislators received a confidential briefing from the Comptroller on preliminary audit findings.

96.    The Comptroller's office simultaneously advised that the findings were not final and not evidence of fraud. MSCS had no contemporaneous opportunity to review or respond to the preliminary audit findings.

97. On February 4, 2026, House Speaker Cameron Sexton, after receiving this briefing, stated that "the audit further tells us that the House version is correct, which is a total *takeover* of the Memphis-Shelby County school system." (emphasis added).

98. On or about April 1, 2026, the Interim Forensic Audit Report (the "Interim Audit Report") was released.

99. The Interim Audit Report findings fundamentally contradict Speaker Sexton's characterization.

100. Across every major testing area, the auditors with CLA expressly concluded that they *did not identify evidence of fraud*.

101. With regard to journal entry testing and travel reimbursement testing, CLA did not identify evidence of fraud, waste, or abuse.

102. With regard to professional services contract testing, CLA did not identify evidence of fraud or intentional malfeasance.

103. With regard to bank statement and disbursement testing, CLA concluded that the expenses reviewed generally represented legitimate District business activities.

104. With regard to charter school leadership, CLA's review did not identify any noncompliance, significant concerns, or notable issues with MSCS's conflicts of interest policy 4003, pursuant to Tenn. Code Ann. § 49-6-2003.

105. With regard to suspicious accounts analysis, CLA did not identify evidence of off-the-books, dummy, or temporary accounts.

106. The forensic audit directed at MSCS, and used as the predicate for the Commissioner's determination as to Criterion 5, found no fraud.

107. The total amount identified in the Interim Audit Report as potentially consistent with "waste and abuse" was approximately $1,145,909.97 over three years—approximately 0.02 percent of MSCS's operating budget over the same three-year period.

108. Any identified deficiencies in the Interim Audit Report findings consisted of record management and documentation deficiencies, not misappropriation or diversion of funds.

109. The largest single category of potential deficiencies in the Interim Audit Report involved missing signatures on invoices where underlying transactions had been approved through the Advanced Proportional Engine Controls System, or APECS, electronic system.

110. Other findings included: one former employee who continued receiving a salary for approximately four months after separation ($21,343.36); one duplicate vacation payout ($11,816.61); and executive coaching contracts that may have duplicated services already available through existing membership benefits ($45,000 to $75,000).

111. These are administrative oversights that occur in large organizations. They do not constitute evidence of systemic corruption justifying governance displacement of a $1.8 billion institution serving 110,000 students.

112. The Interim Audit Report confirmed that the purported documentation deficiencies were attributable to staff reductions and turnover, not to Board malfeasance or intentional concealment.

113. The Interim Audit Report states that "MSCS leadership communicated that the Board approved the previous superintendent's plans to eliminate over 1,000 District positions" due to following the sunset of COVID relief act funds and the need to reduce the budget to pre-COVID levels.

114. The Interim Audit Report further notes that "[i]nterviews revealed a lack of understanding of the key positions that were needed by MSCS and therefore, many positions that were cut were necessary for the District." District management explained that "the HR office has gone through several changes in the last few years and at one point approximately 50 percent of the staff was lost." These circumstances—loss of institutional knowledge following federally driven budget reductions—explain the records-management gaps the forensic audit identified.

115. The audit's findings regarding governance and ethics further undermine the State's justification The Interim Audit Report concluded that "it appears that the Board generally demonstrated adherence to key governance and ethics requirements during the forensic audit period."

116. The isolated compliance deficiency findings involved minor lapses in timely filing of disclosure forms that were subsequently located and submitted, and one Board member receiving a formal reprimand for inappropriate conduct—a reprimand that demonstrates the Board's accountability mechanisms were functioning, not failing. The audit found no systemic governance failures by the elected Board.

117. Comptroller Mumpower's testimony revealed a fundamental inconsistency in the State's application of audit standards.

118. Comptroller Mumpower's characterized the forensic audit findings as "the worst audit findings his office has seen from any local government in his tenure and his audit director's 45-year career"—yet the auditors themselves expressly concluded they did not identify evidence of fraud in any major testing area.

119. Comptroller Mumpower further acknowledged that for years, MSCS's annual audits conducted by Watkins Uiberall, PLLC returned clean results under the State's supervisory framework.

120. Comptroller Mumpower met with Watkins Uiberall staff and stated he would have expected basic internal control deficiencies by MSCS to appear in their standard work.

121. MSCS was thus permitted, through a state-supervised audit framework, to receive clean certifications for years, then subjected to governance takeover in part on the basis of purported deficiencies that the State's own audit oversight system failed to detect.

122. Imposing governance displacement on an institution for purported failures that the State's own supervisory mechanisms facilitated via the state-approved in-house audits and failed to detect or disclose raises serious concerns and is further evidence that the audit criterion was incorporated as pretext rather than neutral accountability.

## V.      The April 20, 2026 Conference Committee Hearing.

123. When a Tennessee Department of Education ("TDOE") representative was asked how the four-of-six threshold was determined and whether it was set in consultation with TDOE, his response was a single word: "No."

124. The threshold was not derived from a data-driven, statewide analysis of what level would appropriately trigger intervention; it was set by the sponsors themselves.

125. Senator Akbari observed on the record at the hearing: Criteria 5 and 6 "were clearly crafted just to make sure you engineered only Memphis and Shelby County schools."

126. Representative Parkinson moved to amend the conference report to remove Criteria 5 and 6 and lower the threshold to three-of-four original criteria.

127. Representative Parkinson further moved to adopt the advisory board model previously authorized for Hamilton County Schools—a less coercive intervention preserving local democratic governance while providing structured external support.

128. The Republican majority rejected both of Representative Parkinson's motions.

129. TDOE Deputy Commissioner Sam Piercey testified that Tennessee's school turnaround model has not yet had sufficient time to demonstrate results.

130. The General Assembly's decision to impose total governance displacement while simultaneously acknowledging that its own recently enacted turnaround intervention has not had the opportunity to produce results is not the behavior of a legislature acting on a good-faith assessment of what intervention will produce academic improvement

## VI. MSCS's Local Accountability Alternative: A Credible Response the State Ignored.

131. On March 5, 2026, the MSCS Board publicly proposed creating a local accountability oversight council—a community-led body providing transparency, governance accountability, and academic improvement oversight without displacing elected leadership.

132. The proposal was jointly announced by Board Chair McKinney, Shelby County Mayor Lee Harris, and U.S. Representative Steve Cohen.

133. The District was simultaneously engaging with TDOE's Division of School Turnaround on improvement planning.

134. The State's advancement of Public Chapter 1057 in the face of this credible alternative is probative evidence that the actual purpose was not academic improvement.

135. At the April 20, 2026 committee hearing, Representative Parkinson moved to amend the conference report to adopt the advisory board model previously authorized for Hamilton County Schools.

24

136. The Republican majority rejected Representative Parkinson's proposed amendment.

137. The State's willingness to use a collaborative advisory model for Hamilton County and its insistence on total takeover for MSCS cannot be explained on academic grounds.

## VII. The County's Fiscal Authority and the Budget Cascade.

138. Under Public Chapter 1057's budget certification mechanism, the Shelby County Commission cannot adopt its own annual budget until the Oversight Board has approved the school board's proposed budget and the school board chair has certified that approval.

139. If the Oversight Board vetoes the budget, the Shelby County Commission's budget process is suspended.

140. Representative Parkinson identified this consequence on the House floor and stated: "This bill not only gives [the Oversight Board] full oversight and authority over school boards, duly elected school board members, but it also inadvertently gives them oversight over your county commission as well." He characterized this as "an oversight" that was "not well thought out."

141. The majority did not dispute Representative Parkinson's characterization and did not correct it before enactment of Public Chapter 1057.

142. Further, the nine Oversight Board members are compensated from LEA funds at the same rate as elected Board members, including salary and benefits.

