# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

| | | |
|---|---|---|
| SHELBY COUNTY GOVERNMENT, et al., | ) | |
| | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| | ) | |
|     v. | ) | No. 3:26-cv-00835 |
| | ) | Judge Crenshaw |
| BILL LEE, in his official capacity as | ) | Magistrate Judge Frensley |
| Governor of the State of Tennessee, et al. | ) | |
| | ) | |
|     Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Defendants, Tennessee officials sued in their official capacities, move to dismiss Plaintiffs' Amended Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiffs' sole federal claim fails for three reasons: the Governor, Speakers, and Commissioner do not enforce the Tennessee Public Schools Accountability Act's operative provisions and thus are not proper defendants under *Ex parte Young*; the institutional Plaintiffs (Shelby County Government and Memphis-Shelby County Schools) cannot invoke the Fourteenth Amendment against the State that created them; and the individual Plaintiffs fail to plausibly allege that the General Assembly enacted the Act with a racially discriminatory purpose. Absent such discriminatory purpose, the Act is subject to rational-basis review, which it readily survives. Plaintiffs' remaining claims arise under Tennessee law and are barred by sovereign immunity under *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984). The Amended Complaint should therefore be dismissed in its entirety.

## BACKGROUND

### A.      Public Education in Tennessee

The Tennessee Constitution directs the General Assembly to "provide for the maintenance, support and eligibility standards of a system of free public schools."  Tenn. Const. art. XI, § 12.  That provision gives the General Assembly broad authority over Tennessee's public education system.  *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 156 (Tenn. 1993).

The General Assembly has exercised that authority through Title 49 of the Tennessee Code.  The State Board of Education establishes statewide educational standards and policies, and the Commissioner of Education administers the State's public education laws.  Tenn. Code Ann. §§ 49-1-201, -301 to -316.  At the local level, local education agencies (LEAs) are governed by local boards of education exercising powers conferred by statute.  *Id.* §§ 49-2-201 to -214.

The General Assembly possesses broad discretion to structure that system.  It "has the broadest discretion to create or allow various entities to provide educational services to children in the state."  *State ex rel. Bd. of Educ. of Memphis City Schs. v. City of Memphis*, 329 S.W.3d 465, 472 (Tenn. Ct. App. 2010).  Indeed, it could "abolish every local school district in the state and make every school a state school, pure and simple."  *Kelley v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty.*, 836 F.2d 986, 999 (6th Cir. 1987).

### B.      The Tennessee Public Schools Accountability Act

In 2026, the General Assembly enacted the Tennessee Public Schools Accountability Act, codified at Tenn. Code Ann. § 49-1-616.  The Act requires creation of an educational oversight board when an LEA satisfies at least four of six criteria addressing academic performance and institutional stability.  *Id.* § 49-1-616(a)–(b).  Those criteria measure: (1) student proficiency in math and English; (2) the percentage of schools receiving "D" or "F" grades; (3) chronic

2

absenteeism; (4) persistent priority-school status; (5) audit findings concerning management, accounting, internal controls, fraud, waste, abuse, or financial mismanagement; and (6) repeated use of interim directors of schools. *Id.* § 49-1-616(a).

When an LEA meets the statutory threshold, a nine-member oversight board is appointed by the Governor, Speaker of the House, and Speaker of the Senate. *Id.* § 49-1-616(b)–(c). The board assesses the LEA's academic, operational, financial, and administrative performance and develops an annual transformation plan addressing identified deficiencies. *Id.* § 49-1-616(d).

The Act gives the oversight board supervisory authority over specified LEA operations. Among other things, the board may review and veto proposed budgets and budget amendments; approve certain contracts and expenditures of at least $50,000; direct the local board or director of schools to take or refrain from discretionary actions necessary to improve the LEA's performance or management; and, subject to applicable contractual and statutory protections, terminate and replace LEA employees. *Id.* § 49-1-616(e).

