# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **SHELBY COUNTY GOVERNMENT**, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:26-cv-00835 |
| | ) | |
| v. | ) | Judge Waverly D. Crenshaw, Jr. |
| | ) | |
| **BILL LEE,** in his official capacity as | ) | Magistrate Judge Jeffery S. Frensley |
| Governor of the State of Tennessee, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Plaintiffs, Shelby County Government; Shelby County Board of Education operating as Memphis-Shelby County Schools; the Board of County Commissioners of Shelby County; Michelle Robinson McKissack; Natalie J. McKinney; Stephanie P. Love; Tamarques Porter; Sable Otey, individually and on behalf of her minor children A.O. and R.O.; Keith Williams, Towanna Murphy, individually and on behalf of her minor child E.R.; Amber Huett-Garcia; and Joyce Dorse Coleman (collectively, "Plaintiffs"), respectfully submit this Response in Opposition to Defendants' Motion to Dismiss. (ECF Nos. 30, 31.)

The Court should deny Defendants' Motion to Dismiss because the Court has subject matter jurisdiction over the State Defendants and the Amended Complaint is sufficiently pled.

## I.   LAW AND ARGUMENT

### A.   Legal Standard

Where "a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, as this one does, the plaintiff's burden is 'not onerous.'" *Nashville Cmty. Bail Fund v. Gentry*, 496 F. Supp. 3d 1112, 1124 (M.D. Tenn. 2020) (citing *Musson Theatrical Inc. v. Fed.*

*Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996)). "A court evaluating this sort of facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly." *Id.*; *see also Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Likewise, under Federal Rule of Civil Procedure 12(b)(6), the Court "must review the complaint in the light most favorable to Plaintiffs, accept their factual allegations as true, and determine whether Plaintiffs undoubtedly can prove no set of facts in support of [their] claims that would entitle [them] to relief." *Severe Records, LLC v. Rich*, 658 F.3d 571, 578 (6th Cir. 2011) (alteration in original) (quotation omitted). "To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The Sixth Circuit has recognized that the "standard for Rule 12(b)(6) dismissals is quite liberal," though "more than bare assertions of legal conclusions is ordinarily required to satisfy federal notice pleading requirements." *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 597 (6th Cir. 2014) (citation omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 556 (quotation omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Notably, the plausibility standard, "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal

2

evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

**B. The Governor, Speakers, and Commissioner Are Proper Defendants, and the Court Has Subject Matter Jurisdiction Over Them.**

Count I in the Amended Complaint asks for declaratory and injunctive relief that Public Chapter 1057, codified at Tenn. Code Ann. § 49-1-616 (the "Act"), violates the Equal Protection Clause of the Fourteenth Amendment because it was enacted with a discriminatory purpose. (Am. Compl., ECF No. 14, ¶¶ 236–42.) That claim is properly brought against all Defendants[1] including Governor Lee, Speaker Sexton, Speaker McNally, and Commissioner Reynolds.[2]

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). However, *Ex parte Young* provides a "narrow exception" by "allow[ing] certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Id.* (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)). To be a proper *Ex parte Young* defendant, the official must have "some connection with the enforcement" of the challenged law and "threaten and [be] about to commence proceedings." *Ex parte Young*, 209 U.S. at 156–57.

Defendants concede that "[t]he relevant question is whether the official has enforced or threatened to enforce the challenged provision against the plaintiff." (ECF No. 31, PageID #: 295.) Here, there is no question that Defendants Lee, Sexton, McNally, and Reynolds have the authority—indeed, they are required—to enforce the Act. The plain language of the Act requires that the Governor appoint five members of the Oversight Board, that the Speaker of the House

---

[1] Plaintiffs do not contest that the Oversight Board Members are also proper defendants, as Defendants concede in their brief. (*See* Mem. in Supp. Mot. to Dismiss, ECF No. 31, PageID #: 296.)

[2] Plaintiffs intend to contemporaneously seek leave to file a Second Amended Complaint that will, *inter alia*, clarify against which Defendant(s) each count is brought.

appoint two members, and that the Speaker of the Senate appoint two members. *See* Tenn. Code Ann. § 49-1-616(c)(1)(A)–(C).

Defendants cite to one out-of-circuit case for the proposition that "an official's appointment authority, standing alone, does not make that official the enforcer of the body's later decisions." (ECF No. 31, PageID #: 295 (citing *Minn. Chapter of Assoc'd Bldrs. & Cont'rs v. Ellison*, 153 F.4th 695, 699 (8th Cir. 2025), *cert. denied*, 146 S. Ct. 1603 (2026)).) The facts of *Ellison* are inapposite to the facts in this case. In *Ellison*, the plaintiffs sued the Attorney General, a Department of Labor and Industry Commissioner, and Governor Timothy Walz seeking to enjoin the defendants from enforcing the "Employer-Sponsored Meetings or Communication Act." *Id.* at 697 (citing Minn. Stat. Ann. § 181.531.) The Eighth Circuit held that the Governor's power to appoint and remove members from the commission were "'administrative or ministerial' acts with an insufficient connection to enforcement" to bring the governor within the *Ex parte Young* exception. *Id.* at 699.

But the statute challenged in *Ellison* did not specifically prescribe enforcement duties to Minnesota's governor like the Act does in this case. In *Ellison*, the argument was that because the governor had general authority to appoint and remove commissioners under an entirely different statute (Minn. Stat. Ann. § 4.04), there was not sufficient a connection to enforcement to bring the governor under the exception of *Ex parte Young*.  Here, however, the Act specifically proscribes enforcement duties to the Governor, the Speakers, and the Commissioner.

