# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| **SHELBY COUNTY GOVERNMENT**; **SHELBY COUNTY BOARD OF EDUCATION** operating as **MEMPHIS-SHELBY COUNTY SCHOOLS**, a public school district; **THE BOARD OF COUNTY COMMISSIONERS OF SHELBY COUNTY, TENNESSEE**; **MICHELLE ROBINSON MCKISSACK**, in her individual and official capacities; **NATALIE J. MCKINNEY**, in her individual and official capacities; **STEPHANIE P. LOVE**, in her individual and official capacities; **TAMARQUES PORTER**, in his individual and official capacities; **SABLE OTEY**, in her individual and official capacities and on behalf of her minor children **A.O.** and **R.O.**; **KEITH WILLIAMS**, in his individual and official capacities; **TOWANNA MURPHY**, in her individual and official capacities and on behalf of her minor child **E.R.**; **AMBER HUETT-GARCIA**, in her individual and official capacities; and **JOYCE DORSE COLEMAN**, in her individual and official capacities. <br><br> Plaintiffs, <br><br> v. <br><br> **BILL LEE,** in his official capacity as Governor of the State of Tennessee; **LIZZETTE REYNOLDS,** in her official capacity as Commissioner of Education; **CAMERON SEXTON,** in his official capacity as Speaker of the Tennessee House of Representatives; **RANDY McNALLY**, in his official capacity as Lieutenant Governor and Speaker of the Tennessee Senate; and all members of the **EDUCATIONAL OVERSIGHT BOARD OF MEMPHIS-SHELBY COUNTY SCHOOLS** including **BILLY ORGEL**, in his official capacity; **SHANEA McKINNEY**, in her official capacity; **NISHA POWERS**, in her official capacity; **DEDRICK BRITTENUM JR.,** in his official capacity; **TYRONE BURROUGHS**, in his official capacity; **DORSEY HOPSON**, in his official capacity; **DAVID MANSOURI**, in his official capacity; **BEVERLY ROBERTSON**, in her official capacity; and **KAREN VOGELSANG**, in her official capacity, <br><br> Defendants. | Case No. 3:26-cv-00835 <br><br> Judge Waverly D. Crenshaw, Jr. <br><br> Magistrate Judge Jeffery S. Frensley |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION

Plaintiffs, Shelby County Government; Shelby County Board of Education operating as Memphis-Shelby County Schools (the "MSCS Board"); the Board of County Commissioners of Shelby County; Michelle Robinson McKissack; Natalie J. McKinney; Stephanie P. Love; Tamarques Porter; Sable Otey, individually and on behalf of her minor children A.O. and R.O.; Keith Williams, Towanna Murphy, individually and on behalf of her minor child E.R.; Amber Huett-Garcia; and Joyce Dorse Coleman (collectively, "Plaintiffs"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, submit this Memorandum of Law in Support of the Motion for Preliminary Injunction restraining and enjoining Defendants from taking any action to implement, enforce, or give effect to Tennessee Public Chapter No. 1057, codified at Tenn. Code Ann. § 49-1-616 ("Public Chapter 1057" or the "Act").

## INTRODUCTION

Plaintiffs have pled a case that demonstrates likely constitutional, administrative, and legal injuries at the hands of the Defendants. Public Chapter 1057 was enacted for discriminatory purposes, has a discriminatory impact, and rewrites statewide fiscal and academic accountability measures with no notice or administrative rulemaking processes. Moreover, it was improperly and hastily applied to only one school district in the State, Memphis-Shelby County Schools ("MSCS"). The enactment of Public Chapter 1057 and its illegal application to MSCS turns on its head the day-to-day governance and operations of the largest public school system in the State, threatening instant chaos in the lives of thousands of students and employees of the district. This risk of impending harm to Plaintiffs and the public in the face of the well-pled facial and as-applied

challenges to Public Chapter 1057 creates the exact circumstances when a preliminary injunction is most warranted.

Indeed, Plaintiffs have pled real Fourteenth Amendment challenges that are not raised lightly or without caution. These allegations will require proof and careful consideration by this Court, because the Equal Protection Clause nullifies sophisticated as well as simple-minded modes of discrimination. Tennessee, unfortunately, has spent recent years perfecting the sophisticated kind. It began in 2012 with the Achievement School District ("ASD"), a takeover mechanism created for Memphis, run in Memphis, and unceremoniously abandoned in 2020 when it produced nothing but a very large fiscal impact, a decade of displaced governance, and no improvement to show for any of it. (ECF No. 14, Am. Compl. ¶¶ 46–55.) In 2025, the same legislators who had implemented the ASD and watched it collapse announced a new bill calibrated for exactly one district in Tennessee. (*Id.* at ¶¶ 194–212.)

