# IN THE UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF TENNESSEE
# AT NASHVILLE

| | | |
|---|---|---|
| **SHELBY COUNTY GOVERNMENT, et al.**, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:26-cv-00835** |
| | ) | |
| **BILL LEE, in his official capacity as** | ) | **Judge Crenshaw** |
| **Governor of the State of Tennessee, et al.,** | ) | **Magistrate Judge Frensley** |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

"The Tennessee Constitution gives the General Assembly plenary authority over public schools." *Geller v. Henry Cnty. Bd. of Educ.*, 602 S.W.3d 876, 887 (Tenn. 2020) (citing Tenn. Const. art. XI, § 12). In recent years, Shelby County elected officials began voicing greater concerns about the governance of Memphis-Shelby County Schools ("MSCS"). In 2026, the General Assembly enacted the Tennessee Public Schools Accountability Act (the "Act") as both a comprehensive response and to stymie these types of concerns when raised in other districts. Per the Act's terms, when a local education agency ("LEA") meets four of six criteria, an oversight board is appointed to improve the academic performance of the LEA's students and remedy deficiencies in its management. Tenn. Code Ann. § 49-1-616. Plaintiffs now ask this Court to preliminarily enjoin that Act. That request does not seek, as Plaintiffs suggest, to "merely preserve[] the status quo." Pls.' Mem., ECF 43 at 2721.[1] It would instead prevent the State from

---

[1] Pincites to docket filings refer to the PageID file-stamp pagination.

reorganizing its own LEAs to provide for "the maintenance, support and eligibility standards of a system of free public schools." Tenn. Const. art. XI, § 12.

Before this lawsuit, the status quo consisted of a statute in effect and an oversight board lawfully convened. The July 1 order changed that without findings and before the State could respond, resting solely on Plaintiffs' claim that emergency relief was needed to prevent disruption to the opening of schools on August 3. Order, ECF 22. That date has passed, the schools are open, and Plaintiffs have abandoned most of the claims that supported their emergency request. The relief they now seek would preserve nothing; it would require this Court to enjoin a duly enacted statute for the first time. Plaintiffs have not carried the demanding burden required for that extraordinary relief.

Plaintiffs' sole remaining theory is that because the Act presently reaches only MSCS, and because MSCS is majority-African American, the Act must have been passed for a discriminatory purpose. That inference is unfounded. The Act applies statewide through six race-neutral criteria measuring academic performance, school quality, absenteeism, financial management, and leadership stability. Tenn. Code Ann. § 49-1-616(a). Indeed, the Sixth Circuit has rejected Plaintiffs' theory: *Moore v. Detroit School Reform Board* upheld a law replacing Detroit's elected board with an appointed one, though its sole reach was a single majority-African American district, because states may restructure local educational governance in response to district-level concerns. 293 F.3d 352, 370 (6th Cir. 2002). That reasoning is stronger here, where the Act creates a generally applicable statewide framework rather than legislation effectively confined to one district.

Plaintiffs also cannot show irreparable harm. Their alleged emergency has passed. An injunction would not preserve the pre-suit status quo but entrench its reversal on a record satisfying none of the governing factors. The Court should deny the motion and dissolve the July 1 order.

BACKGROUND

**I.     The Call for Intervention and a Forensic Audit of MSCS Originated Locally.**

The impetus to scrutinize the governance and finances of MSCS did not begin in Nashville. It originated with Shelby County's own elected officials. In January 2025, the Shelby County Board of Commissioners ("County Commission") adopted a resolution expressing "no confidence" in the MSCS Board. ECF No. 34-2. The resolution followed a prolonged period without permanent leadership at MSCS and the MSCS Board's efforts to remove the superintendent it had hired less than a year earlier. *Id.* at 1362. These events prompted the County Commission to call for a comprehensive governance plan "to ensure public trust, accountability, and transparency." *Id.* at 1364.

The Commissioners then turned to the district's finances. In February 2025, bipartisan members of the County Commission asked the Tennessee Comptroller to conduct "a comprehensive forensic audit" of MSCS, citing constituent demands to address "numerous allegations of waste, fraud and abuse" and "reports of improper expenditures, questionable procurement procedures, and a lack of financial oversight," including vendor overpayments, inadequate contract approvals, and internal-control failures. ECF No. 34-3. They asked that the audit examine MSCS's financial management, procurement and contracting, use of federal, state, and local funds, and internal controls and compliance. *Id.*

Three days later, the County Commission formally authorized its own forensic audit under Tenn. Code Ann. § 49-2-101 and appropriated up to $50,000 to fund it. ECF 34-7. The County Commission rescinded its funding only after the Comptroller advised that the State had allocated

3

funds to conduct the requested forensic audit, making the County's own appropriation redundant. Ex. 1. The forensic audit Plaintiffs now challenge is thus the same one that they themselves requested.