143. Additionally, up to three additional staff members are compensated from LEA funds.

144. The dual compensation structure imposed by Public Chapter 1057 inflicts additional fiscal injury on the County.

25

145. The conference committee acknowledged no fiscal note analysis had been prepared for this dual compensation structure and approved no mechanism ensuring these costs are borne by the State rather than deducted from MSCS's educational budget.

**VIII. The Ban on Litigation and Public Chapter 818.**

146. Public Chapter 1057 prohibits the Board from: (1) asserting a cause of action; (2) intervening in any cause of action; or (3) providing funding for any cause of action challenging any Oversight Board action.

147. Almost simultaneously, the General Assembly enacted Public Chapter 818, which prohibits any LEA from using public funds to initiate or maintain any civil action against the State challenging a school or district accountability measure.

148. Senator Brent Taylor stated on Facebook: "MSCS BOARD OUTSMARTED — Breaking News: Governor Lee signs bill to keep school districts from suing to stop state accountability measures." Brent Taylor, FACEBOOK (April 21, 2026, at 8:09 PM CT), https://www.facebook.com/BrentTaylorTN/posts/pfbid02nwCcXcamsHpqLmNjFux7UuWPb2w acgMNZetCo4Q341YK8MxWfsm9QcwTzv2C5C78l.

149. Together, Public Chapter 1057's ban on litigation and Public Chapter 818 create a complete institutional litigation blackout.

150. Public Chapter 818 does not apply symmetrically—it prohibits LEAs from challenging state accountability measures but does not prohibit LEAs from litigating in support of state accountability measures.

151. A law that prohibits one side of a legal dispute from funding its own case while leaving the other side free to litigate is not a neutral funding restriction.

152. These provisions were designed from the outset to prevent judicial scrutiny of legislation the General Assembly knew was constitutionally vulnerable.

26

153. MSCS receives public funds as a matter of statutory entitlement, not discretionary grant.

154. Tennessee law requires the State to fund public education through the TISA formula and requires county governments to appropriate funds to LEAs.

155. These funding streams are not conditioned on compliance with litigation prohibitions under existing Tennessee law.

156. Public Chapter 818 imposes a new condition on the receipt of those non-discretionary public funds: surrender the right to challenge state accountability measures in court.

## IX. The April 22, 2026 Floor Debates.

157. On April 22, 2026, the Tennessee House voted to adopt the conference committee majority report by a vote of 73 to 19 and rejected the minority report 13 to 72.

158. Representative Parkinson, a member of the conference committee and sponsor of the minority report, stated: "In order for us to avoid this legislation being deemed unconstitutional, and us coming back here for a special session, and us costing the taxpayers more money because we have to come back here for a special session and undo an unconstitutional piece of legislation, what mine does is remove the unconstitutional portions of the legislation."

159. Representative Parkinson identified Criteria 5 and 6 by name as unconstitutional and "specifically pertain[ing] to Shelby County."

160. Representative Parkinson concluded: "So while this bill is written as if it applies broadly in practice, it narrows and narrows and narrows until it lands on a single district, Memphis and Shelby County Schools. This is not a general law in effect. This is targeted application."

161. The minority report would have eliminated Criteria 5 and 6, applied a threshold of three of the remaining four criteria, implemented the Hamilton County collaborative advisory

model as a first-tier intervention, provided an automatic exit mechanism, and incorporated the full Oversight Board only as a second-tier mechanism if the advisory model failed after four years.

162. As stated by Representative Parkinson, "[t]he minority report provides oversight through transparency, review, and accountability, but it keeps decision-making power where it belongs, with the elected officials chosen by the people."

163. Representative John Ray Clemmons addressed the House during floor debate and confirmed the community-centered character of the Hamilton County model.

164. Representative Clemmons stated that the approach was designed to "let the people closest to the young people have a voice in that committee, that group that is making the decisions" and expressed hope that persons "closest to the children in Shelby County" would be permitted to participate in a similar structure.

165. During floor debate, Representative Larry Miller stated: "You want to control a multi-billion-dollar operation that's in the hands of elected individuals, which happen to be a majority African American community. That's your real purpose."

166. Chairman White denied this characterization but did not address the absence of comparable governance action against other districts with documented financial mismanagement and academic underperformance.

167. Representative Miller further established that the completed 25 percent of the audit revealed approximately $1 million in discrepancies over three years within a multi-billion-dollar institution, while the State had spent $9 million to produce that finding.

168. When asked at the hearing "What if, in fact, the 75 percent comes out positive?" Chairman White did not answer. He stated the General Assembly "can't wait any longer."

169. Representative Parkinson placed before the House that MSCS had received an "advancing" designation from TDOE, reflecting progress across key metrics including achievement, growth, graduation rate, chronic absenteeism, and English learner progress.

170. No member of the majority disputed that characterization.

171. In the Senate, Senator Jeff Yarbro stated that the original legislation contained exactly two criteria and that the additional criteria created "a whole raft of criteria through which only Memphis City Schools can pass."

172. Senator Yarbro characterized the set of criteria as a "mirage" designed to create the appearance of general application, called it "one of the most embarrassing things this legislature's done," and stated that the General Assembly itself "shackled that governance" by enabling suburban secessions that amounted to "effective segregation."

173. Senator Yarbro noted MSCS "has some of the most impressive growth rates of any of our schools."

174. Senator Yarbro further identified that Criteria 5 and 6 are "entirely discretionary" and "not objective at all," stating that even if another district has "two in a row school directors in a four-year period," that alone "is not a trigger for any other district unless the Commissioner of Education makes a subsequent determination."

175. Senator Yarbro observed that the performance metrics used in the legislation "just measure demographics"—"if you just chart performance in third grade against poverty levels in Tennessee, that is effectively a straight line" and the "list of priority schools across the state is basically a way to identify areas of concentrated poverty."

**X.     The Commissioner's Triggering Determination.**

176.    On May 22, 2026—the same day Governor Lee signed the bill into law—Commissioner Reynolds transmitted a letter to the School Board purporting to notify MSCS that it "meets four or more of the six criteria." *See* **Exhibit 2**.

177.    The letter was transmitted by email to boardoffice@scsk12.org and copied to Governor Lee, Senate Speaker Randy McNally, and House Speaker Cameron Sexton. No opportunity to respond, contest, or cure was afforded before the Oversight Board appointment mechanism was activated.

178.    Commissioner Reynolds' letter is two pages.

179.    The operative determination from Commissioner Reynolds' letter occupies two sentences.

180.    Commissioner Reynolds' letter identifies no specific criteria as satisfied, cites no supporting data, makes no findings of any kind, and attaches no administrative record.

181.    The determination that MSCS meets four of six criteria is factually unsupportable on its face because the data required to evaluate several criteria for the most recently completed school year had not been compiled, finalized, or publicly released as of the date of the letter.

182.    The 2025-2026 TCAP proficiency data (Criterion 1), the 2025-2026 school letter grades (Criterion 2), and the 2025-2026 chronic absenteeism data (Criterion 3) were all unavailable.

183.    Commissioner Reynolds' letter does not disclose which school year's data the Commissioner relied upon.

184.    Regarding Criterion 5 (Financial Mismanagement): the letter makes no reference to any audit, identifies no audit findings, and cites no specific deficiency. As of the date of this

30

Complaint, no completed audit exists. An incomplete audit produces no "findings" within the meaning of the statute.

185. An audit in progress is, by definition, an audit whose conclusions remain unverified, whose fieldwork remains open, and whose institutional review processes—including management response and exit conference—have not been completed.

186. Commissioner Reynolds cannot determine that audit "findings show deficiencies" when the audit has produced no final findings to evaluate.

187. If Commissioner Reynolds relied on interim or draft audit observations—neither of which constitutes "findings" under any standard definition of government auditing practice or Tennessee Comptroller procedure—she applied an incomplete, unverified, and unadopted evidentiary predicate to strip an elected board of its governance authority.

188. MSCS had no notice that preliminary audit observations, short of a final published report, would be treated as trigger-qualifying "findings" under the statute.

189. Regarding Criterion 6 (Leadership Instability): the letter does not identify a single interim director by name, does not state how many interim directors MSCS employed, and makes no finding that any pattern of interim leadership "resulted in inconsistent district leadership and operational instability" as the statute requires.