At the time of enactment, Memphis-Shelby County Schools ("MSCS") was the only LEA in Tennessee that satisfied all six statutory criteria. Am. Compl., ECF 14 at 107, ¶ 10; 115, ¶ 66. The Commissioner notified MSCS that it met the statutory threshold for creation of an oversight board. Am. Compl. Ex. 2, ECF 14-2 at 184–85. The Governor and Speakers appointed the nine-member Oversight Board, which convened for its first meeting on June 18, 2026, to elect officers and prepare to begin its oversight of MSCS on July 1. Am. Compl., ECF 14 at 110–112, ¶¶ 23–35; 117, ¶ 78; *see* Tenn. Code Ann. § 49-1-616(c)–(d).

### C.      Plaintiffs' Lawsuit

Plaintiffs—Shelby County Government and its Board of Commissioners, the MSCS Board, and individual MSCS Board members—bring this § 1983 action against Defendants in

their official capacities.  In Count One, the County, MSCS, and two Board members on behalf of their children claim that the Act was enacted with a racially discriminatory purpose in violation of the Fourteenth Amendment.  Am. Compl., ECF 14 at 139–40.  Counts Two through Nine assert various claims under Tennessee law, and Count Ten reasserts those claims against the Oversight Board members.  *Id.* at 140–63.  Plaintiffs seek declaratory and injunctive relief.  *Id.* at 164.

## LEGAL STANDARD

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  A motion under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction and may raise either a facial or factual attack. A facial attack, like Defendants' sovereign-immunity challenge here, questions the sufficiency of the pleading itself, and the Court accepts the complaint's well-pleaded factual allegations as true.  *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint.  To survive, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible only where the pleaded facts allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged"— mere possibility of unlawful conduct is not enough.  *Id.*  Nor are allegations "that are 'merely consistent with' a defendant's liability."  *Id.* (quoting *Twombly*, 550 U.S. at 557).  The Court need not accept as true legal conclusions couched as factual allegations, or "a formulaic recitation of the elements of a cause of action."  *Twombly*, 550 U.S. at 555; *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

4

**ARGUMENT**

I.      **Plaintiffs Have No Claim that the Act Violates the Equal Protection Clause (Counts One and Ten).**

Plaintiffs' equal protection claim fails at every step.  First, the Governor, Speakers, and Commissioner are not proper *Ex parte Young* defendants because they do not enforce the Act's operative oversight provisions.  Second, the institutional Plaintiffs (Shelby County and MSCS) cannot invoke the Fourteenth Amendment against their parent State.  Finally, the individual Plaintiffs (Otey and Murphy) fail to plausibly allege that the Act's facially race-neutral criteria were enacted with a discriminatory purpose; the Act therefore receives rational-basis review, which it readily survives.

> A.      **The Governor, Speakers, and Commissioner do not enforce the Act's operative oversight provisions.**

Sovereign immunity bars Plaintiffs' equal protection claim against the Governor, Speakers, and Commissioner.  Although prospective relief against a state officer for an ongoing violation of federal law may proceed under *Ex parte Young*, 209 U.S. 123 (1908), the officer sued must have a sufficient connection to enforcement of the challenged law; otherwise, the officer's sovereign immunity bars suit.  *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39, 43–44 (2021).  General supervisory authority, ministerial acts, or a completed role in implementing a statute are not enough.  *See Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015).

The relevant question is whether the official has enforced or threatened to enforce the challenged provision against the plaintiff.  *Id.*  A general duty to execute state law is not enough.  *Id.*; *see also Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996).  And an official's appointment authority, standing alone, does not make that official the enforcer of the body's later decisions.  *See Minn. Chapter of Assoc. Builders & Contractors v. Ellison*, 153 F.4th 695, 699 (8th Cir. 2025).