Regarding the Commissioner's enforcement authority, it is also explicitly stated in the Act:

> (5) The commissioner of education determines that the findings of an audit conducted, initiated, or directed by the comptroller of the treasury for the LEA show deficiencies in the management, accounting, or internal controls of the LEA, or instances of fraud, waste, abuse, or financial mismanagement, including, but not limited to, the mismanagement of financial records; and

4

(6) The commissioner of education determines that the local board of education for the LEA has employed more than two (2) directors of schools on an interim basis in the immediately preceding four (4) years, resulting in inconsistent district leadership and operational instability for the LEA.

(b) If an LEA meets four (4) or more of the six (6) criteria in subsection (a), then the commissioner of education shall notify, in writing, the LEA's local board of education, the governor, the speaker of the senate, and the speaker of the house of representatives that an oversight board must be appointed for the LEA. An oversight board must be established for the LEA pursuant to this section no later than July 1 following the date of the commissioner's written notice.

Tenn. Code Ann. § 49-1-616(a)(5)–(6), (b).

Because the Act specifically prescribes enforcement authority to the Governor, Speakers, and Commissioner, they fall within the exception of *Ex parte Young*. The Governor, Speakers, and Commissioners are proper defendants.

### C. Shelby County Government and Memphis-Shelby County Schools Have Standing to Assert Claims on Behalf of the Students in the District.

Defendants argue that the Shelby County Government (the "County") and MSCS are political subdivisions that cannot invoke the protection of the Fourteenth Amendment against the State. (ECF No. 31, PageID #: 289–90.) But the County and MSCS are not bringing a Fourteenth Amendment claim *on their own behalf*, but rather *on behalf of the students* in the District.[3] Defendants' cited authority addresses only whether a *political subdivision itself* possesses Fourteenth Amendment rights vis-à-vis the State that created it. It says nothing about whether a governmental entity may assert third party standing on behalf of individuals who indisputably possess such rights. It can, and the Court should therefore deny Defendants' motion to dismiss Count I of the Amended Complaint as to Shelby County Government and MSCS.

The Supreme Court has recognized that "the bar on third-party standing is not absolute"

---

[3] Plaintiffs intend to seek leave to file a Second Amended Complaint that will state this more explicitly.

and has been "quite forgiving" in recognizing exceptions. *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). Under the doctrine of third-party standing, a litigant may assert the rights of a third party when three conditions are met: (1) the litigant has suffered an "injury in fact" sufficient to satisfy Article III; (2) the litigant has a "close relationship" with the third party; and (3) there exists "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see also Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017); *Gentry*, 496 F. Supp. 3d at 1129.

Critically, the Sixth Circuit has specifically held that school boards and governmental entities may invoke third-party standing on behalf of students. In *Akron Board of Education v. State Board of Education*, the court held that a local board of education had standing to litigate the constitutional rights of students based on "a close relationship between the plaintiffs who seek to bring an action and the class of persons whose constitutional rights are claimed to be violated." *Akron Bd. of Educ.*, 490 F.2d 1285, 1289 (6th Cir. 1974). The Sixth Circuit reaffirmed this principle in *Kelley v. Metropolitan County Board of Education of Nashville & Davidson County*, stating that a local school board can seek to enjoin a state agency from "taking a step to deprive [the local body's] school students of their constitutional right to attend nonsegregated schools." *Kelley*, 836 F.2d 986, 998 (6th Cir. 1987) (alteration in original) (citing *Akron Bd. of Educ.*, 490 F.2d at 1288).

Here, the County and MSCS satisfy all three elements of the third-party standing test. Both the County and MSCS have suffered concrete, particularized injuries that satisfy Article III. MSCS has suffered complete displacement of its elected school board's governing authority: budget adoption, superintendent hiring, contract approval, and policy-setting have all been transferred to the state-appointed Oversight Board. (Am. Compl., ECF No. 14, ¶¶ 78–100.) The County has

suffered the subordination of its independent fiscal authority through the Act's budget cascade mechanism, which prevents the County Commission from adopting its annual budget until the Oversight Board approves the school budget. (*Id.* at ¶¶ 101–15.) These injuries are actual, imminent, and particularized—indeed, the Act is being implemented as this motion is briefed.

These institutional injuries are independent of, and additional to, the injuries suffered by the schoolchildren that MSCS and the County service. The injury-in-fact requirement for third-party standing demands only that the litigant itself have suffered a cognizable injury, thus giving the litigant a "sufficiently concrete interest" in the outcome of the issue in dispute —not that the injury be identical to the third party's injury. *See, e.g.*, *Powers*, 499 U.S. at 411. Here, the County's and MSCS's injuries are direct consequences of the same challenged statute and are more than sufficient to confer Article III standing.

MSCS shares one of the closest possible relationships with the schoolchildren in the district that they serve. MSCS controls their educational environment, curriculum, funding, teacher employment, school facilities, and every aspect of their educational experience. (ECF No. 14, ¶¶ 36–45.) And the County provides, in large part, the funding for those schoolchildren's education. This close relationship is precisely the type the Sixth Circuit found sufficient in *Akron Board of Education* to confer third party standing on the local school board on behalf of the schoolchildren. There the court recognized "a close relationship between the plaintiffs who seek to bring an action and the class of persons whose constitutional rights are claimed to be violated." *Akron Bd. of Educ.*, 490 F.2d at 1289.