Public Chapter 1057 allows a nine-member Oversight Board, appointed by no one Shelby County ever voted for, to hold veto power over a $1.8 billion budget, hiring-and-firing authority over the superintendent, approval rights over every contract above $50,000, and the power to override the Board's charter decisions.[1] (Am. Compl. at 2 (Preliminary Statement).) This, however, is not the first time such interventions have followed a familiar pattern. Nationally, roughly eighty-five percent of state takeovers of local school districts have targeted majority-Black or majority-Latino communities, and that pattern persists even after controlling for a district's

---

[1] Eight of the nine elected MSCS Board members are Black, and the Board itself has not been abolished, unlike the boards in many majority-Black districts that have faced a state takeover. What has been abolished is its authority: the Board retains its seats but loses the very function for which those seats were created. To make certain no court could intervene before the damage was done, the Legislature also added an anti-injunction tolling provision and a litigation bar. (Am. Compl. ¶¶ 101–15, 342–52.)

3

fiscal condition. *See* AJ Rice, *What TN School Takeover Law Inherits from Reconstruction*, The Commercial Appeal (June 10, 2026).[2] Commentators have traced this pattern to Reconstruction-era propaganda that manufactured narratives of Black governmental incompetence to justify the targeting of Black communities.[3] *See id.*

Now, the State's post hac justification for the takeover is premised on a purported "forensic audit." It is not an audit. It is a consulting engagement, performed under AICPA consulting standards rather than generally accepted auditing standards, and Defendants know the difference. They simply hope this Court will not ask about it before the takeover becomes irreversible. (Am. Compl. ¶¶ 90, 93–95.) Notably, the Comptroller's own Interim Report found no fraud and identified alleged waste equal to roughly two-hundredths of one percent of MSCS's budget. (*Id.* at ¶¶ 89–94, 106–08.) When that number proved too small to justify what the Legislature had already decided to do, the State's retained accounting firm produced a "Final Report" with a an even larger allegation of waste based substantially on a single custodial contract for services that were, in fact, performed and that saved the District money.

Yet Commissioner Reynolds did not even wait for that Final Report in applying Public Chapter 1057 to MSCS. She issued her two-sentence determination the same day the Governor signed the bill, before the data underlying half the statutory criteria even existed. (*Id.* at ¶¶ 176–88.) This was not a measured determination. Instead, it was a rubber stamp devoid of the most basic legal and administrative underpinnings and not actually supported by relevant data.[4]

---

[2] https://www.commercialappeal.com/story/opinion/contributors/2026/06/10/mscs-tn-school-takeover-accountability-reconstruction/90478474007/.

[3] Although the current Oversight Board is currently predominately Black, the members can be replaced at anytime without any influence from the voting population.

[4] MSCS has posted the highest academic growth score in Tennessee for years running, on the very measure the State uses to judge whether a struggling district is improving, and the State declared it a failure anyway.

The remedy this Court is asked to order is not novel. It is the ordinary relief owed whenever a State deprives constitutional rights or acts in an arbitrary manner and attempts to restrict access to the courts through a codified litigation ban. A preliminary injunction preserves what has been preserved since July 1: the status quo, and with it, the right of equal protection and an unfettered education to 110,000 students while this Court decides this matter on a full record.

## FACTUAL BACKGROUND

### I. A HISTORICAL PATTERN OF STATE INTERVENTION IN MEMPHIS SCHOOLS.

As previously noted herein, Public Chapter 1057 is not the first time the State has targeted MSCS. For more than a decade, the State of Tennessee repeatedly singled out Memphis's school system for extraordinary governance interventions not imposed on similarly situated, majority-white districts. (Am. Compl. ¶¶ 46–55, 200.) In 2012, the General Assembly created the ASD to take over the state's lowest-performing schools. In practice, the ASD operated almost exclusively in Memphis, and after nearly a decade produced no sustained academic improvement before it was wound down in 2020 with no accountability for its failure. (*Id.* at ¶ 200.)

While the ASD was operating, Memphis voters approved the 2011 surrender of the Memphis City Schools charter, leading to the 2013 merger that created MSCS. The General Assembly then intervened to pass a law that (again) only applied to Shelby County and allowed six predominantly white suburban municipalities to secede and form their own districts. When that law was invalidated and voided by a federal court on the ground that it targeted Shelby County and violated the Tennessee Constitution's Home Rule provision, the General Assembly tried again and managed to draft a law that had more general application, allowing the creation of the six municipal districts and further concentrating minority enrollment within MSCS. (Am. Compl. ¶ 200.) The structural challenges facing MSCS today are thus substantially the product of State

5

policy choices, including a funding formula that has not remedied the resource disparities created by decades of differential treatment between Memphis and its suburbs. Rather than addressing those disparities, the State has again chosen to intervene in MSCS's governance. (*Id.* at ¶ 212.)