## II.     The General Assembly's Response.

In March 2025, the General Assembly also took up the question of how to address the governance and financial-accountability problems in MSCS. Legis. Rec., ECF 34-5 at 2043–47. For more than a year, legislators proposed and debated intervention measures. *See id.* In April 2026, the General Assembly passed the Accountability Act, codified at Tenn. Code Ann. § 49-1-616. The Act applies statewide, requiring an appointed oversight board for any LEA that satisfies four or more of six objective criteria: academic proficiency, school letter grades, chronic absenteeism, persistent priority-school status, comptroller-audit findings of financial mismanagement, and leadership instability. Tenn. Code Ann. § 49-1-616(a). Although legislators understood that MSCS would qualify for an oversight board, nothing in the Act limits its application to MSCS alone. Senator Brent Taylor of Shelby County, the Act's primary sponsor in the Senate, explained that "although one district has received all of the attention, this is a statewide effort." Legis. Rec., ECF 34-5 at 2495. Senator Taylor noted that multiple districts "meet three of the six criteria, and if they happen to meet a fourth criteria, they will get the same treatment." *Id.* at 2504; *see also id.* at 2382 (discussing other LEAs that meet three of the six criteria).

The dispute was never about whether MSCS warranted intervention, but about the form of that intervention. Legislators on both sides agreed that intervention was necessary; they disagreed only about its extent. Representative Antonio Parkinson and Senator Raumesh Akbari both acknowledged the need for intervention in MSCS and differed only on its degree. Legis. Rec., ECF 34-5 at 2470, 2515. Those are the very legislators whose statements Plaintiffs now offer as evidence of discriminatory purpose, *see* Am. Compl., ECF 14 at ¶ 210, but their objection was to

4

the degree of state control the Act imposed, not to the premise that MSCS's documented governance and financial failures warranted a state response. Legis. Rec., ECF 34-5 at 2470–73, 2515–23. Dissatisfied that their preferred form of intervention did not prevail, Plaintiffs now recast that policy dispute as a constitutional one. But the Act's origins in Shelby County officials' own concerns about the governance and finances of MSCS, and in the General Assembly's broad bipartisan agreement that intervention was necessary, cannot be squared with that theory.

## III.    The Present Posture of Plaintiffs' Claims

Plaintiffs' original complaint asserted one federal equal-protection claim and six state-law claims. Compl., ECF 1 at 34–48. They later amended to add the Educational Oversight Board members and three additional state-law claims. Am. Compl., ECF 14 at 102, 139–63. Plaintiffs then moved for a TRO, ECF 19, and on July 1 the Court ordered the parties to maintain the status quo "before enactment of" the Act pending resolution of the motion. Order, ECF 22 at 260. Defendants responded on July 14, ECF 34, and have separately moved to dissolve the July 1 order, ECF 32, and to dismiss all of Plaintiffs' claims, ECF 30.

Plaintiffs now move to preliminarily enjoin the Act, and their memorandum asserts a likelihood of success on two claims: a federal equal-protection claim and a state-law claim that the Commissioner of Education acted ultra vires in determining that the Act applies to MSCS. Pls.' Mem., ECF 43 at 2716–19. But the ultra vires claim does not appear in the operative Amended Complaint. *See* ECF 14. Plaintiffs acknowledged when they filed their motion that they needed leave to file a further complaint "that underlies the claims addressed in [their] motion," ECF 43 at 2712, and they sought that leave, ECF 44. They have since moved for leave to file yet another complaint that drops their state-law claims entirely and have represented that they do not intend to pursue the ultra vires claim. ECF 51; ECF 51-1. The Court has granted that motion. ECF 53.

5

Defendants therefore address the only claim properly before the Court on this motion: Plaintiffs' equal-protection claim.

**STANDARD OF REVIEW**

A preliminary injunction "is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The movant must establish: (1) a likelihood of success on the merits; (2) that it is likely to suffer irreparable harm absent relief; (3) that the balance of equities favors it; and (4) that an injunction is in the public interest. *Id.* at 20. Although no factor is controlling, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000). Failure to demonstrate irreparable harm that is "both certain and immediate," not "speculative or theoretical," is likewise sufficient to warrant denial. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019).

Plaintiffs bear the burden of justifying that extraordinary relief, *ACLU Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015), a "burden of proof more stringent than the proof required to survive a summary judgment motion." *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020). They cannot lighten that burden by asserting that the requested injunction would "merely preserve[] the status quo." Pls. Mem., ECF 43 at 2721. On the contrary, it would continue to suspend the operation of a duly enacted state statute and prevent duly appointed state officials from exercising authority the General Assembly conferred.

**ARGUMENT**

**I.      Plaintiffs' Equal Protection Claim Fails at the Threshold.**

Before the merits, two threshold defects independently defeat Plaintiffs' motion as to the relief they seek and the defendants they have sued. First, the *Ex parte Young* exception they

6

invoke does not reach the Governor, the Speakers, or the Commissioner, whose only connection to the Act is the power to appoint, remove, or notify. Whatever relief Plaintiffs might obtain cannot run against these officials. Second, the only Plaintiffs who could assert an equal-protection injury allege none, while the injuries Plaintiffs do allege belong to governmental entities that cannot sue their own State.

### A. Sovereign immunity and *Ex parte Young* bar relief against the Governor, the Speakers, and the Commissioner.

To demonstrate a likelihood of success on the merits, Plaintiffs must also show a likelihood of establishing jurisdiction. *Memphis A. Philip Randolph Inst. v. Hargett*, 2 F.4th 548, 554 (6th Cir. 2021). The Governor's, Speakers', and Commissioner's sovereign immunity prevents Plaintiffs from overcoming that bar.