190. The causation requirement embedded in Criterion 6 is not a ministerial checkbox. It is a substantive finding requiring the Commissioner to evaluate actual operational impact: continuity of academic programming, administrative capacity, budget execution, staff retention, and governance stability. None of those considerations are addressed anywhere in the Commissioner's letter because no such analysis was performed.

191. On information and belief, no independent analysis of MSCS's interim leadership history was performed before issuance of Commissioner Reynolds' letter.

192. The absence of any stated findings, evidentiary basis, or administrative record renders the triggering determination unreviewable on its face and confirms that the letter was not the product of deliberate, evidence-based evaluation but rather a coordinated predicate act timed to the bill's signing.

## XI. The *Arlington Heights* Factors Establish That the General Assembly Acted with a Discriminatory Purpose.

193. Public Chapter 1057 is facially neutral. To invoke heightened scrutiny for a facially neutral law under the Equal Protection Clause, Plaintiffs must plausibly allege discriminatory purpose under the five *Arlington Heights* factors. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–68 (1977). The following documented facts establish such purpose.

**Factor 1: Disparate Impact.**

194. Public Chapter 1057 applies in functional effect to MSCS alone.

195. MSCS's student population is approximately 94 percent racial minorities.

196. Shelby County's electorate (i.e., residents of voting age) is approximately 60 percent racial minorities.

197. The governance displacement falls exclusively on a majority-Black school district, majority-Black school board, and majority-Black electorate.

198. No majority-white Tennessee school district is subject to comparable governance displacement or legislatively directed forensic audit.

199. The impact extends to county fiscal governance through the budget cascade mechanism, subordinating the Commission—an elected body chosen by the same majority-Black electorate—to Oversight Board approval.

32

**Factor 2: Historical Background.**

200. The relevant sequence includes: (a) the ASD's creation in 2012 exclusively targeting Memphis schools; (b) the merger dynamics of 2013 driven by inequitable state funding; (c) post-2013 suburban secessions concentrating poverty and minority enrollment without state intervention; (d) the ASD's failure and wind-down without accountability; and (e) Public Chapter 1057.

**Factor 3: Sequence of Events.**

201. The intervention criteria were calibrated to MSCS's actual performance data rather than derived from a neutral statewide analysis.

202. When asked whether the four-of-six threshold was set in consultation with TDOE, the answer was "No."

203. Criteria 5 and 6 were not in the original 2025 legislation—they were added specifically to ensure MSCS qualified.

204. The forensic audit was directed at MSCS alone and invoked when only 25 percent was completed.

205. The State's own TDOE designated MSCS as "advancing," yet the General Assembly proceeded with total governance displacement while rejecting the less-restrictive Hamilton County advisory model.

206. MSCS's advancement is reflected in the test scores from the State's standardized testing, the TCAP. On June 24, 2026, TDOE released data from the 2025-2026 TCAP testing. For example, the 2026 data showed that Third Graders in MSCS have improved their reading scores every year since 2023 by a total of over 32 percent. To take another example, the percentage of

33

students who scored "proficient" or higher on Language Arts was higher in 2026 than in any of the previous ten years.

207. Hamilton County's student population is predominately white.

208. Hamilton County's voting electorate is predominately white.

**Factor 4: Departures from Normal Procedure.**

209. The following are departures from normal procedures:

a. The state directed an $8–9 million forensic audit at a single majority-Black school district—confirmed as the only such audit in Tennessee history—while majority-white districts with documented worse audit findings (Maury County: $4.6 million budget imbalance, $371,000 IRS penalties, $20 million in discrepancies; Polk County: multiple unclean audits; Overton County: unauthorized expenditures and $1 million in audit adjustments) received no forensic audit or governance intervention.

b. Preliminary audit findings were shared exclusively with the Republican caucus before MSCS could review or respond.

c. The State's own audit oversight system permitted clean certifications for years, then imposed governance displacement based on purported deficiencies that system failed to detect.

d. The General Assembly rejected an early-exit amendment to Public Chapter 1057.

e. The General Assembly rejected implementation of the Hamilton County advisory model, a majority-white district, instead imposing total governance displacement on MSCS, a majority-Black district.

f. Public Chapter 1057 incorporated substantive new provisions without prior notice to MSCS.

g. The budget cascade consequence was identified yet enacted without correction.

**Factor 5: Legislative History and Contemporary Statements.**

210. The following statements establish purposeful targeting:

a. Speaker Sexton's "total takeover" declaration.

b. Senator Akbari's statement that Criteria 5 and 6 "were clearly crafted just to make sure you engineered only Memphis and Shelby County schools."

c. Representative Parkinson's floor statement that those criteria are unconstitutional and "specifically pertain to Shelby County."

d. Representative Miller's direct statement: "You want to control a multi-billion dollar operation that's in the hands of elected individuals, which happen to be a majority African American community. That's your real purpose."

e. Chairman White's unsupported "guarantee" about future audit findings.

f. The General Assembly's appropriations labeling the $1,000,000 allocation "Memphis School Takeover."

g. The majority's failure to address Representative Parkinson's challenge that members "ran on smaller government" yet voted to "expand more government by putting this board in place."

h. Senator Yarbro's characterization of the criteria as a "mirage" and the legislation as "one of the most embarrassing things this legislature's done."

211. Taken together, these five factors present a coherent pattern converging on a single explanatory inference: the legislation was designed to reach MSCS, and MSCS was reached because of its identity as the school district serving Memphis's majority-Black community.

212. The structural architecture of Public Chapter 1057 confirms its character as an instrument of control over a majority-Black institution, not neutral educational administration. A

legislature that funds an intervention under the heading "Memphis School Takeover," imposes no qualifications on appointees, permits at-will removal by appointing authorities, grants unchecked discretionary authority to direct or prohibit any action within the elected Board's authority, strips judicial review through a ban on litigation, allows an out-of-county appointee over objection, and pre-neutralizes injunctive relief through an anti-injunction tolling provision has not designed an educational accountability mechanism. It has designed a takeover.

## XII.    Plaintiffs Will Suffer Immediate, Concrete, and Irreparable Harm.

213.    Plaintiffs will suffer immediate, concrete, and irreparable harm if the requested relief is not granted. No adequate remedy at law exists.

214.    Once the Oversight Board is constituted and takes consequential action—approving or rejecting a budget, executing a contract, terminating the superintendent—those actions cannot be meaningfully undone.

215.    MSCS's operational continuity will be immediately impaired.

216.    For instance, under Public Chapter 1057, MSCS cannot enter into, renew, or amend any contract with a total value of fifty thousand dollars ($50,000) or more unless the contract is first submitted to the Oversight Board, which can approve such contract, reject such contract or hold such contract for up to fifteen business days without acting.

217.    This process creates complete deadlock at a time when numerous contracts are being negotiated and executed by MSCS in anticipation of the new school year, which begins in less than five weeks.

218.    Additionally, the Oversight Board can require SCBOE or the MSCS Superintendent to take any discretionary action with the SCBOE or the Superintendent's authority and may likewise prohibit SCBOE or the Superintendent from taking any action within their authority.

219. The District operates on an annual budget cycle which is well underway, yet Public Chapter 1057 ostensibly provides the Oversight Board authority to veto the currently proposed 2027 budget and to prevent the Shelby County Commission from adopting its own budget until such time as the Oversight Board approves a new budget.

220. The Board's loss of meaningful governing authority is a constitutional injury not compensable by damages.

221. The right of the electorate to vote for school board members who actually exercise governance authority cannot be restored through retroactive litigation after years of nullification.

222. The Individual Board Member Plaintiffs will each suffer distinct, personal, and irreparable harm as elected officials, registered voters, taxpayers, and—for Plaintiffs Otey and Murphy—as parents of children attending MSCS schools.

223. The County faces distinct irreparable harm from the budget cascade mechanism. The Shelby County Commission's annual budget funds the county school fund, the public safety fund, the health services fund, the infrastructure fund, and other essential county functions.