Here, the Act assigns the challenged supervisory powers—budget vetoes, contract approvals, directives to MSCS officials, and personnel actions—to the Oversight Board itself. Tenn. Code Ann. § 49-1-616(e). The Commissioner's role was to determine whether the statutory criteria were met and provide written notice. *Id.* § 49-1-616(a)(5)–(6), (b). The Governor and Speakers appointed the Board's members, and the Governor called its first meeting. *Id.* § 49-1-616(c)(1), (4). To be sure, the appointing authorities retain power to fill vacancies and remove their appointees, and the Governor, Speakers, and Commissioner receive annual progress reports. *Id.* § 49-1-616(c)(2)–(3), (d)(12). But Plaintiffs do not allege that those officials have used or threatened to use those powers to inflict the asserted equal-protection injury. The Oversight Board—not the Governor, Speakers, or Commissioner—possesses and exercises the operative authority Plaintiffs seek to enjoin. *See Whole Woman's Health*, 595 U.S. at 43–44. *Ex parte Young* therefore does not apply to those State Officials, and the claims against them should be dismissed for lack of subject-matter jurisdiction.

**B.      The institutional Plaintiffs cannot invoke the Fourteenth Amendment against the State.**

The Sixth Circuit has squarely held that political subdivisions "cannot invoke the protection of the Fourteenth Amendment against" their parent State. *Greater Heights Acad. v. Zelman*, 522 F.3d 678, 679–81 (6th Cir. 2008). *Greater Heights* affirmed dismissal under Rule 12(b)(6) because the political-subdivision plaintiffs were "barred from asserting Fourteenth Amendment claims against state officials." *Id.*; *see also S. Macomb Disposal Auth. v. Washington Twp.*, 790 F.2d 500, 505 (6th Cir. 1986) ("The relationship between [political subdivisions] is a matter of state concern; the Fourteenth Amendment protections and limitations do not apply.").

Shelby County is a political subdivision of Tennessee. *Morris v. Snodgrass*, 886 S.W.2d 761, 763 (Tenn. Ct. App. 1994). MSCS likewise exists within a public-school system

6

"inaugurated, operated, shaped, supported, and controlled by" the General Assembly. *Bd. of Educ. of Memphis City Schs. v. Shelby Cnty.*, 292 S.W. 462, 463–64 (Tenn. 1927) (quotation omitted). Indeed, as the Sixth Circuit has observed, the General Assembly could abolish local school districts and make every public school a state school. *Kelley*, 836 F.2d at 999.

The institutional Plaintiffs therefore have no Fourteenth Amendment right they may invoke to resist Tennessee's decision to reallocate authority within its own public-school system. *Greater Heights*, 522 F.3d at 679–81. Count One should be dismissed under Rule 12(b)(6) as to Shelby County and MSCS. And if the same Plaintiffs in Count Ten reassert Count One against the Oversight Board Members, the same rule forecloses that claim.

**C. The individual Plaintiffs fail to plausibly allege purposeful racial discrimination, and the Act survives rational-basis review.**

The remaining Equal Protection theory is asserted by Otey and Murphy on behalf of their children. Am. Compl., ECF 14 at 139–40. The Act contains no racial classification. Thus, the children must plausibly allege facts supporting a reasonable inference that racial discrimination was a motivating factor in the Act's enactment. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–68 (1977). Conclusory allegations of discriminatory purpose are not enough. *See Iqbal*, 556 U.S. at 678.

Absent a plausible allegation of purposeful racial discrimination, the Act receives rational-basis review. It comes to the Court "bearing a strong presumption of validity" and must be upheld if "there is any reasonably conceivable state of facts that could provide a rational basis" for its classifications. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993). The fit here is obvious: the General Assembly could rationally conclude that an LEA combining low proficiency, failing schools, chronic absenteeism, prolonged underperformance, financial-control deficiencies, and leadership instability should receive heightened oversight. *See Mixon v. State of Ohio*, 193

F.3d 389, 403 (6th Cir. 1999) ("State legislatures need the freedom to experiment with different techniques to advance public education and this need to experiment alone satisfies the rational basis test.").