This is not uncommon. In *Board of Education of Shelby County v. Memphis City Board of Education,* the Western District of Tennessee applied this precedent and held that the School Board had "standing to sue in a representative capacity on behalf of Memphis schoolchildren affected by

the defendants' actions." *Bd. of Educ. of Shelby Cty.*, No. 11-2101, 2011 WL 3444059, at \*20 (W.D. Tenn. Aug. 8, 2011) (citing *Akron Bd. of Educ.*, 490 F.2d at 1289–90), *decree aff'd sub nom. Bd. of Educ. of Shelby Cty. v. Memphis City Bd. of Educ.*, No. 11-2101, 2011 WL 13130644 (W.D. Tenn. Sept. 28, 2011); *see also id.* at \*23 ("The Sixth Circuit has found that a board of education has standing to assert the constitutional rights of students it is responsible for educating," and collecting cases).

Likewise, the County shares a close relationship with the schoolchildren in the District. The County Commission exercises plenary fiscal authority over the county school fund through which MSCS is financed. (ECF No. 14, ¶¶ 101–15.) The Act subordinates the County's independent fiscal authority to the unelected Oversight Board—an authority exercised directly on behalf of, and for the benefit of, Shelby County students.

Additionally, there are hindrances to the schoolchildren's ability to protect their own interests against the Defendants that MSCS and the County have sued for violating those interests. Those hindrances include the substantial expense of litigation and uncertainty about whether MSCS or the State is responsible for educating MSCS students, particularly given the elected School Board's continued operation coupled with the appointment of the new Oversight Board. MSCS schoolchildren are not in a position to address these complex issues.

Moreover, the hindrance analysis considers systemic and practical barriers, not merely whether *any* individual could theoretically litigate. *See Gentry*, 496 F. Supp. 3d at 1130 ("The hindrance analysis, in other words, allows the court to consider obstacles both legal and practical, and a hindrance is not required to be an absolute bar to seeking relief in order to be sufficient."); *see also Moody*, 847 F.3d at 402–03 (recognizing "systemic practical challenges to pursuing one's own rights" as sufficient hindrance).

In sum, Plaintiffs MSCS and Shelby County Government have constitutional and prudential standing to bring a Fourteenth Amendment claim on behalf of the schoolchildren of the District against the State Defendants.

**D.    Plaintiffs Plausibly and Properly Plead a Violation of the Equal Protection Clause of the Fourteenth Amendment.**

      1.     <u>The Court Should Decline to Engage in Factfinding at the Motion to Dismiss Stage.</u>

In the Memorandum in Support of Motion to Dismiss, Defendants repeatedly ask the Court to resolve contested factual questions and weigh competing inferences—exercises wholly inappropriate at the motion-to-dismiss stage. The question before the Court is not whether Plaintiffs will ultimately prevail, but whether the Amended Complaint states sufficient facts to plausibly allege their claims. It does. The Court should reject this invitation to prematurely adjudicate the merits.

First, Defendants argue that the Act's criteria are "facially race-neutral and calibrated to identify districts exhibiting multiple forms of serious underperformance." (ECF No. 31, PageID #: 299.) This is a merits argument about the Act's actual purpose—not a challenge to the sufficiency of the pleading. At this stage, the Court must accept as true Plaintiffs' allegations regarding the criteria's discriminatory design and draw all reasonable inferences in Plaintiffs' favor. Whether the criteria are in fact "calibrated" to neutral performance metrics or are instead engineered to target a single majority-Black school district is a question of fact that cannot be resolved on a motion to dismiss.

Second, Defendants contend that the Act "readily survives" rational-basis review. (*Id.* at PageID #: 291, 297.) But rational-basis review is the standard of scrutiny applied after discovery and on the merits—not a threshold pleading requirement. Plaintiffs' burden at this stage is to plausibly allege that discriminatory purpose was a motivating factor, not to disprove every

conceivable legitimate justification for the statute. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).

Third, Defendants' contention that the Act serves legitimate interests in education reform asks the Court to resolve a factual dispute that is inappropriate at the pleading stage. (ECF No. 31, PageID #: 297.) Whether the Tennessee General Assembly was genuinely motivated by educational reform or by a discriminatory desire to displace Black governance is precisely the type of factual question discovery is designed to resolve.

Fourth, Defendants argue that MSCS's demographic profile relative to other majority-African American districts that did not qualify under the Act undermines the inference of racial targeting. (*Id.* at PageID #: 299–300.) This argument asks the Court to weigh competing inferences—the very exercise that *Iqbal* and *Twombly* forbid at the motion to dismiss stage. At this juncture, the Court must draw inferences in Plaintiffs' favor. Whether alternative explanations better account for the data is a question for summary judgment or trial.

### 2. The *Arlington Heights* Framework.

In *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, the Supreme Court established a non-exhaustive set of factors for determining whether official action was motivated by discriminatory purpose: (1) the impact of the official action—whether it bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequence; and (5) the legislative or administrative history, including contemporaneous statements by members of the decision-making body. *Arlington Heights*, 429 U.S. at 266–68.

"Challengers need to show only that discriminatory purpose was 'a motivating factor,' not necessarily the law's 'dominant' or 'primary' purpose." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 631 (6th Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 265–66). Courts

10

must undertake a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.

At the pleading stage, a plaintiff need not *prove* discrimination—the plaintiff need only *plausibly allege* it. The Amended Complaint more than satisfies this standard for each *Arlington Heights* factor.

Defendants assert that *Moore v. Detroit School Reform Board*, 293 F.3d 352 (6th Cir. 2002) supports their argument that allegations of racial discrimination tied to the appointment of a school-reform board in Detroit "reflected 'general dissatisfaction with the legislative process,' not discriminatory motive." (Mem. in Supp. Of Mot. to Dismiss, ECF No. 31, PageID #: 298 (citing *Moore*, 293 F. 3d at 369–70).)