## II.     THE 2025 LEGISLATIVE CAMPAIGN TARGETING MSCS.

In January 2025, Representative Mark White and Senator Brent Taylor announced legislation empowering the State to supersede the elected MSCS Board with a state-appointed management entity. Although framed as a statewide accountability measure, the bill's triggering criteria were calibrated to match MSCS's existing performance and demographic profile. No other Tennessee district satisfied all the proposed triggering criteria, and Memphis-area legislators warned on the record that the criteria were engineered to target MSCS and that the ASD experiment had already failed. The bills were not reconciled before the 2025 session adjourned, but the Legislature appropriated $6 million for what it called a "legislatively directed forensic audit" of MSCS's finances for fiscal years 2022–2024—a process ordered for no other district and, as explained below, one that did not ultimately amount to an audit performed under generally accepted auditing standards.

## III.    ENACTMENT OF PUBLIC CHAPTER 1057 IN 2026.

In January 2026, Representative White and Senator Taylor reintroduced the legislation as House Bill 662 and Senate Bill 714 (collectively, "Public Chapter 1057"). (Am. Compl. ¶ 56.) As enacted, the law creates a nine-member oversight board appointed entirely by state officials. Although eight members must reside in Shelby County, none is elected by Shelby County voters. (*Id.* at ¶¶ 57–59.)

The statute mandates appointment of an oversight board when a local education agency

Case 3:26-cv-00835    Document 43    Filed 07/27/26    Page 6 of 23 PageID #: 2708

meets at least four of the following six defined criteria:

1. **Academic Proficiency Dual Threshold:** 50% or more of students not proficient in both mathematics AND English language arts on the most recently administered TCAP tests;

2. **School Grades:** 25% or more of the LEA's schools received a 'D' or 'F' letter grade in the most recent grading cycle conducted by the Department of Education pursuant to Tenn. Code Ann. § 49-1-228;

3. **Chronic Absenteeism:** 25% or more of enrolled students were chronically absent—defined as absent 10% or more of the school year—in the most recent school year;

4. **Persistent Priority School Designation:** At least one school managed by the LEA has been identified as a priority school or maintained that designation for each of the immediately preceding five (5) consecutive years;

5. **Financial Mismanagement:** The commissioner of education determines that findings from a comptroller-directed audit show deficiencies in management, accounting, or internal controls, or instances of fraud, waste, abuse, or financial mismanagement, including mismanagement of financial records; and

6. **Leadership Instability:** The local board has employed more than two (2) directors of schools on an interim basis in the immediately preceding four (4) years, resulting in inconsistent district leadership and operational instability.

(*See* Am. Compl. ¶ 64.)

The Commissioner of Education determines whether an agency meets the threshold. (*Id.* at ¶ 65.) Legislative testimony confirmed that MSCS is the only district in Tennessee that satisfies all six criteria simultaneously. Furthermore, the Tennessee General Assembly specifically calibrated two criteria—the Financial Mismanagement criterion and the Leadership Instability criterion—to ensure MSCS's inclusion. (*Id.* at ¶ 66.)

Once appointed, the oversight board exercises comprehensive authority. It may (a) approve MSCS's annual budget before local adoption; (b) approve or reject all contracts and purchases at or above $50,000; (c) hire, evaluate, and terminate the superintendent and other district personnel; (d) override any Board decision to deny a charter application; and (e) control real property

decisions. (*Id.* at ¶ 2.) The oversight board's initial term is four years, with a mandatory two-year extension if the District still meets four of the six criteria, and no mechanism for early exit even if performance improves. The statute also contains an anti-injunction tolling provision under which judicial injunctions pause, rather than shorten, the oversight period.

## IV. THE STATE'S PURPORTED "FORENSIC AUDIT."

The process the State has branded as a "legislatively directed forensic audit" has been applied exclusively to MSCS. No other Tennessee district has ever been subjected to a comparable engagement ordered by legislative appropriation, despite the existence of districts with documented and repeated audit failures. As the record confirms, this engagement was not performed under generally accepted auditing standards. It was instead a consulting engagement performed under AICPA standards for consulting services—a compilation of observations and recommendations, not audited findings. (Am. Compl. ¶¶ 90, 93–95.)[5]

The Interim Report, publicly released before the General Assembly finalized Public Chapter 1057, found no evidence of fraud and identified approximately $1,145,909.97 in transactions potentially consistent with waste and abuse.[6] The State's retained firm subsequently released a purported "Final Report" claiming to identify a substantially larger figure of potentially noncompliant spending. That figure, approximately $119 million, is more than one hundred times

---

[5] The Comptroller shared preliminary findings from this consulting engagement in confidential briefings to Republican legislators in early February 2026, before MSCS had an opportunity to review or respond. Legislative leaders publicly invoked these preliminary findings to justify enactment of the takeover legislation, even as the Comptroller cautioned that the findings were not final and did not establish fraud. (Am. Compl. ¶¶ 95–96.)