Sovereign immunity is a "jurisdictional bar" that protects State officials sued in their official capacity from suit. *White's Landing Fisheries, Inc. v. Ohio Dep't of Nat. Res.*, 174 F.4th 493, 500 (6th Cir. 2026). This "longstanding principle" protects a State's "interests in avoiding not just ultimate liability, but litigating a suit itself," and requires a court to resolve whether the State is entitled to immunity "at each step that litigation proceeds." *Kerchen v. Univ. of Mich.*, 100 F.4th 751, 760 (6th Cir. 2024).

As State officials, the Governor, Speakers, and Commissioner enjoy sovereign immunity from suit. *See White's Landing*, 174 F.4th at 500. Plaintiffs attempt to overcome that immunity by invoking the exception in *Ex parte Young*, 209 U.S. 123 (1908), and pointing to these officials' roles under the Act to notify, appoint, and remove oversight board members. Pls.' Mem., ECF 43 at 2715. But *Ex parte Young's* "narrow exception" does not apply here. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).

7

*Ex parte Young* permits a suit seeking prospective relief "against a state official who is engaged in a continuing violation of federal law." *White's Landing*, 174 F.4th at 500. That requires a plaintiff to show that the official has an "obligation to enforce a law" and that "there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015).

Plaintiffs have not clearly shown that the Governor, Speakers, or Commissioner have a duty to enforce the Accountability Act or a realistic possibility of doing so in the future. The Act tasks the Commissioner with notifying the Governor and Speakers that an LEA meets four of the six factors, and the Governor and Speakers may then appoint and remove oversight board members. Tenn. Code Ann. § 49-1-616(a)-(c). Federal courts have rejected suits against state officials whose connection to a statute is the power to appoint, remove, or notify, because those actions are not "enforcement," even when the challenged statute itself grants that power. *E.g.*, *Balogh v. Lombardi*, 816 F.3d 536, 546 (8th Cir. 2016); *Smith v. DeWine*, 476 F. Supp. 3d 635, 652 (S.D. Ohio 2020); *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 673-74 (S.D. Ohio 2017); *Kelly v. Burks*, 414 F. Supp. 2d 681, 686 (E.D. Ky. 2006); *LensCrafters, Inc. v. Sundquist*, 184 F. Supp. 2d 753, 758–59 (M.D. Tenn. 2002). Plaintiffs point the Court to no contrary authority. Pls.' Mem., ECF 43 at 2715.

Even if those actions resembled enforcement, Plaintiffs have not clearly shown a realistic possibility that the Governor, the Speakers, or the Commissioner will take them again. *See Russell*, 784 F.3d at 1048. *Ex parte Young* requires a plaintiff to show that the official's "violation of federal law . . . is ongoing," not that the official "at one time or over a period of time in the past" violated federal law. *Papasan v. Allain*, 478 U.S. 265, 277–78 (1986). By the time Plaintiffs filed suit on June 18, the Commissioner had notified the Governor and Speakers that MSCS met

four of the six factors, the Governor and Speakers had already appointed the Oversight Board for MSCS, and the members had held their inaugural meeting. Am. Compl., ECF 14 at 111–12, 117. Plaintiffs have not shown that removal of any member is a "realistic possibility," *see Russell*, 784 F.3d at 1048, nor that MSCS is unlikely to continue meeting four of the Act's six criteria at the end of the Board's four-year term, *see id.*; Tenn. Code Ann. § 49-1-616(d)(1)(B). Because Plaintiffs cannot overcome these officials' sovereign immunity, they cannot show a likelihood of establishing jurisdiction. *See Hargett*, 2 F.4th at 554.

### B. No Proper Plaintiff Alleges a Redressable Injury.

Shelby County[2] and MSCS are political subdivisions of Tennessee, and political subdivisions "cannot invoke the protection of the Fourteenth Amendment against" their parent State. *Greater Heights Acad. v. Zelman*, 522 F.3d 678, 679–81 (6th Cir. 2008); *S. Macomb Disposal Auth. v. Washington Twp.*, 790 F.2d 500, 505 (6th Cir. 1986). They are "convenient agencies" for exercising such governmental powers as the State entrusts to them, and the State's power over them "is unrestrained by any provision of the Constitution of the United States." *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178–79 (1907); *accord Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009). The State's reallocation of governance authority within its own school system is not an equal protection injury to County or the district; it is an exercise of authority the Constitution leaves to the State.

Nor can Shelby County and MSCS sue "on behalf of the students of MSCS." Pls.' Proposed Sec. Am. Compl., ECF 51 at ¶ 12. Third-party standing requires a hinderance that keeps

---

[2] Plaintiffs name Shelby County Government and the Board of Commissioners of Shelby County as separate plaintiffs but do not meaningfully distinguish them. The Amended Complaint describes the County Commission as both the County's legislative body and as "the county government" itself. Am. Compl., ECF 14 at ¶¶ 9, 11. The distinction makes no difference here as both are organs of the county government and therefore political subdivisions of the State.

the third party from protecting his or her own rights. *Moody v. Michigan Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017). Plaintiffs cannot clearly show any such hinderance because the very students whose rights they seek to assert are already parties here. *Id.* at 403 ("No practical barriers exist if the third party asserts his own rights.").