224. Governance paralysis caused by an Oversight Board budget veto would cascade through the County's entire fiscal operations and cannot be undone retroactively.

225. Critically, denial of preliminary relief would permanently foreclose MSCS's access to the courts.

226. Once Public Chapter 1057 takes effect, the ban on litigation prohibits the Board from asserting or funding any challenges to the law.

227. Public Chapter 818 separately prohibits MSCS from using public funds to maintain any civil action challenging Title 49 accountability measures.

228. Together, Public Chapter 1507 and Public Chapter 818 ensure that if preliminary relief is denied, MSCS will be permanently stripped of the institutional and financial resources to pursue this constitutional challenge.

229. The balance of equities and public interest favor relief. The harm to Defendants from a preliminary injunction is comparatively limited.

230. The State's asserted interest in academic improvement can continue through existing mechanisms: (a) TDOE designated MSCS as "advancing" across every key metric; (b) MSCS is engaging with the Division of School Turnaround; (c) MSCS proposed a local accountability oversight council; and (d) the minority report offered the Hamilton County collaborative advisory model.

231. A member of the conference committee publicly characterized the enacted legislation as unconstitutional on the day of enactment, which weighs heavily in favor of preliminary relief.

232. The public interest is served by judicial review of legislation raising substantial constitutional questions, not by permitting potentially unconstitutional governance displacement before those questions are answered.

233. The public interest is further served by avoiding a repetition of the ASD experiment, which consumed $2 billion in public funds over nearly a decade without producing sustained academic gains and, as Representative Parkinson established on the floor, moved students from a Level 5 district into a Level 1 district.

234. The County's equities independently favor injunctive relief.

235. The County received no notice that its independent fiscal authority was being targeted for subordination, never voted to subordinate its budget authority, and the budget cascade was characterized on the floor as an inadvertent "oversight."

## CAUSES OF ACTION

### COUNT ONE
**Violation of the Equal Protection Clause of the Fourteenth Amendment
of the United States Constitution**
*(Brought by Shelby County Government, Memphis-Shelby County Board of Education, and Plaintiffs Otey and Murphy on behalf of their Children A.O., R.O., and E.R.)*

236. The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

237. The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution prohibits state action taken because of, not merely in spite of, adverse effects upon a racial group.

238. A facially neutral law, like Public Chapter 1057, may be challenged as racially discriminatory by demonstrating discriminatory intent or purpose through an analysis of the five *Arlington Heights* factors: (1) disparate impact; (2) historical background; (3) sequence of events; (4) departures from normal procedure; and (5) legislative history and contemporary statements. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–68 (1977).

239. As alleged above, specific documented events and statements from the public record, confirmed by the April 20, 2026 conference committee hearing the April 22, 2026 House floor debate evidence the General Assembly's the discriminatory purpose:

    a. Representative Miller's statement that the majority's "real purpose" was to "control a multi-billion dollar operation . . . which happen to be a majority African American community";

    b. Representative Parkinson's narrowing-funnel presentation showing criteria narrow from 80 percent of districts to one district;

39

c. Representative Parkinson's identification of Criteria 5 and 6 as unconstitutional and pertaining only Shelby County;

d. Senator Akbari's statement that Criteria 5 and 6 "were clearly crafted just to make sure you engineered only Memphis and Shelby County schools";

e. Speaker Sexton's "total takeover" declaration;

f. the forensic audit directed exclusively at MSCS;

g. Chairman White's unsupported guarantee about future audit findings ;

h. the General Assembly's "Memphis School Takeover" label;

i. the rejection of the Hamilton County advisory board alternative;

j. the ASD's history of documented failure; and

k. the unbroken historical sequence of Memphis-specific interventions.

240. Because Public Chapter 1057 disparately impacts minority schoolchildren, it is subject to strict scrutiny.

241. The State cannot demonstrate a compelling interest served by the exclusive targeting of a majority-Black school district for governance displacement using criteria calibrated to that district's data alone, following a decade of documented failure of a comparable state governance experiment in the same district, and against the availability of a credible less-restrictive alternative.

242. Plaintiffs are entitled to declaratory and injunctive relief pursuant to 42 U.S.C. § 1983.

## COUNT TWO
**Violation of the Equal Protection Clauses in Article I, Section 8 and Article XI, Section 8 of the Tennessee Constitution**
*(Brought by Shelby County Government, Memphis-Shelby County Board of Education, and Shelby County Commissioners)*

243. The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

40

244. The full text of Article I, Section 8, of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land."

245. The full text of Article XI, Section 8, of the Tennessee Constitution states as follows:

> The Legislature shall have no power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunities, or exemptions other than such as may be, by the same law extended to any member of the community, who may be able to bring himself within the provisions of such law. No corporation shall be created or its powers increased or diminished by special laws but the General Assembly shall provide by general laws for the organization of all corporations, hereafter created, which laws may, at any time, be altered or repealed and no such alteration or repeal shall interfere with or divest rights which have become vested.

*Id.*

246. Public Chapter 1057 treats the Shelby County Government and the SCBOE differently than any other municipality and school board in the State for no rational purpose.

247. The State cannot demonstrate a rational basis for displacing elected governance of MSCS by state-appointed officials when:

   a. the State's own most recent Memphis-specific governance experiment, the ASD, produced no sustained academic gains after a decade of operation;

   b. the State's newly enacted turnaround model, which DOE testified is currently deployed in several of the same underperforming LEAs, has not been given the opportunity to produce results;

   c. MSCS has offered a credible local accountability alternative; and

   d. the State cannot identify any empirical basis for concluding that state-appointed board governance produces better academic outcomes than democratic local governance.

41

248. A state may not rationally repeat an experiment it knows has failed and call it rational policy.

249. The six triggering criteria are individually and collectively irrational as measures of governance failure warranting state displacement.

250. Criterion 1 triggers at 50 percent dual-subject non-proficiency—a threshold the TDOE testified 80 percent of Tennessee districts satisfy.

251. A metric identifying four out of five school districts does not indicate extraordinary failure warranting state displacement.

252. The dual-subject simultaneous requirement was not derived from research establishing that simultaneous failure across both subjects indicates a categorically more serious governance breakdown.

253. The dual-subject simultaneous requirement was derived from MSCS's specific performance profile.

254. Criterion 2 triggers at 25 percent D or F school grades—a threshold the TDOE testified 50 percent of districts satisfy.

255. A threshold met by half of the state's school districts does not delineate extraordinary failure warranting governance displacement.

256. The 25 percent threshold lacks any empirical basis for the conclusion that the 25 percent level—rather than 30 percent, 40 percent, or 50 percent—represents the point at which school-level grading outcomes reflect a governance failure so severe that displacing the elected board is the rational response.

257. No such basis exists for the threshold because the 25 percent figure was chosen to match MSCS's profile.

258. Criterion 3 triggers at 25 percent chronic absenteeism in the most recent school year—a threshold the TDOE testified that 7 percent of Tennessee school districts satisfy.

259. Chronic absenteeism is driven by poverty concentration, transportation, housing instability, and family economic circumstances—conditions that governance displacement does not address and that an unqualified state-appointed board has no demonstrated capacity to remedy.

260. The use of chronic absenteeism as a governance displacement trigger, without any demonstrated causal relationship between the form of governance and the rate of absenteeism, is not rational policy. It is the intentional inclusion of a metric that only MSCS satisfies.

261. Criterion 4 triggers when a single school managed by the LEA has maintained a priority school designation for each of the five immediately preceding years.

262. A single persistently failing school in a district of 150 schools is not rational evidence that the district's elected governance has failed in a manner warranting displacement of the entire governing board.

263. The General Assembly's own recently enacted school turnaround framework, as confirmed by DOE testimony at the April 20, 2026 hearing, operates at the school level precisely because underperformance is a school-specific condition responsive to school-specific intervention.

264. A criterion that attributes a single school's persistent underperformance to the governance failure of the entire LEA, without any inquiry into whether the LEA's governance caused that underperformance or whether school-level intervention has been attempted and exhausted, does not rationally measure the condition it purports to identify.