Plaintiffs instead seek strict scrutiny by alleging that the General Assembly enacted the facially race-neutral Act for a racially discriminatory purpose. Am. Compl., ECF 14 at 139–40, ¶¶ 238–41. To succeed on that claim, Plaintiffs must plausibly allege that "an invidious discriminatory purpose was a motivating factor" in the decision. *Arlington Heights*, 429 U.S. at 265–66; *see Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (the decisionmaker must act "because of," not merely "in spite of," the law's effects on an identifiable group). Relevant factors may include (1) the historical background of the decision to enact the law, (2) the specific sequence of events leading to the decision, (3) departures from the normal procedural sequence, (4) substantive departures from usual considerations that would strongly favor a contrary decision, and (5) legislative history. *Arlington Heights*, 429 U.S. at 267–68. But disparate impact, without more, does not establish an equal-protection violation or trigger strict scrutiny. *Washington v. Davis*, 426 U.S. 229, 242 (1976).

*Moore v. Detroit School Reform Board*, 293 F.3d 352 (6th Cir. 2002), is instructive. There, a facially neutral statute authorized an appointed school-reform board in qualifying districts; when enacted, only Detroit qualified. *Id.* at 354–55. The plaintiffs alleged racial discrimination because Detroit's students and electorate were overwhelmingly African American and attacked the legislative process, the rejection of alternatives, and the chosen reform measures. *Id.* at 369. The Sixth Circuit held that those allegations reflected "general dissatisfaction with the legislative process," not discriminatory motive. *Id.* at 369–70.

*Moore* also relied on *Hearne v. Board of Education of City of Chicago*, 185 F.3d 770 (7th Cir. 1999), which affirmed dismissal on the pleadings of a discriminatory-purpose challenge to school-reform legislation directed at Chicago. *Moore*, 293 F.3d at 370. *Hearne* explained that merely saying the legislature "wanted to disadvantage African Americans" was not enough where "the legislation itself contains not a hint of an impermissible racial classification." 185 F.3d at 776. The same is true here.

Measured against *Moore* and the *Arlington Heights* factors, Plaintiffs do not plausibly allege discriminatory purpose.

**Disparate Impact.** Plaintiffs rely first on MSCS's majority-African American student population, Board composition, and electorate, and on the fact that no majority-white district presently qualifies. Am. Compl., ECF 14 at 132, ¶¶ 196–98. But the Act applies statewide to any LEA meeting four of six criteria tied to academic performance, chronic absenteeism, prolonged priority-school status, financial-control or mismanagement findings, and leadership instability. Tenn. Code Ann. § 49-1-616(a)(1)–(6). Those criteria are facially race-neutral and calibrated to identify districts exhibiting multiple forms of serious underperformance or instability.

Nor is MSCS the only Tennessee LEA with a majority-African American student population, yet MSCS alone presently meets the statutory threshold.[1] That fact undercuts the inference that the criteria operate as a proxy for race: other majority-African American districts are not swept in merely because of their racial composition. The Act distinguishes among LEAs

---

[1] *See* Tennessee Department of Education 2024-25 Report Card, *available at* tdepublicschools.ondemand.sas.com/* (listing Fayette County Schools, Hardeman County Schools, Haywood County Schools, Humboldt City Schools, and Madison County Schools as having majority African American student populations).

9

based on the specified performance and institutional criteria, not race.  *See Mixon*, 193 F.3d at 402–03.