*Moore* was not a ruling on a motion to dismiss, but rather a ruling on a motion for summary judgment. Thus, the sufficiency of the pleading was not at issue. In fact, the complete quote from *Moore* is as follows: "These complaints, rather than constituting evidence of a discriminatory motive, indicate a general dissatisfaction with the legislative process that preceded the enactment of the MSRA." *Id.* (emphasis added). The *Moore* court thus found that plaintiffs had not produced evidence of discriminatory motive for purposes of surviving summary judgment—not that they failed to plead it.

Defendants' reliance on *Hearne v. Board of Education of City of Chicago* is similarly misguided. *Hearne*, a case from the Seventh Circuit, involved a statute Public Act 89–15, a broadranging measure designed to reform the Chicago public school system. After the statute was enforced, teachers and other tenured employees of the Chicago Board of Education who were terminated from their jobs under the procedures established by the new legislation, together with the Chicago Teachers Union, sought declaratory and injunctive relief against certain sections of

11

that statute. The Seventh Circuit upheld dismissal of the Equal Protection claims finding that "there is nothing here to indicate that the Illinois General Assembly structured the Chicago school reform legislation specifically because it wanted to disadvantage African Americans." *Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 776 (7th Cir. 1999).

Unlike in *Hearn*, here Plaintiffs' Amended Complaint is replete with factual allegations to support all of the *Arlington Heights* factors.

### a) Factor One: Disparate Impact.

The first *Arlington Heights* factor examines "the impact of the official action—whether it bears more heavily on one race than another." *Arlington Heights*, 429 U.S. at 266. Here, the disparate impact is stark and undeniable.

The Act applies, in functional effect, to Memphis-Shelby County Schools alone. (Am. Compl., ECF No. 14, ¶¶ 194–99.) MSCS's student population is approximately ninety-four percent racial minorities. (*Id.* at ¶¶ 1, 10, 195.) The Shelby County electorate is approximately sixty percent racial minorities. (*Id.* at ¶ 196.) The governance displacement mandated by the Act thus falls exclusively on a majority-Black school district, governed by a majority-Black elected school board, and accountable to a majority-Black electorate. (*Id.* at ¶ 197.) No majority-white Tennessee school district is subject to comparable governance displacement. (*Id.* at ¶ 198.) The impact extends beyond the school district to county fiscal governance through the budget cascade mechanism created by the Act. (*Id.* at ¶ 199.)

The Supreme Court has recognized that "[s]ometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action." *Arlington Heights*, 429 U.S. at 266. This is such a case. The Act targets one district—the largest majority-Black school district in Tennessee—for total governance displacement while leaving all other districts untouched.

The State Defendants argue that because MSCS *is not the only* Tennessee local education

agency ("LEA") with a majority-Black student population, that fact undercuts the inference that the Act's criteria operate as a proxy for race. (ECF No. 31, PageID #: 299.)

That fact is a red herring. The analysis is not whether MSCS is *the only majority-Black LEA in the state*, but whether MSCS is *a majority-Black district that is targeted and impacted by the Act*. Unquestionably, MSCS is.

Thus, the first *Arlington Heights* factor is plausibly alleged in the Amended Complaint.

b)      Factor Two: Historical Background.

The second factor requires the Court to examine "the historical background of the decision." *Arlington Heights*, 429 U.S. at 267. The Amended Complaint details an unbroken sequence of Memphis-specific state interventions. (ECF No. 14, ¶¶ 46–55, 200.)

In 2012, the State created the Achievement School District, which operated almost exclusively in Memphis, produced no sustained academic improvement over nearly a decade, and was wound down by 2020 without any accountability for its failure. (*Id.* at ¶ 200.) Following the 2013 suburban municipal secessions—which concentrated poverty and minority enrollment in MSCS—the State took no corrective action. (*Id.*) Instead, the General Assembly now proposes yet another intervention directed exclusively at Memphis's majority-Black school system. (*Id.* at ¶ 212.) This historical pattern of targeting Memphis for state intervention while ignoring comparable or worse performance in majority-white districts provides powerful circumstantial evidence of discriminatory purpose. (*Id.* at ¶¶ 46, 55, 94, 201–08.)

Thus, the second *Arlington Heights* factor is plausibly alleged in the Amended Complaint.

c)      Factor Three: Sequence of Events.

The third factor considers "the specific sequence of events leading up to the challenged decision." *Arlington Heights*, 429 U.S. at 267. The Amended Complaint alleges a sequence of events that strongly suggests the Act's criteria were reverse-engineered to target MSCS. (Am.

Compl. ¶¶ 201–08.)

Specifically, the four-of-six threshold was not set in consultation with the Tennessee Department of Education ("TDOE"). (*Id.* at ¶¶ 123, 202.) Criteria 5 (financial mismanagement) and 6 (leadership instability) were not in the original 2025 legislation—they were added specifically to ensure MSCS qualified. (*Id.* at ¶ 203.) A forensic audit was directed at MSCS alone and was invoked as a basis for intervention when only twenty-five percent complete.[4] (*Id.* at ¶ 204.) Meanwhile, TDOE itself designated MSCS as "advancing" under its own accountability framework, yet the General Assembly proceeded with total governance displacement regardless. (*Id.* at ¶ 205.)

Perhaps most tellingly, the General Assembly treated the predominantly white Hamilton County school district—which faced its own documented challenges—with an advisory assistance model, while imposing a total governance takeover on the predominantly Black MSCS. (*Id.* at ¶¶ 205, 209, 230, 239.) The disparate treatment of similarly situated districts of different racial compositions is powerful evidence of discriminatory intent. (*Id.* at ¶¶ 94, 137, 209.) Moreover, MSCS had demonstrated significant improvement: third graders improved reading scores by 32% since 2023, and Language Arts proficiency in 2026 was higher than any of the previous ten years. (*Id.* at ¶ 206.)