[6] This figure consisted primarily of documentation and internal-control deficiencies from staff reductions and turnover after federal COVID relief funds expired. (Am. Compl. ¶¶ 89–94, 107–08.)

the figure reported in the Interim Report. That characterization, however, does not withstand scrutiny.

Neither the Interim Report nor the Final Report was performed under generally accepted auditing standards. Both were performed under AICPA consulting standards and are properly understood as compilations of observations and recommendations, not audits. The Final Report offers no opinion on whether any of the conduct it describes causes, or is likely to cause, any present or future harm to MSCS, its students, or the public. Much of its content simply repackages issues MSCS itself had already identified, investigated, and self-reported years earlier—and in at least one instance already referred to federal authorities—and does not reconcile with MSCS's continuing compliance with Tennessee's own Fiscal Accountability Standards, under which the district's annual financial reports have been filed with and reviewed by the Department of Education without objection. The Final Report's largest component rests on a single contract for services that were in fact performed and that produced cost savings for the District, with no allegation that any funds were misappropriated.

Whatever ultimate significance the Final Report's figures may have, they cannot retroactively validate the Commissioner's May 22 determination: no completed audit—or, more precisely, no completed engagement of any kind—existed on the date she issued her letter, and the findings on which the State now relies did not exist until weeks later. (Am. Compl. ¶¶ 184–88.) A determination that a statutory criterion is satisfied cannot rest on evidence that had not yet been gathered or on a consulting compilation that is not an audit at all.

## PROCEDURAL HISTORY

The Educational Oversight Board convened its first meeting on June 18, 2026 to elect officers and prepare to assume authority over MSCS on July 1, 2026. Plaintiffs moved for a

9

temporary restraining order on June 30, 2026. (ECF Nos. 19, 20.) On July 1, 2026, this Court entered an order directing the parties to maintain the status quo that existed before Public Chapter 1057's enactment pending the Court's consideration of Plaintiffs' request for injunctive relief (the "Status Quo Order"). (ECF No. 22.)

On July 14, 2026, Defendants moved to dismiss the Amended Complaint and separately moved to dissolve the Status Quo Order. (ECF Nos. 30–33.) Plaintiffs filed their oppositions to both motions on July 23, 2026, and Defendants filed their replies to both motions on July 27, 2026. (ECF Nos. 37, 38, 40, 41.) Thus, both motions are now fully briefed and pending before the Court.

Plaintiffs are filing a motion on July 28, 2026 seeking leave to file a Second Amended Complaint that underlies the claims addressed in this motion. The proposed Second Amended Complaint asserts a single federal claim—that Public Chapter 1057 violates the Equal Protection Clause of the Fourteenth Amendment—against all Defendants, and claims under the Declaratory Judgment Act asserted solely against Commissioner Reynolds and the Educational Oversight Board Defendants. This memorandum addresses only those claims.

## STANDARD OF REVIEW

Courts consider four factors in determining whether to grant injunctive relief: "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest." *Planned Parenthood of Tenn. & N. Miss. v. Slatery*, No. 3:20-CV-00740, 2020 WL 5797984, at *5 (M.D. Tenn. Sept. 29, 2020). Importantly, "[t]hese four considerations are factors to be balanced, not prerequisites that must be met." *ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 670 (S.D. Ohio

2016) (citing *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997)). Each factor here favors Plaintiffs.

**ARGUMENT**

**I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

Plaintiffs are likely to succeed on the merits of their claims. A plaintiff need not prove its entire case. It is ordinarily sufficient if the plaintiff has raised questions going to the merits "so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007); *see also Corp. Exp. Off. Prods. v. Warren*, No. 01-2521 DBRE, 2002 WL 1901902, at *7 (W.D. Tenn. May 24, 2002).

**II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.**

The Equal Protection Clause of the Fourteenth Amendment prohibits state action taken because of, not merely in spite of, adverse effects upon a racial group. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–68 (1977). A facially neutral law may be challenged as racially discriminatory by demonstrating discriminatory intent or purpose through five non-exhaustive factors: (1) disparate impact; (2) historical background; (3) the specific sequence of events leading to the challenged decision; (4) departures from the normal procedural sequence; and (5) the legislative history, including contemporaneous statements by decisionmakers. *Id.* at 253. A plaintiff need show only that discriminatory purpose was "a motivating factor," not the law's sole or dominant purpose. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 636 (6th Cir. 2016) (quoting *Arlington Heights*, 429 U.S. at 265–66). Each factor is satisfied here.