The result is that no Plaintiff alleges a redressable federal injury. Shelby County and MSCS cannot invoke the Fourteenth Amendment against the State that created them, and they cannot cure that defect by suing on behalf of MSCS students who are themselves Plaintiffs. That leaves the individual MSCS Board members and three MSCS students asserting injuries that are not theirs. Every harm alleged in Plaintiffs' motion is institutional: the MSCS Board's loss of authority over contracts, personnel, and policy; the County Commission's inability to finalize its budget; the displacement of democratic governance and foreclosure of judicial review. Pls. Mem., ECF 43 at 2720–21. Those injuries belong to the institutional Plaintiffs, barred by *Hunter*. The individual MSCS Board members lack standing to assert them, *State by & through Tennessee Gen. Assembly v. United States Dep't of State*, 931 F.3d 499, 510 (6th Cir. 2019), and cannot do so as citizens because there is no constitutional right to a particular form of school governance, *see Mixon v. State of Ohio*, 193 F.3d 389, 403 (6th Cir. 1999). And the County Commission has finalized the County's budget before considering MSCS's budget. Exs. 2-3. In short, the Plaintiffs who can sue allege no imminent harm, and the injuries alleged belong to Plaintiffs who cannot sue. The Court may deny Plaintiffs' motion on that ground alone.

## II. Plaintiffs are Unlikely to Succeed on Their Equal Protection Claim.

Should the Court reach the merits, Plaintiffs cannot show a likelihood of success on their equal-protection claim. As an initial point of reference, Plaintiffs allege that the Accountability Act was *enacted* with a discriminatory purpose. Am. Compl., ECF 14 at 139. That defect lies in the motive of the legislators who passed it; it must exist in the statute itself and cannot turn on how

10

the statute is applied. If an impermissible purpose infected the Act's passage, that purpose is the same regardless of which school districts meet its criteria. Yet Plaintiffs' Amended Complaint asks the Court to enjoin the Act only "as applied to MSCS," Am. Compl., ECF 14 at 164, while their motion seeks to bar implementation and enforcement outright. Pls.' Mot., ECF 42 at 2698. However they label it, a discriminatory-purpose claim attacks the statute as enacted, not its application to any one district. Plaintiffs thus seek facial, statewide suspension of a duly enacted, race-neutral law on a preliminary record and must carry the full burden that relief demands.

### A. Plaintiffs cannot demonstrate discriminatory purpose under *Arlington Heights*.

Courts considering an equal-protection challenge must "begin from the presumption that legislatures act in good faith." *United States v. Myrie*, 167 F.4th 876, 880 (6th Cir. 2026). The Accountability Act draws no racial classification, and "official action will not be held unconstitutional solely because it results in a racially disproportionate impact." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Plaintiffs must therefore prove that discriminatory purpose was "a motivating factor" in the Act's enactment, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977), and that the General Assembly selected this course of action "because of, not merely in spite of," its adverse effects on an identifiable racial group, *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Without that showing, the Act is reviewed only for a rational basis, which it unquestionably satisfies. *See Mixon*, 193 F.3d at 403 ("[W]e agree that appointed school boards may provide significant benefits in a State's attempt to improve local schools. State legislatures need the freedom to experiment with different techniques to advance public education and this need to experiment alone satisfies the rational basis test."). Legislative awareness that a neutral statute will initially reach one district does not establish discriminatory purpose. Neither does disagreement with the legislature's policy choices or its rejection of proposed alternatives. Plaintiffs cannot carry their burden under any *Arlington Heights* factor.

**Disparate Impact.** Plaintiffs first say the Act must be discriminatory because MSCS serves a majority-African American student population and no majority-white districts qualify. Pls. Mem., ECF 43 at 2714. The argument depends on a correlation between the Act's coverage and race, a tie that does not exist. Tennessee has five other majority-African American districts, and the Act reaches none of them.[3] It has eleven more districts that are not majority-white, and the Act reaches none of them either.[4] Were the Act directed at race, some of those districts would be swept in; none is. The disparity Plaintiffs identify is therefore one of performance, not race: the criteria measure student proficiency, school performance, absenteeism, fiscal control, and leadership stability, and they sort districts accordingly. That MSCS alone presently meets four of the six shows only that the criteria found the district with the problems they measure, not that race drove the selection. Indeed, multiple other districts meet three of the Act's criteria and will receive "the same treatment" if they "meet a fourth." Legis. Rec., ECF 34-5 at 2504. And disparate impact alone, even if shown, "is not sufficient to state a plausible equal-protection claim." *Myrie*, 167 F.4th at 881; *see Washington*, 426 U.S. at 239.

**Historical Background.** Plaintiffs point to the Achievement School District in 2012 and the creation of municipal school districts in Shelby County in 2013 as evidence of a discriminatory

---

[3] Plaintiffs relied on the Tennessee Department of Education 2024-25 Report Card, available on the Department's website, in support of their motion for a temporary restraining order. ECF 20 at 237. That source demonstrates that Fayette County Public Schools, Hardeman County Schools, Haywood County Schools, Humboldt City Schools, and Jackson-Madison County Schools all have majority-African-American student populations. Tenn. Dep't Educ. 2024-25 Report Card, *available at* https://tdepublicschools.ondemand.sas.com/.