265. Criterion 5 vests unlimited subjective determination in the Commissioner, with no statutory standard governing what level of deficiency in management, accounting, or internal

controls, or what frequency of instances of fraud, waste, abuse, or financial mismanagement warrants a determination.

266. A standard with no content produces no meaningful distinction—it produces whatever result the Commissioner chooses to produce.

267. Criterion 5 is not a governance failure metric. It is a solely gubernatorially-controlled trigger.

268. The irrationality of criterion five is compounded by the circumstances of its application to MSCS. The forensic audit that serves as the factual predicate for MSCS's satisfaction of criterion five was only 25 percent complete when the legislation was advanced for final passage. Invoking an audit-based governance displacement trigger on the basis of findings representing one quarter of the audit's scope, before the audit is complete is not the application of a rational diagnostic criterion to measure evidence of governance failure. It is the use of an incomplete evidentiary record to justify a conclusion the General Assembly had already reached.

269. Criterion 6 counts interim superintendent appointments without inquiry into their cause.

270. A superintendent who dies in office, resigns for personal reasons, or is recruited to another position creates an interim appointment that counts toward the criterion's threshold without reflecting any governance failure.

271. The criterion cannot distinguish between boards that drove out superintendents and boards that experienced normal leadership transitions.

272. The four-of-six criteria framework is irrational as a system because it treats heterogeneous conditions—academic performance, attendance, financial management, and leadership instability—as arbitrary inputs to a single governance-failure score.

273.     The four-of-six criteria framework does not consider any inquiry into whether the conditions actually reflect governance failure rather than structural demographics and resource constraints.

274.     Taken together, the six criteria do not measure governance failure. They measure a performance profile determined by poverty and prior state policy choices, repackaged as evidence that MSCS's elected governance has failed.

275.     Plaintiffs request that the Court enter a declaratory judgment holding Public Chapter 1057 unconstitutional under the Equal Protection Clauses in Article I, Section 8, and Article XI, Section 8, of the Tennessee Constitution and an order enjoining its enforcement.

**COUNT THREE**
**Violation of the Tennessee Constitution, Article XI, Section 9**
**Home Rule: An Act Local in Effect**
*(Brought by Shelby County Government and Shelby County Commissioners)*

276.     The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

277.     Article XI, Section 9 of the Tennessee Constitution provides that any act of the General Assembly private or local in form or effect applicable to a particular county shall be void and of no effect unless the act by its terms either requires the approval by a two-thirds vote of the local legislative body of the county or requires approval in an election by a majority of those voting in said election in the county affected. Tenn. Const. Art. XI, § 9.

278.     Any legislation that omits local approval language required by the Local Legislation Clause is "absolutely and utterly void." *Farris v. Blanton*, 528 S.W.2d 549, 551 (Tenn. 1975).

45

279.     Public Chapter 1057 is local in form and effect as applied to Shelby County, for the reasons set forth throughout this Complaint and in the factual allegations specific to the County set forth above.

280.     The takeover provisions apply only to SCBOE, which is an agency and instrumentality of Shelby County Government.

281.     As applied to Shelby County specifically, Public Chapter 1057 subordinates the Shelby County Commission's independent budget authority to Oversight Board approval, imposes dual compensation obligations on county-appropriated LEA funds without the County's consent, and conditions the Commission's exercise of its own fiscal functions on the conduct of a state-appointed board.

282.     These are obligations imposed on Shelby County government specifically, through a statutory mechanism that operates in practical effect exclusively in Shelby County, because the Oversight Board exists exclusively in Shelby County.

283.     Public Chapter 1057 is applicable to Shelby County for purposes of the Home Rule Amendment because it regulates and governs the County. *See Metro. Gov't of Nashville & Davidson Cnty. v. Lee*, No. M2023-01678-COA-R3-CV, 2025 WL 1218089, at *12–13 (Tenn. Ct. App. Apr. 28, 2025). The court held that a statute is "applicable to" a county when it both negatively restrains the county from performing duties it previously had been directed to perform and positively imposes new duties upon the county. *Id*.

284.     Public Chapter 1057 restrains Shelby County from performing duties it previously exercised: the Shelby County Commission can no longer adopt its own annual budget until the Oversight Board approves the school board's proposed budget and the school board chair certifies that approval.

285. The Commission's independent fiscal authority—the core mechanism through which the voters of Shelby County exercise democratic accountability over county expenditures— is conditioned on the approval of an unelected, state-appointed Oversight Board.

286. The law also imposes new obligations on Shelby County: dual compensation obligations on county-appropriated LEA funds without the County's consent, and a structural subordination of the Commission's budget adoption process to Oversight Board conduct.

287. Public Chapter 1057 is applicable to Shelby County Government in its governmental capacity.

288. Similarly, under Tenn. Code Ann. § 49-1-102, local boards of education exercise governmental authority on behalf of the counties they serve.

289. The Shelby County Commission exercises plenary fiscal authority over county funds pursuant to Tenn. Code Ann. §§ 5-9-401 *et seq*., including authority over the county school fund through which MSCS is financed.

290. Public Chapter 1057 does not contain a provision requiring consent of Shelby County voters or a two-thirds vote of the Shelby County Commission before taking effect.

291. No supermajority vote by the Shelby County Commission approved Public Chapter 1057 or its application to the County's fiscal authority. No referendum of Shelby County voters was held to approve Public Chapter 1057.

292. The County is accordingly entitled to a declaration that Public Chapter 1057, as applied to Shelby County Government and the Shelby County Board of Commissioners, violates Article XI, Section 9 of the Tennessee Constitution and is void and of no effect, and to injunctive relief prohibiting its implementation.

293. Because Public Chapter 1057 applies only to Shelby County without the mandatory local approval language, it violates the Local Legislation Clause in the Home Rule Amendment.

294. Shelby County requests that the Court enter a declaratory judgment holding the Public Chapter 1057 unconstitutional under the Local Legislation Clause and an order enjoining its enforcement.

**COUNT FOUR**
**Violation of the Tennessee Constitution, Article XI, Section 9**
**Local Acts: Functional Displacement of Elected County Officers**
*(Brought by McKissack, McKinney, Love, Porter, Otey, Williams, Murphy, Huett-Garcia, Coleman, Shelby County Government, and Shelby County Commissioners)*

295. The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

296. Article XI, Section 9 of the Tennessee Constitution provides that "[t]he General Assembly shall have no power to pass a special, local or private act having the effect of removing the incumbent from any municipal or county office or abridging the term or altering the salary prior to the end of the term for which such public officer was selected." This provision was specifically added to the Tennessee Constitution to combat so-called "ripper bills"—legislation targeting particular local officials for removal or diminishment of their authority.

297. Although Public Chapter 1057 does not formally remove the elected Board from office, it nonetheless strips the Board of every function and authority that constitutes the substance of governance.

298. The General Assembly cannot accomplish through functional displacement what it is prohibited from accomplishing through formal removal. Importantly, legislative enactments which run afoul of this provision are illegal and unconstitutional whether there is local approval or not.

299. The Memphis-Shelby County Board of Education Member Plaintiffs and Shelby County Commissioners are entitled to a declaration that Public Chapter 1057 violates Article XI, Section 9 of the Tennessee Constitution and is void and of no effect, and to injunctive relief prohibiting its implementation.

**COUNT FIVE**
**Violation of the Tennessee Constitution, Article I, Section 20**
**Retroactive Impairment of Established Rights**
*(Brought by Shelby County Government, Memphis-Shelby County Board of Education, Shelby County Commissioners)*

300. The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

301. Article I, Section 20 of the Tennessee Constitution provides: "That no retrospective law, or law impairing the obligations of contracts, shall be made."

302. Public Chapter 1057 is retrospective as applied to Criterion 6.

303. During 2022 to 2024, the elected Board exercised its lawful statutory authority under Tenn. Code Ann. § 49-2-301 to manage the superintendent position during a leadership transition: Dr. Joris Ray resigned in August 2022; the Board appointed Tutonial "Toni" Williams as interim superintendent while conducting a nationwide search for a permanent replacement; and Dr. Marie N. Feagins was permanently appointed in February 2024.