**Historical Background.**  Plaintiffs point to the Achievement School District, suburban municipal school districts, the MSCS forensic audit, and the evolution of the bill's criteria.  Am. Compl., ECF 14 at 113–14, 123–27, ¶¶ 46–55, 131–57.  But the decade-old actions of different legislatures do not plausibly establish the intent of the General Assembly that enacted this Act. *See United States v. Myrie*, 167 F.4th 876, 880 (6th Cir. 2026) (a later legislature has no "duty to purge its predecessor's allegedly discriminatory intent," and "views of an earlier legislature are generally not probative of the intent of a later legislature" (quotations omitted)).  And the more immediate sequence alleged in the Amended Complaint is equally consistent with the race-neutral concern the Act addresses: a forensic audit of MSCS identified management and internal-control deficiencies, and the final legislation adopted statewide criteria incorporating those types of institutional failures.  Plaintiffs' disagreement with the legislature's reliance on those events does not plausibly show that the General Assembly acted because of race.

**Sequence and Procedural Departures.**  Plaintiffs object to the addition of Criteria 5 and 6, legislators' reliance on the forensic audit, and the rejection of an advisory-board alternative used elsewhere.  Am. Compl., ECF 14 at 133–34, ¶¶ 203, 209.  But the Complaint identifies no departure from a rule, procedure, or ordinary legislative practice.  It alleges contested amendments, reliance on disputed information, and rejection of alternatives—the same type of "dissatisfaction with the legislative process" *Moore* found insufficient. 293 F.3d at 369–70.

**Legislative History.**  Plaintiffs principally marshal statements by legislators who opposed the Act.  Am. Compl., ECF 14 at 127–29, ¶¶ 158–75.  But courts do not infer the intent of those who enacted a law from the accusations of those trying to defeat it.  The Supreme Court has

cautioned that "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). And the Sixth Circuit has held that opponents' "fears and doubts," voiced "in their zeal to defeat a bill," are entitled to "little weight." *Fieger v. U.S. Att'y Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008) (quotations omitted). Courts likewise "do not judge the intention of a bill's supporters by the characterization of its opponents." *Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 351 (6th Cir. 2018).

Plaintiffs identify no statement by a legislator who voted for the Act expressing a racial purpose. The cited statements by opponents characterize the bill as a takeover of a majority African American district, but they do not establish that the enacting majority selected the Act's criteria because of their effect on African American students. The General Assembly is entitled to a presumption of good faith that selective quotation of the opposing side does not overcome. *See Abbott v. Perez*, 585 U.S. 579, 603 (2018).

Nor does the "Memphis School Takeover" label move the needle. Plaintiffs rely on a "Funded Amendments and Bills" summary that labels the appropriation by location. Am. Compl., ECF 14 at 103–04, ¶ 2; 140, ¶ 239(h); Am. Compl. Ex. 1, ECF 14-1. A label identifying the place where a law presently operates is not a racial classification. *See Hearne*, 185 F.3d at 772, 774–75. More importantly, the appropriations language actually enacted describes the bill as legislation "relative to state interventions for certain underperforming school districts"—neutral language tied to performance, not race. 2026 Tenn. Pub. Acts, ch. 1142, § 61, Item 12.

In sum, Plaintiffs have not plausibly alleged that the General Assembly enacted the Act because of its effect on any racial group. *Arlington Heights* requires that much, and the Amended Complaint does not supply it. The Court should dismiss Count One.

**II. Sovereign Immunity Bars Plaintiffs' State-Law Claims (Counts Two through Nine).**

Counts Two through Eight seek declaratory and injunctive relief against State officials based exclusively on alleged violations of Tennessee law. Count Nine likewise seeks a declaration that the Act does not apply to MSCS because the statutory criteria were not satisfied. Plaintiffs invoke supplemental jurisdiction under 28 U.S.C. § 1367(a) and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Am. Compl., ECF 14 at 105–06, ¶¶ 5–6; 160–61, ¶¶ 384–87. Neither statute overcomes Tennessee's sovereign immunity.