Thus, the third *Arlington Heights* factor is plausibly alleged in the Amended Complaint.

        d)      Factor Four: Departures from Normal Procedural Sequence.

The fourth factor examines "[d]epartures from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 267. The Amended Complaint identifies multiple extraordinary procedural

---

[4] It appears the outcome had effectively been predetermined, making the $7.7 million audit little more than a pretext and suggesting that the decision had already been made regardless of what the audit ultimately found.

irregularities. (Am. Compl. ¶ 209.)

The State directed a forensic audit at a single majority-Black school district—the only such audit in Tennessee history. (*Id.* at ¶ 209.) Majority-white districts with documented worse audit findings (Maury County, Polk County, Overton County) received no forensic audit or governance intervention. (*Id.*) Preliminary audit findings were shared exclusively with the Republican caucus before MSCS could review them. (*Id.*) The General Assembly rejected an early-exit amendment that would have allowed MSCS to regain local control upon demonstrating improvement. (*Id.*) The General Assembly rejected the Hamilton County advisory model—used for the majority-white district—and instead imposed total governance displacement on MSCS. (*Id.*) And the budget cascade consequence was identified during the legislative process yet enacted without correction. (*Id.*)

These departures from ordinary legislative and administrative procedure are precisely the type of circumstantial evidence that *Arlington Heights* instructs courts to consider.

Thus, the fourth *Arlington Heights* factor is plausibly alleged in the Amended Complaint.

e)      Factor Five: Legislative History.

The fifth factor considers "[t]he legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body." *Arlington Heights*, 429 U.S. at 268. Here, the legislative record is replete with statements evidencing discriminatory purpose. (Am. Compl. ¶ 210.)

Speaker Sexton declared the legislation a "total takeover." (*Id.* at ¶¶ 2, 97, 210, 239.) Senator Raumesh Akbari stated that Criteria 5 and 6 "were clearly crafted just to make sure you engineered only Memphis and Shelby County schools." (*Id.* at ¶ 125.) Representative Larry Miller stated: "You want to control a multi-billion dollar operation that's in the hands of elected individuals, which happen to be a majority African American community. That's your real

purpose." (*Id.* at ¶ 165.) Representative Antonio Parkinson presented a narrowing-funnel analysis showing how the criteria narrow from eighty percent of Tennessee districts to a single district—MSCS. (*Id.* at ¶ 160.) The General Assembly appropriations were labeled "$1,000,000" allocation for "Memphis School Takeover." (*Id.* at ¶ 210.) Senator Jeff Yarbro characterized the criteria as a "mirage" and the legislation as "one of the most embarrassing things this legislature's done." (*Id.* at ¶ 172.)

Such direct statements by legislators are "highly relevant" to the inquiry into legislative purpose. *Arlington Heights*, 429 U.S. at 268; *see also Ne. Ohio Coal. for the Homeless*, 837 F.3d at 635–36 (legislative statements probative of discriminatory intent).

Defendants' reliance on *Abbott v. Perez*, 585 U.S. 579 (2018) is unavailing. *Abbott* addressed the presumption of good faith in the context of *findings after trial*—not at the pleading stage. At the motion to dismiss stage, all reasonable inferences must be drawn in Plaintiffs' favor, and Plaintiffs need only plausibly allege—not prove—discriminatory intent. *Twombly*, 550 U.S. at 556. The presumption of legislative good faith does not eliminate Plaintiffs' claims at the threshold; it merely informs the burden of proof at later stages of litigation.

Thus, the fifth and final *Arlington Heights* factor is plausibly alleged in the Amended Complaint.

### E. Commissioner Reynolds Is Not Entitled to Sovereign Immunity Because She Acted Ultra Vires.

The State argues that Counts Two through Eight of the Amended Complaint are barred because a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State, and the Eleventh Amendment bars a federal court from granting relief on that basis—even when the state-law claim is pendent to a federal claim. (ECF No. 31, PageID #: 302–03 (citing *Pennhurst State Sch.& Hosp. v. Halderman*, 465 U.S. 89, 106, 117, 121

(1984)).)[5]

It is well established, however, that "[s]tate officials are not entitled to Eleventh Amendment immunity if they are acting ultra vires, that is without proper authority." *Miami Univ. Assoc'd Student Gov't v. Shriver*, 735 F.2d 201, 205 (6th Cir. 1984). The Supreme Court has "made clear that the doctrine still applies when an official acts 'without any authority whatever.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984) (citing *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982))). The ultra vires doctrine is analytically distinct from the *Ex parte Young* exception: it strips sovereign immunity entirely because the official is not acting as the State at all.

Commissioner Lizette Reynolds acted ultra vires in two ways: (1) her letter was not a valid statutory determination under the Act, and (2) she acted as an agency of the State to enforce the standards of Public Chapter 1057 without first engaging in the proper rulemaking process and procedures of Tennessee's Administrative Procedures Act. Tenn. Code Ann. § 4-5-101, *et. seq.*

> 1.  Commissioner Reynolds' Determination Was Not a Valid Statutory Determination.

Tennessee Code Annotated § 49-1-616(a)(5)–(6) require the Commissioner to "determine" that a local education agency meets the specified statutory criteria. This language imposes a substantive obligation: the Commissioner must engage in a genuine evaluative exercise— examining evidence, applying the statutory criteria to actual data, and reaching a reasoned conclusion. A "determination" is not a ministerial rubber stamp; it requires substantive findings.