11

*Disparate Impact.* Public Chapter 1057 applies in functional effect to MSCS alone—a district serving a 94 percent minority student population, governed by a majority-Black school board, elected by a majority-Black electorate. (Am. Compl. ¶¶ 194–97.) No majority-white Tennessee school district is subject to comparable governance displacement. (*Id.* at ¶ 198.)

*Historical Background.* The relevant sequence includes the ASD's creation in 2012 exclusively targeting Memphis schools; post-2013 suburban secessions concentrating poverty and minority enrollment; the ASD's decade-long failure without accountability; and now Public Chapter 1057—a repetition of the same experiment against the same institution. (*Id.* at ¶ 200.)

*Sequence of Events.* The triggering criteria were calibrated to MSCS's actual performance data rather than derived from neutral statewide analysis. (*Id.* at ¶ 201.) Criteria 5 and 6 were not in the original legislation—they were added specifically to ensure MSCS qualified. (*Id.* at ¶ 203.) The purported "forensic audit" was directed at MSCS alone and invoked when only twenty-five percent complete. (*Id.* at ¶ 204.)

*Departures from Normal Procedure.* The State directed an $8–9 million forensic audit at a single majority-Black school district—the only such audit in Tennessee history—while majority-white districts with documented worse audit findings received no forensic audit or governance intervention. (*Id.* at ¶ 209.) Preliminary audit findings were shared exclusively with the Republican caucus before MSCS could review or respond. (*Id.*) The General Assembly rejected the Hamilton County advisory model (for a majority-white district) while imposing total governance displacement on MSCS (a majority-Black district). (*Id.*)

*Legislative History.* Representative Miller stated the majority's "real purpose" was to "control a multi-billion-dollar operation . . . which happen to be a majority African American community." (*Id.* at ¶ 210.) Senator Akbari stated Criteria 5 and 6 "were clearly crafted just to

12

make sure you engineered only Memphis and Shelby County schools." (*Id.*) Representative Parkinson identified those criteria as unconstitutional. (*Id.*) Senator Yarbro characterized the criteria as a "mirage" and the legislation as "one of the most embarrassing things this legislature's done." (*Id.*)

Because Public Chapter 1057 was enacted with discriminatory purpose, per *Arlington Heights*, and disparately impacts minority schoolchildren, it is subject to strict scrutiny. The State cannot demonstrate a compelling interest served by the exclusive targeting of a majority-Black school district for governance displacement using criteria calibrated to that district's data, following a decade of documented failure of a comparable state experiment, and against the availability of a credible less-restrictive alternative.

Moreover, *Ex parte Young*, 209 U.S. 123 (1908), permits prospective injunctive relief against a state official where that official has a sufficient enforcement connection to the challenged conduct. *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). The Oversight Board Defendants—who exercise the operative approval authority over MSCS's budget, contracts, superintendent, and charter decisions—satisfy that requirement without regard to whether they are ultimately deemed arms of the State. *See* Tenn. Code Ann. § 49-1-616(c)(2)–(3); (ECF No. 31, PageID #: 296.) The Governor and the Speakers likewise have a sufficient enforcement connection independent of the Oversight Board Defendants. *See* Tenn. Code Ann. § 49-1-616(c)(2)–(3). The statute vests each of them with direct, ongoing appointment authority over the very body that exercises the challenged powers. *Id.* at § 49-1-616(c)(1)(A)–(C). That authority is not a one-time, backward-looking act because each appointing official may remove any of his appointees at any time for any reason. *Id.* at § 49-1-616(c)(3)(A). Further, each remains statutorily obligated to fill

vacancies as they arise and to reconstitute the Oversight Board with new appointees if the LEA still meets four of six criteria at the end of the initial four-year term. *Id.* § 49-1-616(b), (c)(2).

Additionally, and as set forth below, Commissioner Reynolds' May 22, 2026 determination was *ultra vires*. She issued it without the evidentiary findings, administrative record, or evaluative process that Tenn. Code Ann. § 49-1-616(a)(5)–(6) requires, and before the criteria it purported to satisfy could have been met. While *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 121 (1984), bars a federal court from ordering a state official to comply with state law, that bar only applies where the official is acting within the scope of lawful state authority. It does not immunize an official's conduct that exceeds any authority the state law itself confers.

An official who acts without colorable statutory authority is not exercising "state law" within the meaning of *Pennhurst*. She acts in her own name, outside the office Tennessee law created. It is well established that "[s]tate officials are not entitled to Eleventh Amendment immunity if they are acting *ultra vires*, that is without proper authority." *Miami Univ. Assoc'd Student Gov't v. Shriver*, 735 F.2d 201, 205 (6th Cir. 1984).