[4] Clarksville Montgomery County School System, Cleveland City Schools, Dyersburg City Schools, Fayetteville City Schools, Hamilton County Schools, Lauderdale County Schools, Metro Nashville Public Schools, Millington Municipal Schools, Murfreesboro City Schools, Rutherford County Schools, and Union City Schools have majority non-white student populations. Tenn. Dep't Educ. 2024-25 Report Card, *available at* https://tdepublicschools.ondemand.sas.com/.

pattern. Pls. Mem., ECF 43 at 2714. Neither bears weight. Historical background has particular relevance only where a plaintiff shows "a series of official actions taken for invidious purposes," *Arlington Heights*, 429 U.S. at 267, and the "views of an earlier legislature are generally not probative of the intent of a later legislature," *Myrie*, 167 F.4th at 880. The ASD was a race-neutral intervention directed at the State's lowest-performing schools, Tenn. Code Ann. § 49-1-614, and Plaintiffs do not contend it was racially motivated. ECF 43 at 2714. Nor could they, because the State's identification of those schools tracks federal requirements to receive federal funds. *Compare* 20 U.S.C. § 6311(c)(4)(D), *with* Tenn. Code Ann. § 49-1-602(b)(1)(C). The municipal school districts in Shelby County were created by vote of the residents of those municipalities, not by the General Assembly. *See* Am. Compl., ECF 14 at ¶ 53. And the existence of multiple districts in Shelby County is nothing new—multiple school districts have operated in the County for all but one year since 1868. *See Bd. of Cnty. Comm'rs v. Burson*, 121 F.3d 244, 246 & n.1 (6th Cir. 1997); *Dallas v. Shelby Cnty. Bd. of Educ.*, 603 S.W.3d 32, 39 (Tenn. Ct. App. 2019). Plaintiffs tie neither event to any racial motivation or to this Act.

**Sequence of Events.** Plaintiffs complain that Criteria 5 and 6—audit findings and leadership instability—were added to ensure MSCS qualified. ECF 43 at 2714. Those criteria track concerns documented by Plaintiffs themselves. The County Commission's February 2025 resolution recited that "[i]n less than three (3) years, M-SCS has had four (4) different school superintendents, including two (2) interim appointments," and sought a forensic audit "to ensure that there has been no misuse of public-school funds." ECF No. 34-7 at 2608–09. Criteria 5 and 6 measure precisely those conditions. The General Assembly adopted criteria capturing problems Shelby County's own elected officials had identified a year earlier–criteria drawn to reach documented governance and financial failures. These criteria reach MSCS, but they may also arise

13

at any district in the State regardless of race.  Beyond Plaintiffs' postulations, the accurate timeline shows Shelby County's elected officials first sounding the alarm and the General Assembly enacting solutions, and nothing in that sequence of events ties any adopted criterion to the district's racial composition.  *See Feeney*, 442 U.S. at 279.

**Departures from Normal Procedure.**  Plaintiffs' procedural-departure argument collapses on inspection.  They lead with the forensic audit, stressing that it was the first of its kind in Tennessee, but as explained above, that audit was requested by the County Commission, not imposed by the State.  The State's *response* to local government's requests cannot constitute a racially motivated departure from normal procedure.  The legislative path to the Act confirms the point: the measure was considered across two legislative sessions, refined through multiple bills and proposed amendments, and reconciled in conference committee.  *See* Legis. Rec., ECF 34-5.  That is the opposite of a procedural departure; it is careful deliberation.  Nor does the comparison to Hamilton County Schools aid them.  ECF 43 at 2714.  That district is not majority-white, as Plaintiffs assert, *see* Hamilton County Schools, Tenn. Dep't Educ. 2024-25 Report Card, *available at* https://tdepublicschools.ondemand.sas.com/, and its treatment supplies no basis to infer that race, rather than governance and accountability concerns, drove the legislature's choices.  What Plaintiffs protest reflects disagreement with the outcome of that process, not evidence of unconstitutional motive.  *See Moore* 293 F.3d at 369–70.

**Legislative History.**  Plaintiffs' legislative-history evidence does not suggest a discriminatory purpose, for two threshold reasons and one that is dispositive.  First, the statements Plaintiffs marshal come primarily from legislators who opposed the Act.  Statements by a bill's opponents are not competent evidence of the enacting majority's purpose.  "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to

14

enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). Courts therefore "do not judge the intention of a bill's supporters by the characterization of its opponents," *Michigan State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 351 (6th Cir. 2018), and afford the "fears and doubts" opponents voice "in their zeal to defeat a bill" little weight, *Fieger v. U.S. Atty. Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008).

Second, none of the statements suggest a racial purpose. Plaintiffs cite references to Memphis, Shelby County, and MSCS, but those name places and a school district, not a racial group. The only cited reference to race at all is Representative Miller's characterization of the majority's "real purpose," and even that ascribes a desire to control the MSCS budget and operations, not to act against a racial group. Pls. Mem., ECF 43 at 2714. Representative Miller invoked race only to observe that MSCS "happen[s] to be a majority African American community." *Id.* That conveys awareness of who is affected, not intent to act because of it—the difference between acting "because of" and merely "in spite of" a foreseeable racial impact that *Feeney* holds dispositive. *See* 442 U.S. at 279. In any event, Representative Miller's statement is an opponent's accusation, not the enacting body's stated purpose, and cannot overcome the presumption of good faith that the General Assembly is entitled to. *Myrie*, 167 F.4th at 880. Plaintiffs identify no statement by any legislator who voted for the Act reflecting racial animus.