304. At no point during this sequence did Tennessee law provide that the Board's use of interim leadership could serve as grounds for state governance displacement.

305. Public Chapter 1057 now attaches a new and severe disability—loss of governing authority—to those past decisions. This is the definition of a retrospective law.

306. MSCS possessed vested rights in the exercise of their statutory governing authority at the time the trigger events occurred. Tennessee law vests specific, defined governing powers in

the Board by statute: Tenn. Code Ann. § 49-2-201(a)(1) mandates four-year elected terms for board members; Tenn. Code Ann. § 49-2-301 grants the Board authority to employ and dismiss the director of schools; and the Board's budgetary, contracting, and policy-setting functions are established by statute. These are vested statutory rights that attach upon the Board members' election and the Board's assumption of its statutory duties.

307. Public Chapter 1057 takes away these vested rights based on events that occurred while the Board was lawfully exercising them.

308. The retrospective character of Public Chapter 1057 cannot be cured by characterizing the legislation as merely "prospective in operation" because it governs MSCS going forward. Here, the impairment of the Board's vested governing authority is triggered exclusively by events that happened in the past, none of which can be changed because they have already occurred. The Board cannot un-employ interim superintendents.

309. The General Assembly has constructed a scheme in which the impairment of vested rights is triggered by unchangeable historical facts. That is the essence of a retrospective law.

310. The retroactive operation of Public Chapter 1057 is confirmed by Commissioner Reynolds' letter, transmitted the same day the statute was signed into law.

311. Every criterion measures exclusively historical conduct: proficiency rates from prior test administrations; letter grades from prior school years; chronic absenteeism from prior years; priority school designations spanning five preceding years; audit findings from an ongoing review of prior fiscal periods; and leadership transitions over four preceding years.

312. The letter, transmitted effectively the moment the Governor's signature dried, confirms that no interval existed between enactment and enforcement.

50

313. Plaintiffs are entitled to a declaration that Public Chapter 1057 violates Article I, Section 20 of the Tennessee Constitution and is void and of no effect, and to injunctive relief prohibiting its implementation.

**COUNT SIX**
**Violation of the Tennessee Constitution, Article II, Sections 1 and 2**
**Separation of Powers: Legislative Encroachment on Judicial Authority**
*(Brought by all Plaintiffs)*

314. The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

315. Article II, Section 1 of the Tennessee Constitution provides: "The powers of the Government shall be divided into three distinct departments: the Legislative, Executive, and Judicial." Article II, Section 2 provides: "No person or persons belonging to one of these departments shall exercise any of the powers properly belonging to either of the others, except in the cases herein directed or permitted."

316. These provisions establish a foundational structural requirement that the three branches of government operate within their constitutionally assigned spheres and that no branch may encroach upon the powers properly belonging to another.

317. Public Chapter 1057's anti-injunction tolling provision dictates that if a court enjoins the Oversight Board's operation, the mandatory four-year period is paused and resumes upon the injunction being lifted.

318. This anti-injunction tolling provision is a direct legislative attempt to nullify the practical effect of judicial remedies before they are sought.

319. The power to grant injunctive relief and to determine the consequences of such relief is a core judicial function.

51

320. By providing that an injunction shall have no operative effect on the statutory scheme, the General Assembly has legislated away the remedy courts are constitutionally empowered to provide.

321. The separation of powers violation is compounded by the ban on litigation in Public Chapter 1057, which prohibits the Board from filing suit, intervening, or funding litigation challenging Oversight Board actions.

322. Together, the tolling provision and the ban on litigation form a coordinated legislative scheme designed to insulate the Oversight Board from judicial accountability.

323. The Constitution does not permit the General Assembly to construct a zone of unreviewable governmental action by combining a prospective nullification of injunctive remedies with a categorical bar on the primary institutional plaintiff's access to courts.

324. Additionally, Tennessee's non-delegation doctrine prohibits the General Assembly from conferring legislative or quasi-judicial authority upon an executive officer without an intelligible principle guiding its exercise.

325. Criteria 5 and 6 vest Commissioner Reynolds with pure, unconstrained determination authority—"the Commissioner determines"—without specifying any evidentiary standard, requiring any factual findings, mandating any administrative record, or providing any mechanism for review.

326. Commissioner Reynolds' two-page letter, supported by no record and constrained by no standard, demonstrates the consequence of this impermissible delegation of authority.

327. There is no intelligible principle here, and the Commissioner's letter proves it.

328. Plaintiffs are entitled to a declaration that the anti-injunction tolling provision of Public Chapter 1057 violates Article II, Sections 1 and 2 of the Tennessee Constitution by

encroaching upon the judicial power, and to injunctive relief prohibiting enforcement of the tolling provision.

## COUNT SEVEN
### Violation of Article XI, Section 17 of the Tennessee Constitution:
### The Right of Choice to the People
*(Brought by All Plaintiffs)*

329. The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

330. Article XI, Section 17 of the Tennessee Constitution provides that "[n]o county office created by the Legislature shall be filled otherwise than by the people or the County Court."

331. Article XI, Section 17 preserves the constitutionally authorized method for filling county offices and prevents the General Assembly from transferring county-office duties to officials chosen by an unauthorized appointing authority.

332. The Shelby County Board of Education is a county office within the meaning of Article XI, Section 17.

333. Public Chapter 1057 transfers to the Oversight Board the core Tennessee Code Title 49 school governance powers of the elected Board, thereby displacing the county office in substance.

334. The Oversight Board performs the same governing functions as the elected Board while operating under a different statutory label.

335. No Oversight Board member is elected by the people of Shelby County.

336. No Oversight Board member is selected by the county court or by any constitutionally authorized county appointing body.

337. Oversight Board members are appointed by the Governor, the Speaker of the House of Representatives, and the Speaker of the Senate.

338.    Because Oversight Board members may be removed by their state-appointing authorities at any time and for any reason, they are accountable to those officials rather than the Shelby County voters or a constitutionally authorized local body.

339.    The General Assembly cannot evade Article XI, Section 17 by assigning county school-governance powers to state-appointed officials and calling them an Oversight Board.

340.    Plaintiffs are entitled to a declaration that Public Chapter 1057 is unconstitutional and void under Article XI, Section 17 of the Tennessee Constitution.

341.    Plaintiffs are further entitled to preliminary and permanent injunctive relief prohibiting Defendants from appointing, seating, funding, recognizing, empowering, enforcing, or giving effect to the Oversight Board or Public Chapter 1057.

**COUNT EIGHT**
**Violation of Article I, Section 8 of the Tennessee Constitution:**
**Void for Vagueness**
*(Brought by all Plaintiffs)*

342.    The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

343.    Article I, Section 8 of the Tennessee Constitution prohibits enforcement of statutes that fail to give fair notice of what they require or authorize, or that invite arbitrary or discriminatory enforcement.

344.    A statute is void for vagueness when persons of common intelligence must guess at its meaning and differ as to its application.

345.    Tenn. Code Ann. Section 49-2-201(a)(1) provides that "there shall be a board of education elected by the people."

346.    Public Chapter 1057, however, imposes a contrary command. It creates a nine-member Oversight Board appointed by the Governor, the Speaker of the House, and the Speaker

54

of the Senate, and authorizes that appointed body to exercise powers otherwise vested in the elected Board.

347. Public Chapter 1057 defines the Oversight Board's "authority" to include "all powers and duties of a local board of education authorized and established in state law." The result is that the same statutory powers are assigned to two different bodies: one elected by the people under § 49-2-201(a)(1), and one appointed by state officials under Public Chapter 1057.

348. These conflicting commands make it impossible for regulated parties to determine their rights, duties, and obligations with reasonable certainty.

349. Nor can others determine which body's decisions control: the director of schools cannot know whether legal accountability runs to the elected Board or the Oversight Board; Shelby County Government cannot know whether the elected Board's budget is legally operative unless and until the Oversight Board approves, revises, or certifies it; and LEA employees, contractors, charter applicants, parents, students, taxpayers, and the public cannot know which body has final authority to bind the LEA, approve contracts, decide charter matters, direct school policy, terminate personnel, or act on behalf of MSCS.