A claim that state officials violated state law in carrying out their official responsibilities is a claim against the State, and the Eleventh Amendment bars a federal court from granting relief on that basis—even when the state-law claim is pendent to a federal claim. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 117, 121 (1984). The Sixth Circuit reaffirmed that rule days ago: "*Pennhurst* bars" independent injunctive and declaratory relief on a state-law claim, and § 1367 does not extend supplemental jurisdiction to claims against nonconsenting State defendants. *Gmeiner v. Kent*, --- F.4th ----, No. 25-2000, 2026 WL 1998638, at \*10 (6th Cir. July 10, 2026) (citing *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 542 (2002)). The Declaratory Judgment Act fares no better; it creates a remedy, not subject-matter jurisdiction, and does not abrogate state sovereign immunity. *Id.*; *Fischer v. Thomas*, 176 F.4th 470, 476 (6th Cir. 2026).

That rule disposes of every remaining claim. Counts Two through Eight ask this Court to declare that Tennessee officials and the Act violate the Tennessee Constitution. Count Nine asks the Court to decide whether MSCS satisfies the criteria in Tenn. Code Ann. § 49-1-616. And Count Ten seeks an injunction against the Oversight Board Members based in part on those same state-law theories. Each request would require a federal court to instruct Tennessee officials

"how to conform their conduct to state law"—the precise intrusion *Pennhurst* forbids. 465 U.S. at 106.

Nor can Plaintiffs avoid *Pennhurst* by packaging their state-law theories as requests for prospective relief or declaratory judgment. *Ex parte Young* applies only to ongoing violations of federal law, not state law. *Pennhurst*, 465 U.S. at 106. Section 1367 does not abrogate Tennessee's immunity, and the Declaratory Judgment Act supplies no independent jurisdiction. *Gmeiner*, 2026 WL 1998638, at *10. This Court therefore lacks jurisdiction over Counts Two through Nine and over Count Ten if it seeks relief against the Oversight Board for alleged violations of Tennessee law.

## CONCLUSION

For these reasons, the Court should dismiss Counts One and the federal claim in Count Ten under Rule 12(b)(6), dismiss the claims against the Governor, Speakers, and Commissioner for lack of jurisdiction under sovereign immunity, and dismiss Counts Two through Nine—and Count Ten to the extent that it rests on state law—for lack of subject-matter jurisdiction under *Pennhurst*.

Respectfully submitted,

**JONATHAN SKRMETTI**
Attorney General and Reporter

s/ Robert W. Wilson
SHANNON HOFFERT TN BPR 28430
Deputy Attorney General

ROBERT W. WILSON TN BPR 34492
MATTHEW DOWTY TN BPR 36070
Senior Assistant Attorneys General

One Commerce Square
40 S. Main St., Suite 1014
Memphis, TN 38103

13

(901) 543-9039
Shannon.Hoffert@ag.tn.gov
Robert.Wilson@ag.tn.gov
Matthew.Dowty@ag.tn.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was served by operation of the

Court's ECF/PACER system on this the 14th day of July 2026, upon:

**BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, PC**

Bruce McMullen
Lori H. Patterson
Jerrick Murrell
Jennie Vee Silk
165 Madison Ave., Suite 2000
Memphis, TN 38103
bmcmullen@bakerdonelson.com
lpatterson@bakerdonelson.com
jmurrell@bakerdonelson.com
jsilk@bakerdonelson.com
*Counsel for Plaintiffs Shelby County
Government & Shelby County
Board of Commissioners*

14

**THE WADE LAW FIRM, PLLC**

Allan J. Wade
Brandy S. Parrish
5050 Poplar Ave., Suite 1028
Memphis, TN 38157
awade@thewadefirm.com
bparrish@thewadefirm.com
*Counsel for Plaintiffs Shelby County*
*Board of Education, Michelle Robinson*
*McKissack, Natalie J. McKinney,*
*Stephanie P. Love, Sable Otley,*
*Keith Williams, Towanna Murphy,*
*Amber Huett-Garcia, Joyce Dorse*
*Coleman, & Tamarques Porter*

s/ Robert W. Wilson
Robert W. Wilson
Senior Assistant Attorney General

15