Commissioner Reynolds' May 22, 2026 letter satisfied none of these requirements. (ECF No. 14, ¶ 176, Ex. 2.) On the very same day Governor Lee signed the bill into law, Commissioner

---

[5] Plaintiffs concede that the Eleventh Amendment and *Pennhurst* bar counts Two through Eight against the State Defendants other than the Oversight Board and Oversight Board Defendants.

Reynolds transmitted a two-page letter to MSCS purporting to notify the district that it "meets four or more of the six criteria." (*Id.*) The letter identifies no specific criteria as satisfied; cites no supporting data or evidence; makes no findings of any kind; attaches no administrative record; consists of a determination occupying two sentences; and afforded MSCS no opportunity to respond, contest, or cure.

This conclusory notification cannot constitute a "determination" within the meaning of the statute.

### 2. The Statutory Criteria Could Not Have Been Satisfied.

The Amended Complaint further alleges that several of the statutory criteria were factually impossible to satisfy as of the date of the Commissioner's letter.

*Criterion 5—Financial Mismanagement.* No completed audit existed as of May 22, 2026. The forensic audit was only twenty-five percent complete. An incomplete audit produces no "findings" within the meaning of the statute—and findings of financial mismanagement cannot be premised upon an investigation that has barely begun. (ECF No. 14, ¶¶ 184–88.)

*Criterion 6—Leadership Instability.* The letter identifies no interim director by name, does not state how many interim directors MSCS employed, and makes no finding of causation ("resulted in inconsistent district leadership and operational instability") as the statute requires. (ECF No. 14, ¶¶ 189–90.) A bare conclusory assertion, unsupported by any factual findings, does not constitute the statutory "determination."

*Criteria 1, 2, and 3.* The 2025–2026 TCAP proficiency data (Criterion 1), school letter grades (Criterion 2), and chronic absenteeism data (Criterion 3) were all unavailable as of the letter's date. (ECF No. 14, ¶¶ 181–83.) The Commissioner could not have "determined" that the criteria were satisfied based on data that did not yet exist.

### 3. The Timing Confirms the Absence of a Genuine Determination.

The timing of Commissioner Reynolds' letter—issued on the very same day the Governor signed the Act into law—confirms that this was a coordinated predicate act rather than a deliberate, evidence-based evaluation. (ECF No. 14, ¶ 192.) A genuine statutory determination requires time to gather evidence, analyze data, and reach a reasoned conclusion. The simultaneous issuance of the letter and the Governor's signature demonstrates that the "determination" was a fait accompli, predetermined in coordination with the Governor's office to immediately trigger the Act's governance displacement provisions.

Thus, Commissioner Reynolds acted ultra vires when she issued her determination that MSCS met four of the six criteria for takeover in the Act.

### 4. Commissioner Reynolds Failed to Comply with the UAPA's Rulemaking Requirements.

Commissioner Reynolds acted ultra vires for an additional reason: she failed to comply with the rulemaking requirements of the Uniform Administrative Procedures Act ("UAPA") before implementing the standards of the Act. TDOE—and Commissioner Reynolds as its head— is an "agency" under the UAPA. *See* Tenn. Code Ann. § 4-5-102(2) (defining "Agency" as "each state board, commission, committee, department, officer, or any other unit of state government authorized or required by any statute or constitutional provision to make rules or to determine contested cases" (emphases added)). Because TDOE is an agency, it is subject to the rulemaking procedures of the UAPA.

Under the UAPA, a "rule" is defined as "any agency regulation, standard, statement, or document of general applicability that is not a policy as defined in subdivision (10) that: (A) Describes the procedure or practice requirements of an agency; or (B) Implements, prescribes, or interprets an enactment of the general assembly or congress or a regulation adopted by a federal

agency." Tenn. Code Ann. § 4-5-102(12) (emphases added). The Act grants the Commissioner authority to determine whether an LEA meets four of the six statutory criteria. Before exercising that authority, however, the Department was required to promulgate rules establishing how it would implement the standards of the Act. The Department failed to do so. It issued no rules, held no rulemaking hearings, and provided no notice of proposed rulemaking before declaring that MSCS did not meet the legislative standard. This failure constitutes a violation of the UAPA.

Because Commissioner Reynolds acted outside the confines of the UAPA—without engaging in the requisite rulemaking process—she acted ultra vires and is not entitled to Tennessee's Eleventh Amendment immunity. *See Miami Univ. Assoc'd Student Gov't*, 735 F.2d at 204 ("State officials are not entitled to eleventh amendment immunity if they are acting ultra vires, that is without proper authority."). Here, the Commissioner had no authority to make any determination at all absent prior rulemaking implementing the statute's standards. Without duly promulgated rules defining how the criteria would be evaluated, the Commissioner lacked the procedural authority to act—regardless of the merits of her conclusions.

**F.      The Oversight Board Members Are Not Entitled to Sovereign Immunity Because They Are Not State Officials.**

The Amended Complaint includes sufficient facts to plausibly allege that the Oversight Board members are not state officials.

1.      State vs. Local Official Analysis.

Defendants bear the burden of establishing that the Oversight Board members are entitled to Eleventh Amendment sovereign immunity. *Guertin v. Mich.*, 912 F.3d 907, 937 (6th Cir. 2019) (quoting *Lowe v. Hamilton Cty. Dep't of Job & Family Servs.*, 610 F.3d 321, 324 (6th Cir. 2010)) ("The entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, i.e., that it is an arm of the state."). Sovereign immunity "doesn't extend to counties and

county officials." *Ermold v. Davis*, 936 F.3d 429, 433 (6th Cir. 2019) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Whether sovereign immunity protects an official "depends on her role in government." *Id.*

"[N]ot all officials operate within jurisdictional silos—some have hybrid duties in which they serve both state and local government. In such scenarios, immunity depends on which entity the official serves when engaging in the challenged conduct." *Id.* (citing *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 & n.2 (1997)). "And that inquiry turns on how state and local law treat the official." *Id.* (citing *McMillian*, 520 U.S. at 786).