III. **PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIM FOR DECLARATORY JUDGMENT THAT PUBLIC CHAPTER 1057 DOES NOT APPLY TO MSCS AND THAT COMMISSIONER REYNOLDS ACTED *ULTRA VIRES*.**

Commissioner Reynolds acted *ultra vires* in two independent ways: (1) her letter was not a valid statutory determination under the Act, and (2) she acted as an agency of the State to enforce the standards of Public Chapter 1057 without first engaging in the rulemaking process the Uniform Administrative Procedures Act requires. Tenn. Code Ann. § 4-5-101, *et seq.*

A. **Commissioner Reynolds' Letter Was Not a Valid Statutory Determination.**

Tenn. Code Ann. § 49-1-616(a)(5)–(6) requires the Commissioner to "determine" that a local education agency meets the specified statutory criteria. This language imposes a substantive

14

obligation: the Commissioner must engage in a genuine evaluative exercise—examining evidence, applying the statutory criteria to actual data, and reaching a reasoned conclusion. A "determination" is not a ministerial rubber stamp; it requires substantive findings.

Commissioner Reynolds' May 22, 2026 letter satisfied none of these requirements. (Am. Compl. ¶ 176.) On the very same day Governor Lee signed the bill into law, Commissioner Reynolds transmitted a two-page letter to MSCS purporting to notify the district that it "meets four or more of the six criteria." (*Id.*) The letter identifies no specific criteria as satisfied, cites no supporting data or evidence, makes no findings of any kind, attaches no administrative record, consists of a determination occupying two sentences, and afforded MSCS no opportunity to respond, contest, or cure. (*Id.* at ¶¶ 177–81.) This conclusory notification cannot constitute a "determination" within the meaning of the statute.

The Amended Complaint further alleges that several of the statutory criteria were factually impossible to satisfy as of the date of the Commissioner's letter.

*Criterion 5—Financial Mismanagement.* No completed audit existed as of May 22, 2026. The forensic audit was only twenty-five percent complete. An incomplete audit produces no "findings" within the meaning of the statute, and findings of financial mismanagement cannot be premised on an investigation that has barely begun. (Am. Compl. ¶¶ 184–86.)

*Criterion 6—Leadership Instability.* The letter identifies no interim director by name, does not state how many interim directors MSCS employed, and makes no finding of causation—that any pattern of interim leadership "resulted in inconsistent district leadership and operational instability"—as the statute requires. (*Id.* at ¶¶ 189–91.) A bare, conclusory assertion, unsupported by any factual findings, does not satisfy the statutory "determination" requirement.

15

*Criteria 1, 2, and 3.* The 2025–2026 TCAP proficiency data (Criterion 1), school letter grades (Criterion 2), and chronic absenteeism data (Criterion 3) were all unavailable as of the letter's date. (*Id.* at ¶¶ 181–83.) The Commissioner could not have "determined" that these criteria were satisfied based on data that did not yet exist.

Moreover, the timing of Commissioner Reynolds' letter—issued the same day the Governor signed the Act into law—confirms that this was a coordinated predicate act rather than a deliberate, evidence-based evaluation. (*Id.* at ¶¶ 176, 192.) A genuine statutory determination requires time to gather evidence, analyze data, and reach a reasoned conclusion. The simultaneous issuance of the letter and the Governor's signature demonstrates that the "determination" was a fait accompli, coordinated with the Governor's office to trigger the Act's governance-displacement provisions immediately upon enactment.

Commissioner Reynolds therefore acted *ultra vires* when she determined that MSCS met four of the six statutory criteria for an Oversight Board.

**B.      Commissioner Reynolds Also Failed to Comply with the UAPA's Rulemaking Requirements.**

Commissioner Reynolds acted *ultra vires* for an additional, independent reason. She failed to comply with the rulemaking requirements of Tennessee's Uniform Administrative Procedures Act ("UAPA") before implementing Public Chapter 1057's standards. The Department of Education, and Commissioner Reynolds as its head, is an "agency" under the UAPA. *See* Tenn. Code Ann. § 4-5-102(2) (defining "agency" as "each state board, commission, committee, department, officer, or any other unit of state government authorized or required by any statute or constitutional provision to make rules or to determine contested cases").

A "rule" under the UAPA is "any agency regulation, standard, statement, or document of general applicability" that "describes the procedure or practice requirements of an agency" or

16

"implements, prescribes, or interprets an enactment of the general assembly." Tenn. Code Ann. § 4-5-102(12). Public Chapter 1057 grants the Commissioner authority to determine whether an LEA meets four of the six statutory criteria, but before exercising that authority, the Department was required to promulgate rules establishing how it would implement those standards. The Department did none of that. It issued no rules, held no rulemaking hearings, and gave no notice of proposed rulemaking before declaring that MSCS met the statutory criteria.