Third, and most tellingly, even the Act's opponents agreed that intervention in MSCS was warranted, including the very legislators whose statements Plaintiffs now offer as evidence of discriminatory purpose. *See* Am. Compl., ECF 14 at ¶ 210. Representative Parkinson acknowledged, "We know that [MSCS] needs an intervention. I think we all agree with that. I think where we may disagree or differ a little bit is in how that intervention looks." Legis. Rec., ECF 34-5 at 2470. Senator Akbari likewise recognized "that [MSCS] needs a level of

15

intervention." *Id.* at 2515. Concern for MSCS was bipartisan and openly acknowledged, foreclosing any inference that the State's chosen solution to the problem masked invidious racial motive. Nor is the Act confined to MSCS. Had the General Assembly wished to limit it to that district, it had familiar tools to do so: a population bracket, an enrollment floor, or a budget threshold keyed to the State's largest district. It used none of them. The Act instead applies statewide, regardless of demographics, student population, or budget to any district that satisfies four of six neutral, performance-based criteria. Indeed, legislators identified other districts as approaching the statutory threshold, naming several they described as meeting three of the six criteria. *Id.* at 2382. A statute framed around neutral triggers that other districts can and do approach is the opposite of one aimed at a single district because of its racial composition.

After each *Arlington Heights* factor is evaluated, what remains is a statute that provides for additional governance in one of several majority-African American districts in Tennessee, enacted in response to local elected officials' documented concerns about the district's governance and finances. Plaintiffs point to nothing in the record suggesting race motivated the General Assembly. If anything, the record indicates that the General Assembly was motivated by the same concerns the County Commission voiced in declaring no confidence in the Board and requesting a forensic audit—and concern shared with the district's own local government cannot be pretext for racial animus. That the Act reaches a majority-African American district is, standing alone, insufficient; the Constitution requires a showing that the legislature acted because of, not merely in spite of, the law's racial impact, *Feeney*, 442 U.S. at 279, and disparate impact alone does not supply it, *Washington*, 426 U.S. at 239. Rational-basis review therefore governs, and the Act easily satisfies it: the General Assembly rationally concluded that a district exhibiting the governance instability, leadership turnover, and financial-accountability failures warrants state intervention. *Moore*, 293

16

F.3d at 372; *Mixon*, 193 F.3d at 403; *Hearne v. Bd. of Educ. of City of Chicago*, 185 F.3d 770, 776 (7th Cir. 1999). Plaintiffs therefore fail to carry the "stringent" burden of showing likely success on their equal protection claim. *See Glowco, LLC*, 958 F.3d at 539.

### B. *Moore v. Detroit School Reform Board* confirms the point.

The conclusion compelled by *Arlington Heights* is reinforced by the Sixth Circuit's decision in *Moore v. Detroit School Reform Board*, which upheld Michigan's School Reform Act against a materially similar equal-protection challenge. 293 F.3d at 368–72. There, Michigan replaced Detroit Public Schools' elected school board with an appointed reform board in response to concerns about the district's governance, finances, and educational performance. *Id.* at 355–56. The plaintiffs alleged that the statute was enacted because Detroit and DPS were overwhelmingly African American and challenged the legislature's chosen reform measures, rejection of proposed alternatives, and legislative process. *Id.* at 369. The Sixth Circuit rejected those arguments, holding that the plaintiffs' complaints reflected only "general dissatisfaction with the legislative process," not evidence of discriminatory purpose. *Id.* at 370.

Indeed, the legislation upheld in *Moore* was more narrowly tailored to a single school district than Public Chapter 1057. The Michigan statute applied only to districts with more than 100,000 students. *Id.* at 354. At the time of enactment, DPS had approximately 180,000 students; the next-largest district in Michigan enrolled approximately 27,000 students. *Id.* Detroit itself was nearly 80% African American, more than 90% of DPS students were African American, and approximately 60% of Michigan's African American population resided in Detroit. *Id.* at 369. Yet the Sixth Circuit rejected the contention that the statute violated the Equal Protection Clause, concluding instead that Michigan legislators sought to address problems they perceived to exist in exceptionally large school districts, not to discriminate because of race. *Id.* at 370.

17

The Accountability Act is also materially less restrictive than the Michigan law, which was functionally limited to a single district. It does not identify school districts by enrollment or any other single characteristic. It applies to any Tennessee LEA satisfying four of six criteria measuring academic performance, school quality, chronic absenteeism, financial management, and leadership stability. Tenn. Code Ann. § 49-1-616(a). And of these, legislators identified multiple LEAs that already satisfied three of the six statutory criteria, demonstrating that other districts could become subject to the Act if they later satisfy one additional criterion. Legis. Rec., ECF 34-5 at 2382.

Nor does Plaintiffs' emphasis on legislative awareness distinguish *Moore*. Legislators there understood that DPS would be the only district immediately subject to the Michigan statute, just as legislators here understood that MSCS presently satisfies the Act's criteria. *Moore*, 293 F.3d at 371–72. The Sixth Circuit nevertheless rejected the argument that legislative knowledge of a statute's application establishes discriminatory purpose. *Id.* The constitutional question is not whether legislators understood which district would initially qualify. It is whether they selected the statutory criteria because of, rather than merely in spite of, their effect on a racial group. *See Feeney*, 442 U.S. at 279. Plaintiffs have not made that showing.