350. Under Article I, Section 8 of the Tennessee Constitution, a law is void for vagueness when persons of common intelligence must guess at its meaning and differ as to its application, or when it lacks minimal standards sufficient to prevent arbitrary enforcement.

351. The conflict between § 49-2-201(a)(1) and Public Chapter 1057 creates exactly that constitutional defect. It deprives Plaintiffs and other regulated parties of fair notice as to who governs MSCS, who may exercise the legal powers of the local board of education, and whose decisions carry legal effect. It also invites arbitrary enforcement by allowing state officials to

decide, without clear statutory boundaries, when the elected Board's authority exists in substance and when it may be displaced by the appointed Oversight Board.

352. Plaintiffs are entitled to a declaration from the Court construing the conflicts between these two statutes.

353. Public Chapter 1057 is unconstitutional vague in other regards. It relies on undefined, standardless, and discretionary criteria to strip SCBOE of its governing authority and subordinate it to the state-appointed Oversight Board.

354. Criterion 5 of Public Chapter 1057 is unconstitutionally vague because it applies whenever "the commissioner of education determines" that comptroller directed audit "findings" show management, accounting, or internal-control deficiencies, or instances of fraud, waste, abuse, financial mismanagement, or mismanagement of financial records.

355. Criterion 5 does not define "findings" or state whether the audit must be complete, final, published, subject to management response, or accepted by the Comptroller before triggering state displacement of local governance.

356. Criterion 5 does not specify the degree of internal-control deficiency required, leaving unclear whether isolated documentation issues, immaterial accounting errors, temporary recordkeeping lapses, staffing-related administrative deficiencies, or preliminary audit observations qualify.

357. Criterion 5 does not define "waste," "abuse," "financial mismanagement," or "mismanagement of financial records" in a way that gives LEAs, elected officials, parents, students, taxpayers, contractors, or the Commissioner a meaningful standard.

358. Criterion 5 requires no finding that an alleged deficiency was material, systemic, intentional, current, caused by the elected board, tied to student outcomes, tied to governance failure, or incapable of correction through existing Title 49 oversight mechanisms.

359. Because Criterion 5 leaves the triggering determination to the Commissioner's standardless discretion, it fails to provide fair notice and invites arbitrary enforcement.

360. The facts alleged here illustrate the defect because Public Chapter 1057 was advanced and enacted while the MSCS forensic audit was incomplete, the Interim Audit Report identified no fraud across major testing areas, and the alleged issues were administrative or documentation matters in district with an approximately $1.8 billion annual budget.

361. As of the filing of this Complaint, no completed audit exists, and an incomplete audit produces no final findings sufficient to displace the elected Board.

362. Commissioner Reynolds' May 22, 2026 letter identified no audit, audit findings, specific deficiency, reliance on final findings or interim observations, or any administrative record.

363. Criterion 6 of Public Chapter 1057 is also unconstitutionally vague because it applies when "the commissioner of education determines" that the local board "has employed more than two directors of schools on an interim basis in the immediately preceding four years, resulting in inconsistent district leadership and operational instability for the LEA."

364. Criterion 6 does not define "employed," nor does it state which acting, temporary, emergency, transitional, or holdover appointments count, nor specify how long an interim appointment must or address appointments caused by unforeseen resignations, administrative necessity, lawful succession planning, title changes, temporary assignments, or overlap.

57

365. Criterion 6 does not define "inconsistent district leadership" or "operational instability," nor identify what evidence must be considered, specify the required causation, or require evaluation of academic continuity, budget execution, staffing, administrative capacity, or student outcomes.

366. The phrase in Criterion 6 "resulting in inconsistent district leadership and operational instability" requires a substantive causal determination, yet Public Chapter 1057 supplies no standard governing that determination.

367. The facts alleged here show the danger of arbitrary enforcement because Commissioner Reynolds' letter identified no interim director, number of interim directors, relevant time periods, or finding that interim leadership caused inconsistent district leadership or operational instability.

368. Criterion 6 fails to provide fair notice of what conduct or circumstances trigger state displacement and allows the Commissioner to convert lawful past leadership transitions into a present basis for stripping elected officials of governing authority.

369. Public Chapter 1057's operational-authority provisions are also unconstitutionally vague because Section 49-1-616(e)(5)(A) permits the Oversight Board to require or prohibit any discretionary action by the elected Board if the Oversight Board deems the action or inaction "necessary to improve the LEA's performance, operation, or management."

370. Section 49-1-616(e)(5)(B) likewise permits the Oversight Board to require or prohibit any discretionary action by the director of schools if the Oversight Board deems the action or inaction "necessary to improve the LEA's performance, operation, or management."

371. Public Chapter 1057 defines "authority" to include all state-law, private—act, or charter powers and duties of the elected Board or director of schools, and defines "discretionary

action" to include any formal or informal judgment-based decision, including policies and school-opening, school-closing, or consolidation decisions.

372. The phrase in Public Chapter 1057 "necessary to improve the LEA's performance, operation, or management" provides no meaningful limit because it defines none of its key terms, requires no showing of causation or proportionality, requires no nexus to triggering criteria, and requires no completed needs assessment or transformation plan.

373. By allowing the Oversight Board to act before completing a comprehensive needs assessment or transformation plan, Public Chapter 1057 grants sweeping authority before the Oversight Board has identified the problems it purports to remedy.

374. Public Chapter 1057 allows the Oversight Board to direct or prohibit policy choices, budget decisions, contracts, charter decisions, school-openings, school-closings, consolidations employment decisions, and other discretionary acts based solely its undefined view of what is "necessary."

375. Public Chapter 1057 compounds the vagueness defect by allowing the Oversight Board to terminate the director of schools for failing or refusing to comply with a directive issued under the same undefined standard.

376. Public Chapter 1057 also permits termination of an LEA employee for "causing or contributing to" covered deficiencies or for "negligence or dereliction" that the Oversight Board may reasonably conclude caused or contributed to the LEA meeting four or more criteria, using undefined terms that incorporate the same vague triggers.

377. The statute fails to give Plaintiffs, MSCS officials, MSCS employees, the Shelby County Commission, students, parents, taxpayers, contractors, and the public fair notice of when

the Oversight Board may act, what conduct is noncompliant, or what standards govern decisions affecting contracts, budgets, charter approvals, employment, and public governance.

378. Public Chapter 1057 invites arbitrary and discriminatory enforcement by placing extraordinary governmental power in state-appointed officials without objective standards for the Commissioner's triggering determination or the Oversight Board's exercise of authority.

379. The danger is concrete because Commissioner Reynolds issued a two-sentence operative determination on the day Governor Lee signed Public Chapter 1057 without identifying criteria, citing data, making findings, identifying an audit, attaching a record, or affording any opportunity to respond, contest, or cure.

380. The absence of standards allowed the Commissioner to impose governance displacement first and supply justification later, if at all.

381. Public Chapter 1057 is especially defective because its vague terms trigger the displacement of an elected local governing body, subordination of a county fiscal process, transfer of public authority to state appointees, and nullification of voters' ability to elect school board members who actually govern.

382. Plaintiffs are entitled to a declaration that Public Chapter 1057, including Criteria 5 and 6 and Section 49-1-616(e)(5), is void for vagueness under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution.

383. Plaintiffs are further entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing, enforcing, relying upon, or giving effect to Public Chapter 1057, including the May 22, 2026 triggering notice, on the basis of the vague and standardless provisions described herein.

**COUNT NINE**
**Declaratory Judgment**
*(Brought by all Plaintiffs)*

384. The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

385. This action presents and actual and justiciable controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

386. For the reasons stated herein, Plaintiffs are entitled to declaratory relief that Tennessee Public Chapter No. 1057 does not apply to MSCS because MSCS does not meet four of the six criteria set forth in the statute.