The Sixth Circuit employs a six-factor test to determine whether an official acts on behalf of the state or a local entity:

1. The State's potential liability for a judgment;
2. How state statutes and courts refer to the official;
3. Who appointed the official;
4. Who pays the official;
5. The degree of state control over the official; and
6. Whether the functions involved fell within the traditional purview of state or local government.

*Ermold*, 936 F.3d at 433 (citing *Crabbs v. Scott*, 786 F.3d 426, 429 (6th Cir. 2015)); *see also Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (en banc) (articulating substantially similar factors).

The first factor—potential liability of the state treasury—is the "foremost" and "most salient" factor, creating a "strong presumption on the issue." *Ernst*, 427 F.3d at 359. Applied here, these factors overwhelmingly demonstrate that the Oversight Board members are not arms of the state.

2. <u>Factor One: The State's Potential Liability for a Judgment.</u>

There is no indication that the State of Tennessee would be liable for a judgment against the Oversight Board or its members. The Act provides that Oversight Board members are compensated from LEA funds at the same rate as elected Board members, including salary and

21

benefits. (ECF No. 14, ¶ 142.) The statute creates no mechanism by which the State treasury absorbs judgments against the Oversight Board. Because this is the "foremost" factor, and it weighs heavily against sovereign immunity, Defendants face an uphill burden on the remaining factors. *Ernst*, 427 F.3d at 359.

### 3. Factor Two: How State Statutes and Courts Refer to the Official.

Under *Ermold*, courts examine "how state statutes and courts refer to the official" as a distinct inquiry from the degree of state control. *Ermold*, 936 F.3d at 433.

Here, no Tennessee statute or court decision refers to the Oversight Board members as "state officials." The Act does not designate the Oversight Board as a state agency, a division of state government, or an instrumentality of the State. To the contrary, the statute creates the Oversight Board specifically for, and tethered exclusively to, a single LEA. The Act assigns the Board authority over local functions: "the LEA's academic, operational, financial, and administrative performance." Tenn. Code Ann. § 49-1-616(d). The statute's text repeatedly refers to the Oversight Board in relation to the local entity it supervises, not as a component of state government. No Tennessee court has characterized the Oversight Board or its members as state officials.

More specifically, the Act creates the Oversight Board for MSCS—a single local education agency. It is a local-function entity. The Act assigns the "challenged supervisory powers—budget vetoes, contract approvals, directives to MSCS officials, and personnel actions—to the Oversight Board itself." (ECF No. 31, PageID #: 296.) The Oversight Board develops an "annual transformation plan" for MSCS specifically. The statutory language and functional design of the Oversight Board establish it as an entity directed at local governance—not a statewide instrumentality.

And perhaps most tellingly, the Oversight Board members themselves have questioned

whether they are a state or local agency. (ECF No. 14, ¶ 79.)

This factor weighs against sovereign immunity.

### 4. Factors Three & Four: Who Appoints and Pays the Officials.

The Governor appoints five members, the Speaker of the House appoints two, and the Speaker of the Senate appoints two. Tenn. Code Ann. § 49-1-616(c). While at first blush, this factor favors sovereign immunity because state officials make the appointments, under *Ernst*'s framework, the last three factors can overcome the first only if they far outweigh it—meaning that a single factor favoring immunity, standing alone, cannot carry the analysis. *See Ernst*, 427 F.3d at 359. And *Ermold* confirms this principle: where the appointment factor favored state status, the court nonetheless found it offered "little help" because other factors were "more probative of the specific conduct at issue." *Ermold*, 936 F.3d at 434. The manner of appointment does not convert an entity performing local functions with local funds into an arm of the state.

Under *Ermold*, "who pays the official" is a separate and independently relevant consideration. *Ermold*, 936 F.3d at 433. The statute's funding structure confirms the Oversight Board's local character. Oversight Board members "must be compensated in the same manner as members of the LEA's local board of education are compensated," § 49-1-616(c)(3)(B), and staff "must be compensated in the same manner as other LEA employees are compensated," § 49-1-616(d)(5). These provisions route the Oversight Board's primary compensation obligations through the LEA's local funding mechanisms—the same local budget the Board itself controls— not through a state payroll. While the statute creates a discretionary state reserve fund of up to $1,000,000, § 49-1-616(f)(1)–(2), that fund is limited to supplemental operational costs disbursed only "upon application . . . and for good cause shown," § 49-1-616(f)(2), and does not fund Board members' ongoing compensation. The Oversight Board's primary and continuing funding flows through local channels, not the state treasury. Unlike the self-funded clerk's office in *Ermold*—

where mixed state and county revenue sources rendered the factor neutral—the Oversight Board's primary compensation structure is unambiguously local.

These factors weigh decisively against sovereign immunity.