Because Commissioner Reynolds acted outside the UAPA's rulemaking framework, she acted *ultra vires* and is not entitled to Eleventh Amendment immunity. *See Miami Univ. Assoc'd Student Gov't*, 735 F.2d at 204 ("State officials are not entitled to eleventh amendment immunity if they are acting *ultra vires*, that is without proper authority."). The Commissioner had no authority to make any determination absent prior rulemaking implementing the statute's standards. Without duly promulgated rules defining how the criteria would be evaluated, she lacked the procedural authority to act, regardless of the merits of her conclusions.

Plaintiffs are accordingly entitled to a declaration that Public Chapter 1057 does not apply to MSCS because MSCS does not meet four of the six statutory criteria, or, alternatively, that Commissioner Reynolds did not comply with Public Chapter 1057 because she made none of the findings the statute requires and issued her determination without the rulemaking the UAPA requires. That same defect that invalidates the Commissioner's determination also confirms that the Oversight Board Defendants, who derive all of their authority from that determination and retain a direct, ongoing enforcement connection to Public Chapter 1057, are properly enjoined under *Ex parte Young* from taking any further action in their official capacities pending resolution of this action. (Am. Compl. ¶¶ 391–93.)

17

**IV. MSCS WILL SUFFER IMMEDIATE AND IRREPARABLE HARM IN THE ABSENCE OF INJUNCTIVE RELIEF.**

MSCS will suffer immediate, concrete, and irreparable harm if the Court does not grant injunctive relief prohibiting Defendants from taking any action to implement, enforce, or give effect to Public Chapter 1057 while this action is pending. The loss of constitutional rights is, in and of itself, an irreparable harm. *See Bongo Prods., LLC v. Lawrence*, 548 F. Supp. 3d 666, 685, 2021 WL 2897301 (M.D. Tenn. 2021); *see also Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987) (agreeing with district court's determination that "there is potential irreparable injury in the form of a violation of constitutional rights").

In addition to the loss of constitutional rights, Plaintiffs have also pled numerous other examples of harm that cannot be ameliorated by a judgment that might come in their favor sometime in the future. The MSCS Board will lose its right to govern as it has been elected to do. It will be unable to make payments or enter into any contracts. It will be unable to make its own hiring and firing decisions on district leadership. It will lose its ability to make educational policy decisions for the district. (Am. Compl. ¶¶ 39, 67.). Likewise, the Shelby County Commission will lose the ability to finalize and implement its own budget. These harms will be suffered by all of the Plaintiffs and by the public and the children for whom they are responsible. As set forth in the Declaration of Tito Langston, the changes in governance required by Public Chapter 1057, are likely to wreak real havoc on the District's ability to operate and maintain schools and District facilities. (ECF No. 20-1.)

The record set forth in the First Amended Verified Complaint also confirms that this harm to the Plaintiffs is neither speculative nor remote. Under Public Chapter 1057, MSCS cannot enter into, renew, or amend any contract valued at $50,000 or more without first submitting it to the

Oversight Board, which may approve the contract, reject it, or simply withhold action on it for up to fifteen business days. (Am. Compl. ¶ 216.) Because MSCS is presently negotiating and executing numerous contracts in anticipation of the school year beginning August 3, 2026, this approval mechanism threatens to create operational deadlock at precisely the moment such contracts must be finalized. (*Id.* at ¶ 217.)[7] Further, the proof to be presented that the Preliminary Injunction hearing will show that this harm to ongoing operations does not evaporate when school starts but will continue throughout the school year if Chapter 1057 is allowed to be implemented without constraint.

## V. THE HARM SUFFERED BY MSCS IN THE ABSENCE OF INJUNCTIVE RELIEF OUTWEIGHS THE HARM DEFENDANTS WILL SUFFER IF AN INJUNCTION IS IMPOSED.

In assessing the balance of equities, a court considers whether the requested relief "would cause substantial harm to others." *Certified Restoration*, 511 F.3d at 550 (quoting *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). Where a court finds a high likelihood of success on a plaintiff's constitutional claims, it correspondingly finds a low likelihood that injunctive relief would intrude on any powers legitimately retained by the State. *Bongo Prods.*, 548 F. Supp. 3d at 687.

The harm to Plaintiffs absent an injunction is catastrophic and irreversible, including but not limited to permanent displacement of democratic governance, permanent foreclosure of judicial review, and district instability that impacts the education of students. By contrast, the harm to Defendants is comparatively limited. A preliminary injunction merely preserves the status quo

---

[7] Moreover, and as noted in Plaintiffs' Motion for Temporary Restraining Order, Public Chapter 1057, *inter alia*, creates drastic changes to the way MSCS conducts business in ways that will inevitably delay operations and jeopardize the start of the school year on August 3, 2026 and will impede the ongoing operations of MSCS throughout the school year. *See generally* Declaration of Tito Langston ("Langston Decl."), ECF No. 20-1.

pending final resolution of this action on the merits. Moreover, because Plaintiffs have shown a strong likelihood of success on their claims, it is questionable whether the State has any "valid" interest in enforcing Public Chapter 1057 in the meantime. *Planned Parenthood Ass'n of Cincinnati*, 822 F.2d at 1400 (finding no substantial harm in preventing enforcement of a potentially unconstitutional ordinance).