*Moore* also rebuts Plaintiffs' reliance on the legislative process itself. There, plaintiffs criticized the legislature's disrespectful treatment of Detroit's elected representatives, rejection of proposed amendments, selection of allegedly ineffective reform measures, and reliance on a scandal that occurred years earlier. *Moore*, 293 F.3d at 369. The Sixth Circuit concluded that those allegations demonstrated only dissatisfaction with the legislative process, not unconstitutional motive. *Id.* Plaintiffs' objections to the addition of statutory criteria, reliance on the forensic audit Shelby County itself requested, and the rejection of alternative oversight

18

proposals fare no better here. They reflect disagreement with the legislature's policy choices, not evidence that the General Assembly acted because of race.

In short, the Sixth Circuit has already rejected an Equal Protection challenge to legislation more narrowly drawn to a single, predominantly African American district than the Act at issue here. Measured against *Moore* and the *Arlington Heights* framework, Plaintiffs cannot make the "clear showing" of discriminatory purpose required for preliminarily injunctive relief.

## III. Plaintiffs Cannot Show Irreparable Harm.

Irreparable harm is an indispensable prerequisite to preliminary relief, and even the strongest showing of likely success cannot eliminate it. *D.T.*, 942 F.3d at 326–27. The injury must be "certain and immediate, not speculative or theoretical," and where a plaintiff faces no imminent harm, "there's no need to grant relief now as opposed to at the end of the lawsuit." *Id.* at 327. Plaintiffs lead with the presumption that a constitutional violation is per se irreparable, but that presumption attaches only where the movant has shown a likelihood of success on the underlying constitutional claim. For the reasons above, Plaintiffs have not, and the presumption drops out— leaving their asserted practical harms to be measured against the ordinary standard, which they cannot meet.

Most of those asserted harms reduce to a single fact: the Act temporarily reallocates governmental authority from one state-created entity to another. The MSCS Board holds only the powers that state law confers, and the Act reassigns some of them to the Oversight Board for a limited statutory term. Those are statutory powers, not vested constitutional rights, and their temporary reallocation is not irreparable harm. Were it otherwise, every legislative reorganization of local government would warrant an injunction without any further showing.

Plaintiffs' remaining theory is one of operational disruption, and it does not describe a certain and immediate injury. The emergency on which their TRO rested was disruption of the

19

2026–27 school year's opening; that date has come and gone, and with it any justification for emergency relief now rather than after the case is decided on the merits. *See D.T.*, 942 F.3d at 327. And while Plaintiffs forecast mid-year deadlocks in contracting, budgeting, and personnel, these are precisely the kind of speculative, contingent harm that cannot support preliminary relief. *Id.*

The Act's own provisions refute that dire forecast. A contract or budget item the Oversight Board does not act on within fifteen business days is "deemed to be approved," the Oversight Board may act through an executive committee empowered to act on its behalf, and the Oversight Board and its committees may meet electronically. Tenn. Code Ann. § 49-1-616(d)(2)(C), (d)(3), (e)(2)(C). The deadlock Plaintiffs predict can occur only if the Oversight Board affirmatively declines to use the tools the Act gives it. That assumption disregards the statute's design. In any event, the change is one of degree, not kind: MSCS already requires its elected Board to approve contracts above $100,000, Langston Decl., ECF 20-1 at ¶ 13, so a district that already routes such contracts through board review will not be paralyzed by a $50,000 threshold and a defined review period. Tenn. Code Ann. § 49-1-616(e)(2)(A).

Plaintiffs also claim that the Act would strip the County Commission of the "ability to finalize and implement its own budget." Pls.' Mem., ECF 43 at 2720. Their theory is that because the Oversight Board must approve the MSCS budget before it goes to the County Commission, any delay in that approval prevent the County from finalizing its own budget, causing "[g]overnance paralysis" to "cascade through the County's entire fiscal operations" and impacting essential county services like public safety, health services, and infrastructure. Am. Compl., ECF 14 at ¶¶ 219–24. But that dire prediction is unfounded. The County Commission adopted the County's budget for fiscal-year 2027 on June 29, 2026, after the Act took effect and before the

20

Court's July 1 order.  Ex. 2.  They did not wait for the Oversight Board to approve the MSCS budget, and the predicted cascade never occurred.  In fact, as of this filing, the County Commission still has not yet adopted MSCS's proposed budget for fiscal-year 2027, which they last considered in committee on August 5, 2026.  Ex. 3.  Even if the County's budget were to some degree dependent on the MSCS budget, the Act forecloses the delay Plaintiffs fear.  If the Oversight Board does not act on a submitted budget within fifteen business days, the budget is "deemed to be approved."  Tenn. Code Ann. § 49-1-616(e)(2)(C).  The Oversight Board's inaction approves a budget; it does not freeze one.  The harm Plaintiffs forecast is speculative at best, and speculative harm cannot support the extraordinary relief they seek.

Finally, Plaintiffs are wrong that denying an injunction will "permanently foreclose" their access to the courts.  The Act's litigation limitation binds only "the local board of education" and reaches only a challenge to "action taken by an oversight board pursuant to, and in accordance with," the Act.  Tenn. Code Ann. § 49-1-616(g).  It does not bar this constitutional challenge to the Act itself, and it does not reach Shelby County Government, the individual MSCS Board members, or the MSCS students.  Each is represented here, litigating now, and free to continue.  Plaintiffs' merits challenge will be heard; they need no injunction to preserve it.