387. Alternatively, Plaintiffs are entitled to a declaration that Commissioner Reynolds did not comply with Tennessee Public Chapter No. 1057 because she did not make the findings required by the plain language of the statute in the letter to MSCS attached as **Exhibit 2**.

**COUNT TEN**
**Injunctive Relief Against Individual Members of the Educational Oversight Board of Memphis-Shelby County Schools**
*(Brought by all Plaintiffs against Defendants Orgel, McKinney, Powers, Brittenum Jr., Burroughs, Dorsey Hopson, Mansouri, Robertson, and Vogelsang, in their official capacities as members of the Educational Oversight Board of Memphis-Shelby County Schools)*

388. The allegations of the foregoing paragraphs are incorporated by reference as if fully restated herein.

389. Defendants Billy Orgel, Shanea McKinney, Nisha Powers, Dedrick Brittenum Jr., Tyrone Burroughs, Dorsey Hopson, David Mansouri, Beverly Robertson, and Karen Vogelsang (collectively, the "Oversight Board Defendants") are the nine members of the Educational Oversight Board of Memphis-Shelby County Schools, each sued in his or her official capacity.

390. Each Oversight Board Defendant was appointed pursuant to Public Chapter 1057.

61

391. Each Oversight Board Defendant has a direct enforcement connection to Public Chapter 1057 sufficient to satisfy the requirements of *Ex Parte Young*, 209 U.S. 123 (1908). The Oversight Board Defendants are the state officers who exercise the challenged statutory authority—approval or rejection of MSCS's budget, approval or rejection of contracts of $50,000 or more, hiring and firing of the superintendent, override of charter school denials, and the power to direct or prohibit any action within the elected Board's authority—and are therefore proper defendants for prospective injunctive relief.

392. Plaintiffs are likely to succeed on the merits of their claims, as set forth in Counts One through Nine of this Complaint.

393. Plaintiffs will suffer irreparable harm absent injunctive relief against the Oversight Board Defendants. Once the Oversight Board Defendants take consequential action in their official capacities—approving or rejecting a budget, executing or rejecting a contract, terminating the superintendent, overriding a charter school denial, or directing or prohibiting any action within the elected Board's authority—those actions cannot be meaningfully undone.

394. The deprivation of constitutional rights, for even a minimal period of time, constitutes irreparable injury as a matter of law.

395. The elected Board's loss of meaningful governing authority is a constitutional injury not compensable by damages. The right of the electorate of Shelby County to vote for school board members who actually exercise governance authority cannot be restored retroactively after years of nullification.

396. The Individual Board Member Plaintiffs will each suffer distinct, personal, and irreparable harm as elected officials, registered voters, taxpayers, and—for Plaintiffs Otey and Murphy—as parents of children attending MSCS schools.

62

397. Shelby County will suffer distinct irreparable harm from the budget cascade mechanism in Public Chapter 1057. The Shelby County Commission's annual budget funds the county school fund, the public safety fund, the health services fund, the infrastructure fund, and other essential county functions. Governance paralysis caused by an Oversight Board budget veto would cascade through the County's entire fiscal operations and cannot be undone retroactively.

398. If preliminary relief is not granted, Public Chapter 1057's ban on litigation will permanently foreclose MSCS's access to the courts. Once Public Chapter 1057 takes full effect, the ban on litigation prohibits the Board from asserting or funding any challenges to the law, and Public Chapter 818 separately prohibits MSCS from using public funds to maintain any civil action challenging Title 49 accountability measures.

399. The balance of equities favors injunctive relief against the Oversight Board Defendants. The harm to Defendants from a preliminary injunction is comparatively limited.

400. The public interest strongly favors injunctive relief. The public interest is served by judicial review of legislation raising substantial constitutional questions, not by permitting potentially unconstitutional governance displacement before those questions are answered.

401. Plaintiffs respectfully request that this Court enter an order, pursuant to 42 U.S.C. § 1983 and Federal Rule of Civil Procedure 65, preliminarily and permanently enjoining Defendants Billy Orgel, Shanea McKinney, Nisha Powers, Dedrick Brittenum Jr., Tyrone Burroughs, Dorsey Hopson, David Mansouri, Beverly Robertson, and Karen Vogelsang, in their official capacities as members of the Educational Oversight Board of Memphis-Shelby County Schools, from taking any other action in their official capacities as members of the Educational Oversight Board pending this Court's resolution of the constitutional claims asserted in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against all Defendants as follows:

1.      A preliminary injunction, pursuant to Fed. R. Civ. P. 65(a), restraining and enjoining Defendants from taking any action to implement, enforce, or give effect to Public Chapter 1057;

2.      A declaratory judgment, pursuant to 28 U.S.C. §§ 2201–2202, declaring Public Chapter 1057 unconstitutional and void in its entirety, or in the alternative, in those provisions found to be unconstitutional, on the grounds alleged above;

3.      A permanent injunction prohibiting Defendants from implementing, enforcing, or giving any effect to Public Chapter 1057 as applied to MSCS; and

4.      Such other and further relief as this Court deems just and proper.

Dated this 26th day of June, 2026.

Respectfully submitted,

BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, PC

*/s/ Bruce McMullen*

Bruce McMullen (Tenn. Bar #18126)
Lori H. Patterson (Tenn. Bar #19848)
Jerrick Murrell (Tenn. Bar # 34368, *pro hac vice motion forthcoming*)
Jennie Vee Silk (Tenn. Bar #35319)

165 Madison Ave., Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 526-2000
Fax: (901) 577-2303
bmcmullen@bakerdonelson.com
lpatterson@bakerdonelson.com
jmurrell@bakerdonelson.com
jsilk@bakerdonelson.com

*Counsel for Plaintiffs Shelby County Government and Shelby County Board of Commissioners*


THE WADE LAW FIRM, PLLC

Allan J. Wade (Tenn. Bar # 4339, *pro hac vice motion forthcoming*)
Brandy S. Parrish (Tenn. Bar # 21631, *pro hac vice motion forthcoming*)

5050 Poplar Ave., Suite 1028
Memphis, Tennessee 38157
Telephone: 901.322.8005
awade@thewadelawfirm.com
bparrish@thewadefirm.com

*Counsel for Plaintiffs Shelby County Board of Education, Michelle Robinson McKissack, Natalie J. McKinney, Stephanie P. Love, Sable Otey, Keith Williams, Towanna Murphy, Amber Huett-Garcia, Joyce Dorse Coleman, and Tamarques Porter*

65

## CERTIFICATE OF SERVICE

I, Bruce McMullen, hereby certify that on June 26, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, and that upon filing, such system will serve a copy of the foregoing upon all counsel of record in this action.

*s/ Bruce McMullen*
Bruce McMullen

66

# VERIFICATION

The undersigned, Natalie J. McKinney, Chair and Member of the Memphis-Shelby County School Board, does hereby state, declare, confirm and verify under penalty of perjury as true and correct, the statements and facts contained in the foregoing Complaint to which this verification is attached, based on facts and information within the undersigned's personal knowledge or where indicated on information obtained from my review of matters of public record and other sources, which information I believe to be true.

Natlie J. McKinney

6/23/26
Date

# VERIFICATION

The undersigned, Sable Otey, Member of the Memphis-Shelby County School Board and parent of a Memphis-Shelby County School student, does hereby state, declare, confirm and verify under penalty of perjury as true and correct, the statements and facts contained in the foregoing Complaint to which this verification is attached, based on facts and information within the undersigned's personal knowledge or where indicated on information obtained from my review of matters of public record and other sources, which information I believe to be true.

_____
Sable Otey

_____6/23/29_____
Date

## VERIFICATION

The undersigned, Towanna Murphy, Member of the Memphis-Shelby County School Board and parent of a Memphis-Shelby County School student, does hereby state, declare, confirm and verify under penalty of perjury as true and correct, the statements and facts contained in the foregoing Complaint to which this verification is attached, based on facts and information within the undersigned's personal knowledge or where indicated on information obtained from my review of matters of public record and other sources, which information I believe to be true.

Towanna Murphy

6/23/2026

Date