### 5. Factor Five: The Degree of State Control Over the Official.

The degree of state control over the Oversight Board's day-to-day operations is minimal. While the appointing authorities retain the power to fill vacancies and remove appointees, the statute vests the Oversight Board itself with independent discretionary authority over MSCS operations. *See* Tenn. Code Ann. § 49-1-616(c)(2)–(3). The Oversight Board—not the Governor, Speakers, or Commissioner—"possesses and exercises the operative authority" challenged in this case. (ECF No. 31, PageID #: 296.) Defendants themselves concede as much: their own Motion to Dismiss argues that the Governor, Speakers, and Commissioner should be dismissed precisely because the Oversight Board independently exercises the challenged powers. (*See id.* at PageID #: 5–6 (arguing those state officials "do not enforce the Act's operative oversight provisions").)

This concession is fatal to Defendants' sovereign immunity argument for the Oversight Board. If the Oversight Board operates with sufficient independence from state officials that those officials cannot be sued under *Ex parte Young* for the Board's actions, then the Board likewise operates with sufficient independence from the State that it cannot claim the State's sovereign immunity. Defendants cannot have it both ways: the Oversight Board cannot simultaneously be so independent from the State that the Governor and Speakers are improper defendants, yet so intertwined with the State that the Board itself enjoys the State's immunity.

In *Ermold*, the fifth factor (degree of state control) was significant because the state "control[ed] every aspect of how county clerks issue marriage licenses; [the county] has no say whatsoever." *Ermold*, 936 F.3d at 435. Here, by contrast, no comparable state control exists over

24

the Oversight Board's discretionary decisions. The State does not direct the Board's budget vetoes, contract approvals, superintendent decisions, or policy directives. Those are independent judgments the Board makes on its own authority. This factor weighs against sovereign immunity.

6.  Factor Six: Whether the Functions Fall Within the Traditional Purview of State or Local Government.

Public education at the local level is traditionally a local government function. The Oversight Board exercises the same powers as the locally elected school board—budget adoption, superintendent hiring, contract approval, and policy-setting. *Compare* Tenn. Code Ann. § 49-1-616(e) *with* Tenn. Code Ann. §§ 49-2-201 to -214 (vesting local boards with these authorities). These are quintessentially local functions. *See Ermold v. Davis*, 936 F.3d 429, 433–35 (6th Cir. 2019) (analyzing whether official acts on behalf of state or local government by examining the function performed).

*Ermold* instructs that "what we need is legal authority specific to" the function at issue, not generalities about the official's classification. Ermold, 936 F.3d at 434. The specific function at issue here—governing a local school district's operation, personnel, budget, and contracts—is a local function, regardless of who performs it. The Oversight Board does not administer statewide education policy, promulgate regulations applicable across Tennessee, or exercise authority over any entity other than MSCS. Its jurisdiction is geographically and institutionally limited to a single county and a single school district.

This factor weighs against sovereign immunity.

7.  Weighing the Factors.

The balance of the factors weigh against treating the Oversight Board members as arms of the state entitled to sovereign immunity: (1) the State treasury faces no liability for judgments against the Board; (2) no statute or court decision refers to them as state officials; (4) they are paid

exclusively from local LEA funds; (5) the State exercises no operational control over their discretionary decisions; and (6) they perform traditionally local government functions. Only one factor—appointment by state officials—arguably favors Defendants.

The Oversight Board members are not state officials, and as such, they not entitled to Eleventh Amendment sovereign immunity.

<div align="center">

8.    Alternatively, the *Ex Parte Young* Exception Applies.

</div>

Even if this Court were to find the Oversight Board constitutes an arm of the state, the *Ex parte Young* exception permits prospective injunctive relief against state officials for ongoing violations of federal law. *See Ex parte Young*, 209 U.S. at 155–56; *Pichiorri v. Burghes*, 162 F.4th 745, 752 (6th Cir. 2025). The Oversight Board members are actively exercising the statutory authority that Plaintiffs challenge as violative of the Equal Protection Clause. Plaintiffs seek prospective injunctive relief to prevent the continuing constitutional violation. The Oversight Board members are therefore proper defendants under *Ex parte Young* regardless of the arm-of-the-state analysis.

## II.    CONCLUSION

For these reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss in its entirety.

Dated: July 23, 2026.

<div style="margin-left:40%">

Respectfully submitted,

BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, PC

*/s/ Bruce McMullen*
Bruce McMullen (Tenn. Bar #18126)
Lori H. Patterson (Tenn. Bar #19848)
Jerrick Murrell (Tenn. Bar # 34368, *pro hac vice motion forthcoming*)
Jennie Vee Silk (Tenn. Bar #35319)

</div>

<div align="center">26</div>

165 Madison Ave., Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 526-2000
Fax: (901) 577-2303
bmcmullen@bakerdonelson.com
lpatterson@bakerdonelson.com
jmurrell@bakerdonelson.com
jsilk@bakerdonelson.com

*Counsel for Plaintiffs Shelby County Government and Shelby County Board of Commissioners*

THE WADE LAW FIRM, PLLC

Allan J. Wade (Tenn. Bar # 4339, *pro hac vice motion forthcoming*)
Brandy S. Parrish (Tenn. Bar # 21631, *pro hac vice motion forthcoming*)

5050 Poplar Ave., Suite 1028
Memphis, Tennessee 38157
Telephone: 901.322.8005
awade@thewadelawfirm.com
bparrish@thewadefirm.com

*Counsel for Plaintiffs Shelby County Board of Education, Michelle Robinson McKissack, Natalie J. McKinney, Stephanie P. Love, Sable Otey, Keith Williams, Towanna Murphy, Amber Huett-Garcia, Joyce Dorse Coleman, and Tamarques Porter*

## CERTIFICATE OF SERVICE

I, Bruce McMullen, hereby certify that on July 23, 2026 the foregoing document was filed with the Court's electronic filing system, and that upon filing, copies were served upon all counsel of record.

*/s/ Bruce McMullen*
Bruce McMullen

27