## VI. INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST.

The public interest also weighs heavily in favor of granting an injunction. "It is always in the public interest to prevent violation of a party's constitutional rights." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cty.*, 274 F.3d 377, 400 (6th Cir. 2001) (internal quotation marks omitted). "[R]equiring the State of Tennessee to abide by the U.S. Constitution, sooner rather than later, vindicates the public interest in rule by law and the acceptance, by States, of constitutional government." *Bongo Prods.*, 548 F. Supp. 3d at 687.

The public interest is served here by judicial review of legislation raising substantial constitutional questions and not permitting potentially unconstitutional and *ultra vires* governance displacement before those questions are answered. More than 110,000 children and their families have a vested interest in democratic accountability over their public schools. The voters of Shelby County have a vested interest in electing representatives who actually govern. The public interest is further served by avoiding a repetition of the ASD experiment, which consumed $2 billion in public funds over nearly a decade without producing sustained academic gains.

## VII. ANTICIPATED DISCOVERY AND REQUEST FOR SUPPLEMENTAL BRIEFING.

Consistent with the Court's July 1, 2026 Order directing the parties to meet and confer regarding discovery and a hearing date, and with the Magistrate Judge's July 24, 2026 status

conference, Plaintiffs identify below the categories of expedited discovery necessary to complete the record before supplemental briefing and the preliminary injunction hearing:

1.     **Commissioner Reynolds' Determination and Administrative Record:** Deposition of Commissioner Reynolds and production of documents, data, and communications she reviewed or relied upon before issuing her May 22, 2026 determination letter;

2.     **The Comptroller's "Forensic Audit":** Deposition of the Comptroller and his retained firm and production of the engagement letter, communications, workpapers, and underlying data for the Interim and Final Reports.

3.     **MSCS's Compliance History with the Department of Education:** Production of MSCS's annual financial reports filed under the Department of Education's Fiscal Accountability Standards for fiscal years 2024 and 2025 and any related correspondence, to confirm the absence of any objection or exception for fraud, waste, or abuse from the Department or the State Board of Education.

4.     **TDOE's Role in Setting the Criteria Thresholds:** Interrogatories and document requests directed to the Tennessee Department of Education concerning whether and to what extent it was consulted in setting the four-of-six threshold and the specific criteria in Public Chapter 1057.

5.     **Comparator District Treatment:** Production of documents and data concerning the State's treatment of other Tennessee school districts, including those with comparable or worse audit findings.

Plaintiffs request that the Court authorize the foregoing discovery on an expedited basis and grant leave to file supplemental briefing addressing the results of that discovery within fourteen days after the close of depositions. Plaintiffs are prepared to discuss this or an alternative schedule with Defendants and the Magistrate Judge at the July 31, 2026 status conference.

**CONCLUSION**

For the foregoing reasons, Plaintiffs request that the Court grant its Motion and enter an order immediately restraining and enjoining Defendants from taking any action to implement, enforce, or give effect to Public Chapter 1057.

Dated: July 27, 2026.

Respectfully submitted,

BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, PC

*/s/ Bruce McMullen*

Bruce McMullen (Tenn. Bar #18126)
Lori H. Patterson (Tenn. Bar #19848, admitted pro hac vice)
Jerrick Murrell (Tenn. Bar # 34368, admitted *pro hac vice*)
Jennie Vee Silk (Tenn. Bar #35319)
165 Madison Ave., Suite 2000
Memphis, Tennessee 38103
Telephone: (901) 526-2000
Fax: (901) 577-2303
bmcmullen@bakerdonelson.com
lpatterson@bakerdonelson.com
jmurrell@bakerdonelson.com
jsilk@bakerdonelson.com

*Counsel for Plaintiffs Shelby County Government and the Shelby County Board of Commissioners*


THE WADE LAW FIRM, PLLC

Allan J. Wade (Tenn. Bar # 4339, *admitted pro hac vice*)
Brandy S. Parrish (Tenn. Bar # 21631, *admitted pro hac vice*)
5050 Poplar Ave., Suite 1028
Memphis, Tennessee 38157
Telephone: 901.322.8005
awade@thewadelawfirm.com
bparrish@thewadefirm.com

22

*Counsel for Plaintiffs Shelby County Board of Education, Michelle Robinson McKissack, Natalie J. McKinney, Stephanie P. Love, Sable Otey, Keith Williams, Towanna Murphy, Amber Huett-Garcia, Joyce Dorse Coleman, and Tamarques Porter*

23