## IV.    The Balance of Equities and the Public Interest Favor the State.

Because the State is a party, the balance-of-equities and public-interest factors merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Both favor allowing the Act to operate.  "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Abbott v. Perez*, 585 U.S. 579, 602 (2018); *accord Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).  That injury is already being inflicted here: the Act has been suspended since July 1, and every day it remains enjoined is a day the State cannot carry out the accountability measures its General Assembly enacted.

Plaintiffs' contrary showing depends entirely on their merits position. They argue that the public interest always favors preventing a constitutional violation and that the State has no valid interest in enforcing an unconstitutional law. Pls. Mem., ECF 43 at 2722. But that reasoning assumes the very conclusion Plaintiffs must prove. Where, as here, the movant has not shown a likelihood of success, the premise fails and the equities revert to their default: the public interest in the operation of validly enacted law. Plaintiffs' invocation of democratic governance does not shift the balance, because the General Assembly is elected too, and the Tennessee Constitution commits maintenance of the public school system to that body, not to any local board. Tenn. Const. art. XI, § 12. Plaintiffs have "no fundamental right to elect an administrative body such as a school board." *Mixon*, 193 F.3d at 403.

In fact, the equities tilt decisively the other way in this case. The State and its citizens share a substantial interest in remedying the documented governance and financial-accountability failures that Shelby County's own elected officials recognized when the County Commission declared no confidence in the MSCS Board. An injunction would not preserve a neutral status quo. It would entrench, for the months or years this litigation may take, the very instability that prompted local officials to seek state assistance. Plaintiffs have shown no entitlement to that extraordinary result. Their motion should be denied, and the July 1 order dissolved.

## V.     The Court Need Not Permit Discovery to Resolve This Motion.

Finally, Plaintiffs ask the Court to grant them limited discovery. Pls.' Mem., ECF 43 at 2722-23. But none of the requested discovery is "necessary" for the Court to rule on Plaintiffs' equal-protection challenge for their preliminary injunction motion. Order, ECF 25 at 272.

Plaintiffs' equal-protection challenge to the "facially neutral" Act requires them to show it was enacted with a "racially discriminatory . . . intent or purpose." Pls.' Mem., ECF 43 at 2713-15; Pls.' Proposed Sec. Am. Compl., ECF 51 at 2852-53. That claim necessarily focuses on the

22

"decisionmaker's purposes." *Arlington Heights*, 429 U.S. at 267. The Act's legislative record is already before the Court. *See* Legis. Rec., ECF 34-5. Plaintiffs have offered no reason they need information about actions taken by non-legislators outside the legislative process. Pls.' Mem., ECF 43 at 2723. And their sole request relating to the legislative process—as to whether the Tennessee Department of Education "was consulted" (*id.*)—runs headlong into the General Assembly's legislative privilege. *See Kent v. Ohio House of Rep. Democratic Caucus*, 33 F.4th 359, 365 (6th Cir. 2022); *see also* Am. Compl., ECF 14 at 123 ¶ 123 (alleging the Department was not consulted). Because Plaintiffs' claim turns on the General Assembly's purpose, and that record is already complete, no discovery is necessary to resolve the motion.

Further, the Court "must" rule on Defendants' "properly raised sovereign immunity defenses" "before ordering discovery." *Kerchen*, 100 F.4th at 760-61. Those defenses are pending, and they bar discovery until resolved.

## CONCLUSION

For these reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for Preliminary Injunction and dissolve the July 1 Order.

23

Respectfully submitted,

**JONATHAN SKRMETTI**
Attorney General and Reporter

s/ Robert W. Wilson
SHANNON HOFFERT TN BPR 028430
Deputy Attorney General

MATTHEW DOWTY TN BPR 36070
ROBERT W. WILSON TN BPR 34492
Senior Assistant Attorneys General

MARK WESTON TN BPR 038585
Assistant Attorney General

One Commerce Square
40 S. Main St., Suite 1014
Memphis, TN 38103
(901) 543-9039
Shannon.Hoffert@ag.tn.gov
Matthew.Dowty@ag.tn.gov
Mark.Weston@ag.tn.gov
Robert.Wilson@ag.tn.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was served by operation of the

Court's ECF/PACER system on this the 10th day of August 2026, upon:

**BAKER, DONELSON, BEARMAN
CALDWELL & BERKOWITZ, PC**

Bruce McMullen
Lori H. Patterson
Jerrick Murrell
Jennie Vee Silk

24

165 Madison Ave., Suite 2000
Memphis, TN 38103
bmcmullen@bakerdonelson.com
lpatterson@bakerdonelson.com
jmurrell@bakerdonelson.com
jsilk@bakerdonelson.com
*Counsel for Plaintiffs Shelby County*
*Government & Shelby County*
*Board of Commissioners*

**THE WADE LAW FIRM, PLLC**

Allan J. Wade
Brandy S. Parrish
5050 Poplar Ave., Suite 1028
Memphis, TN 38157
awade@thewadefirm.com
bparrish@thewadefirm.com
*Counsel for Plaintiffs Shelby County*
*Board of Education, Michelle Robinson*
*McKissack, Natalie J. McKinney,*
*Stephanie P. Love, Sable Otley,*
*Keith Williams, Towanna Murphy,*
*Amber Huett-Garcia, Joyce Dorse*
*Coleman, & Tamarques Porter*

s/ Robert W. Wilson
ROBERT W. WILSON
Senior Assistant Attorney General