**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **SHELBY COUNTY GOVERNMENT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **No. 3:26-cv-00835** |
| | ) | **Judge Crenshaw** |
| **BILL LEE, in his official capacity as Governor of the State of Tennessee, et al.** | ) | **Magistrate Judge Frensley** |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

---

Defendants, Tennessee officials sued in their official capacities, have moved to dismiss Plaintiffs' Second Amended Verified Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiffs' complaint should be dismissed for four reasons: (1) the Governor, the Speakers, and the Commissioner do not enforce the Tennessee Public Schools Accountability Act's operative provisions and thus are not proper defendants under *Ex parte Young*; (2) the individual Plaintiffs lack Article III standing; (3) the institutional Plaintiffs (Shelby County Government and Memphis-Shelby County Schools ("MSCS")) cannot invoke the Fourteenth Amendment against the State that created them nor use third-party standing to assert their claims; and (4) on the merits, Plaintiffs fail to plausibly allege that the General Assembly enacted the Act with a racially discriminatory purpose, so the Act is subject to rational-basis review, which it readily survives. The Court should grant Defendants' motion to dismiss.

## BACKGROUND

### A. Public Education in Tennessee

The Tennessee Constitution directs the General Assembly to "provide for the maintenance, support and eligibility standards of a system of free public schools." Tenn. Const. art. XI, § 12. That provision gives the General Assembly broad authority over Tennessee's public education system. *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 156 (Tenn. 1993).

The General Assembly has exercised that authority through Title 49 of the Tennessee Code. The State Board of Education establishes statewide educational standards and policies, and the Commissioner of Education administers the State's public education laws. Tenn. Code Ann. §§ 49-1-201, -301 to -316. At the local level, local education agencies (LEAs) are governed by local boards of education exercising powers conferred by statute. *Id.* §§ 49-2-201 to -214.

The General Assembly possesses broad discretion to structure Tennessee's public education system. It "has the broadest discretion to create or allow various entities to provide educational services to children in the state." *State ex rel. Bd. of Educ. of Memphis City Schs. v. City of Memphis*, 329 S.W.3d 465, 472 (Tenn. Ct. App. 2010) (quotation omitted). Indeed, it could "abolish every local school district in the state and make every school a state school, pure and simple." *Kelley v. Metro. Cnty. Bd. of Educ. of Nashville & Davidson Cnty.*, 836 F.2d 986, 999 (6th Cir. 1987).

### B. Shelby County's Local Concerns Spark a Statewide Response.

Efforts to reform MSCS's operations were born out of local distrust in the school system. In January 2025, the Shelby County Board of Commissioners adopted a resolution expressing "no

confidence" in the MSCS Board. ECF No. 34-2.[1] That resolution followed a prolonged period without permanent leadership at MSCS and its board's efforts to remove the superintendent it had hired less than a year earlier. *Id.* at 1362.[2] These events prompted the Commissioners to call for a comprehensive governance plan "to ensure public trust, accountability, and transparency." *Id.* at 1364.

A month later, the Commissioners turned to MSCS's finances. In a second resolution, the Commissioners formally authorized their own forensic audit under Tenn. Code Ann. § 49-2-101 and appropriated up to $50,000 to fund it. County Res., ECF 34-7.[3]

Following the Commissioners' no confidence resolution, the General Assembly began introducing legislation providing for intervention in underperforming LEAs. Legis. Rec., ECF 34-5 at 2043-47, 2107-14.[4] For more than a year, legislators proposed and debated various intervention measures. *See* Legis. Rec., ECF 34-5.

On April 1, 2026, an independent accounting firm released the Interim Audit Report. ECF 33-2; Sec. Am. Compl., ECF 57 at 2944 ¶ 103. The report found that MSCS lacked formalized documented policies and procedures, leading to inconsistent execution, reliance on institutional knowledge, and heightened continuity risk, as well as compliance gaps elevating MSCS's legal, financial, and reputational risk. Report, ECF 33-2 at 335-36. The report also found approximately

---

[1] Courts may consider public records and other materials subject to judicial notice in ruling on a motion to dismiss. *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema*, 534 U.S. 506 (2002).

[2] Pincites to docket filings refer to the PageID file-stamp pagination.

[3] The Commissioners rescinded that funding only after the Tennessee Comptroller advised them that the General Assembly had allocated funds to conduct the requested forensic audit. County Res., ECF 55-1.

[4] *See also 114th General Assembly, SB 0714*, https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=SB0714&ga=114.

$1.2 million in transactions potentially identified as waste or abuse "due to weaknesses in" MSCS's "management, oversight, and control environment"; another approximately $1.7 million in transactions reflecting noncompliance with MSCS policies and "significant internal control and documentation deficiencies"; record retention issues across multiple systems; and staff turnover following leadership transitions that eroded institutional knowledge, created inefficiencies in core functions at MSCS, and increased internal control weaknesses and financial risks. *Id.* at 337-38.

### C. The Tennessee Public Schools Accountability Act.

On April 22, 2026, the General Assembly passed the Tennessee Public Schools Accountability Act, codified at Tenn. Code Ann. § 49-1-616. Legis. Rec., ECF 34-5 at 2489 (House); *id.* at 2534 (Senate). The Act requires creation of an educational oversight board when an LEA satisfies at least four of six criteria addressing academic performance and institutional stability. Tenn. Code Ann. § 49-1-616(a)–(b). Those criteria measure: (1) student proficiency in math and English; (2) the percentage of schools receiving "D" or "F" grades; (3) chronic absenteeism; (4) persistent priority-school status; (5) audit findings concerning management, accounting, or internal control deficiencies, or instances of fraud, waste, abuse, or financial mismanagement; and (6) repeated use of interim directors of schools. *Id.* § 49-1-616(a). Legislators in both Houses explained that the Act was a "statewide effort" that would "appl[y] uniformly to every [LEA] in the state of Tennessee." Legis. Rec., ECF 34-5 at 2455-57 (Rep. Mark White); *id.* at 2495 (Sen. Brent Taylor); *id.* at 2525-26 (Sen. Page Walley).

When an LEA meets the statutory threshold, the Commissioner of Education gives notice to that effect, and a nine-member oversight board is appointed by the Governor, the Speaker of the House, and the Speaker of the Senate. *Id.* § 49-1-616(b)–(c). The board assesses the LEA's

academic, operational, financial, and administrative performance and develops an annual transformation plan addressing identified deficiencies. *Id.* § 49-1-616(d).

The Act gives the oversight board supervisory authority over specified LEA operations. Among other things, the board may review and veto proposed budgets and budget amendments; approve certain contracts and expenditures of at least $50,000; direct the local board or director of schools to take or refrain from discretionary actions necessary to improve the LEA's performance or management; and, subject to applicable contractual and statutory protections, terminate and replace LEA employees. *Id.* § 49-1-616(e).

At the time of enactment, MSCS was the "only LEA in Tennessee that could potentially satisfy all six" statutory criteria "simultaneously." Sec. Am. Compl., ECF 57 at 2939 ¶ 68; *cf. id.* at 2926 (alleging "only one district satisfies" the Act's criteria), 2959, ¶ 218 (alleging the Act "was designed to reach MSCS, and MSCS was reached"). While legislators recognized that only MSCS currently met all six criteria, they confirmed that multiple other school districts satisfied three criteria and "will get the same treatment" "if they happen to meet a fourth." Legis. Rec., ECF 34-5 at 2504 (Sen. Taylor); *id.* at 2532 (Sen. Adam Lowe); *id.* at 2483-84 (Rep. White).

On May 22, 2026, the Commissioner notified the Governor, the Speakers, and MSCS that MSCS met the statutory threshold for creation of an oversight board. Sec. Am. Compl., ECF 57-2 at 2983–84, Ex. 2. The Governor and the Speakers appointed the nine-member Oversight Board, which convened its first meeting on June 18, 2026, to elect officers and prepare to begin its oversight of MSCS on July 1. Sec. Am. Compl., ECF 57 at 2933–36, ¶¶ 25-37; 2941–42, ¶¶ 85, 93; *see* Tenn. Code Ann. § 49-1-616(c)–(d).

**D. Plaintiffs' Lawsuit**

Plaintiffs (Shelby County, MSCS, individual MSCS board members, and two board members on behalf of their MSCS students) brought this 42 U.S.C. § 1983 action against Defendants (the Governor, the Speakers of both Houses, the Commissioner for the Tennessee Department of Education, and the Members of the Educational Oversight Board for MSCS) in their official capacities. Sec. Am. Compl., ECF 57 at 2930–36, ¶¶ 9-37. In their only claim, Plaintiffs assert that the "facially neutral" Act violates the Fourteenth Amendment's equal protection guarantee because the General Assembly passed the Act for a racially discriminatory purpose. *Id.* at 2962–64, ¶¶ 240-45. Plaintiffs also seek declaratory and injunctive relief. *Id.* at 2964, ¶ 246.

## LEGAL STANDARD

Defendants move to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). A motion under Rule 12(b)(1) challenges the Court's subject-matter jurisdiction and may raise either a facial or factual attack. A facial attack, like Defendants' sovereign immunity and standing challenges here, questions the sufficiency of the pleading itself, and the Court accepts the complaint's well-pleaded factual allegations as true. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

A motion under Rule 12(b)(6) tests the legal sufficiency of the complaint. To survive, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible only where the pleaded facts allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged"—mere possibility of unlawful conduct is not enough. *Id.* Nor are allegations "that are 'merely consistent with' a defendant's liability." *Id.* (quoting *Twombly*, 550 U.S. at 557). The Court need

not accept as true legal conclusions couched as factual allegations, or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## ARGUMENT

**Plaintiffs' Complaint Must Be Dismissed.**

At every step, Plaintiffs fail to plead a proper equal protection claim against Defendants. First, the Governor, the Speakers, and the Commissioner are not proper *Ex parte Young* defendants because they do not enforce the Act's operative oversight provisions. Second, the individual Plaintiffs have not asserted any cognizable injury as elected board members, taxpayers, voters, residents, or students. Third, the institutional Plaintiffs (Shelby County and MSCS) cannot invoke the Fourteenth Amendment against their parent State, nor can they assert their claims through third-party standing. Finally, even if the Court should reach the merits, Plaintiffs fail to plausibly allege that the facially race-neutral Act was enacted with a discriminatory purpose; the Act therefore receives rational-basis review, which it readily survives.

### A. Sovereign immunity and *Ex parte Young* bar relief against the Governor, the Speakers, and the Commissioner.

Sovereign immunity is a "jurisdictional bar" to Plaintiffs' claims against the Governor, the Speakers, and the Commissioner. *White's Landing Fisheries, Inc. v. Ohio Dep't of Nat. Res.*, 174 F.4th 493, 500 (6th Cir. 2026). In attempting to overcome that immunity, Plaintiffs reflexively point to *Ex parte Young*, 209 U.S. 123 (1908). Second Am. Compl., ECF 57 at 2929, ¶ 8; 2933, ¶ 25. But that "narrow exception" does not apply to the State Officials here. *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021).

*Ex parte Young* permits a suit seeking prospective relief "against a state official who is engaged in a continuing violation of federal law." *White's Landing*, 174 F.4th at 500. That

requires a plaintiff to show that the official has an "obligation to enforce a law" and that "there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests." *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015). General supervisory authority, ministerial acts, or a completed role in implementing a statute are not enough. *See id*. And an official with appointment, removal, or notification authority under a challenged statute does not make that official the statute's enforcer. *See, e.g.*, *Minn. Chapter of Assoc. Builders & Contractors v. Ellison*, 153 F.4th 695, 699 (8th Cir. 2025); *Balogh v. Lombardi*, 816 F.3d 536, 546 (8th Cir. 2016); *Smith v. DeWine*, 476 F. Supp. 3d 635, 652 (S.D. Ohio 2020); *Ball by Burba v. Kasich*, 244 F. Supp. 3d 662, 673-74 (S.D. Ohio 2017); *Kelly v. Burks*, 414 F. Supp. 2d 681, 686 (E.D. Ky. 2006); *LensCrafters, Inc. v. Sundquist*, 184 F. Supp. 2d 753, 758–59 (M.D. Tenn. 2002).

Here, neither the Governor, the Speakers, nor the Commissioner enforce the Act or have a realistic possibility of doing so in the future. The Act tasks the Commissioner with notifying the Governor and the Speakers that an LEA meets the criteria for an oversight board; the Governor and the Speakers may then appoint and remove oversight board members. Tenn. Code Ann. § 49-1-616(a)-(c). None of those actions are "analogous to enforcing the statute's" operative provisions "within the meaning" of *Ex parte Young*. *Balogh*, 816 F.3d at 546; *see also LensCrafters*, 184 F. Supp. 2d at 758–59. Rather, the Act assigns the challenged supervisory powers—budget vetoes, contract approvals, directives to MSCS officials, and personnel actions—to the Educational Oversight Board itself. Tenn. Code Ann. § 49-1-616(e). Thus, the Oversight Board—not the Governor, the Speakers, or the Commissioner—possesses and exercises the operative authority Plaintiffs seek to enjoin. *See Whole Woman's Health*, 595 U.S. at 43–44.

Even if appointment, removal, and notification resembled enforcement, the Governor, the Speakers, and the Commissioner no longer have any enforcement duties under the Act. *Ex parte Young* requires a plaintiff to show that the official's "violation of federal law . . . is ongoing," not that the official "at one time or over a period of time in the past" violated federal law. *Papasan v. Allain*, 478 U.S. 265, 277–78 (1986). By the time Plaintiffs filed suit on June 18, the Commissioner had notified the Governor and the Speakers that MSCS met at least four of the six criteria, the Governor and the Speakers had already appointed the Oversight Board for MSCS, and its members had held their inaugural meeting. Sec. Am. Compl., ECF 57 at 2933–36, ¶¶ 25–37; 2941–42, ¶¶ 85, 93. Plaintiffs have not alleged a "realistic possibility" that these State Officials will use their appointment, removal, or notification authority against MSCS again. *See Russell*, 784 F.3d at 1048. In sum, the Governor, the Speakers, and the Commissioner retain their sovereign immunity and should be dismissed as defendants.

### B. The individual Plaintiffs lack standing.

In addition to naming improper Defendants, a host of improper Plaintiffs assert claims. The individual Plaintiffs' status as board members, registered voters, residents, taxpayers, and students do not give them standing. Sec. Am. Compl., ECF 57 at 2931–33, ¶¶ 14-24; 2960, ¶¶ 224-26.[5] The Court should "proceed no further" with their claims. *California v. Texas*, 593 U.S. 659, 668 (2021).

---

[5] Plaintiffs Otey and Murphy add that they are harmed "as parents of children attending MSCS schools." Sec. Am. Compl., ECF 57 at 2960, ¶ 226. But Otey and Murphy do not bring claims as parents; they only assert claims "on behalf of [their] minor children." *Id.* at 2932–33, ¶¶ 18-19, 21-22. Even if they asserted proper parent claims, it is far from clear how it would give them standing under the Act because they have no fundamental right to an elected school board. *See infra*, p. 11.

Article III of the United States Constitution "confines the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024). That requires every federal court plaintiff to satisfy the "bedrock constitutional requirement" of "standing to sue." *United States v. Texas*, 599 U.S. 670, 675 (2023). This requirement ensures that a "party seek relief" only for an injury "caused by another party's invasion of its rights." *Ass'n. of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 537 (6th Cir. 2021).

To show standing at the motion to dismiss stage, a plaintiff must plausibly allege that: (1) she suffered an injury in fact; (2) the defendant likely caused the injury; and (3) a court could redress the injury. *See TransUnion LLC v. Ramirez*, 594 U.S. 412, 423 (2021); *Ass'n of Am.*, 13 F.4th at 543-44. An Article III injury requires the "invasion of a legally protected interest," meaning that the complaint must show that the "plaintiff has a right to relief if the court accepts the plaintiff's interpretation of the constitutional or statutory laws on which the complaint relies." *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021) (quotation omitted). And the injury must be "concrete" and "particularized"—it must be "real and not abstract" and affect the "plaintiff in a personal and individual way," not a "generalized grievance." *FDA*, 602 U.S. at 381 (quotations omitted).

The individual Plaintiffs here lack standing because they cannot allege an invasion of a legally protected interest. *See CHKRS*, 984 F.3d at 488. The Act regulates how an LEA will function if it qualifies for an oversight board. *See* Tenn. Code Ann. § 49-1-616(e). It does not affect any individual LEA board member, taxpayer, resident, voter, or student "in a personal and individual way." *FDA*, 602 U.S. at 381. That alone requires the Court to dismiss the individual Plaintiffs.

Caselaw confirms that result. Start with the individual board member Plaintiffs' claims that the Act causes them to lose "meaningful governing authority" as elected members. Sec. Am. Compl., ECF 57 at 2960, ¶ 224. Local legislators such as school board members lack "Article III standing based on an allegation of an institutional injury" because they "cannot tenably claim a personal stake in a suit based on such an institutional injury." *See State ex rel. Tenn. Gen. Assembly v. Dep't of State*, 931 F.3d 499, 514 (6th Cir. 2019) (cleaned up); *cf. Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (holding that "regional legislators" have immunity "for their legislative activities"). Any "loss" of governing authority is an institutional injury belonging to MSCS, not its individual board members. *See Dep't of State*, 931 F.3d at 514.

Nor can Plaintiffs show that they have taxpayer standing. "[S]tate taxpayers have no standing under Article III to challenge state tax or spending decisions simply by virtue of their status as taxpayers." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 346 (2006). The individual Plaintiffs fail to allege how the Act harms them as taxpayers in any "distinct" or "personal" way. *Id.* at 344–46; Sec. Am. Compl., ECF 57 at 2960, ¶ 226.

Finally, the individual Plaintiffs lack standing to challenge the Act as residents, voters, or students. The adult Plaintiffs say that the Act deprives them of the right to "vote for school board members." Sec. Am. Compl., ECF 57 at 2960, ¶ 225. But the adult Plaintiffs have "no fundamental right to elect an administrative body such as a school board," even if other political subdivisions "in the state may do so." *Mixon v. State of Ohio*, 193 F.3d 389, 403 (6th Cir. 1999). Likewise, the student Plaintiffs have no constitutional right to attend a school system with any particular governance model. *See id.* With no fundamental right to assert, these Plaintiffs have no invasion of a legally protected interest to allege. *See CHKRS*, 984 F.3d at 488. The Court should thus dismiss the individual Plaintiffs.

### C. The institutional Plaintiffs have no Fourteenth Amendment claim to assert against the State.

The Sixth Circuit has squarely held that political subdivisions "cannot invoke the protection of the Fourteenth Amendment against" their parent State. *Greater Heights Acad. v. Zelman*, 522 F.3d 678, 679–81 (6th Cir. 2008); *see also S. Macomb Disposal Auth. v. Washington Twp.*, 790 F.2d 500, 505 (6th Cir. 1986) ("The relationship between [political subdivisions] is a matter of state concern; the Fourteenth Amendment protections and limitations do not apply."). That dooms Plaintiffs Shelby County Government and MSCS here because both are political subdivisions of Tennessee. *See Bd. of Educ. of Memphis City Schs. v. Shelby Cnty.*, 292 S.W. 462, 463–64 (Tenn. 1927) (LEAs); *Morris v. Snodgrass*, 886 S.W.2d 761, 763 (Tenn. Ct. App. 1994) (counties). [6]

Shelby County and MSCS attempt to evade that inexorable conclusion in two ways. First, they suggest that their claim against the Oversight Board is not a claim against the State because the Board supervises only a single LEA. Sec. Am. Compl., ECF 57 at 2939–40, ¶ 72. Second, they contend that they have third-party standing to assert claims "on behalf of the students of MSCS." *Id.* at 2931 ¶ 12. Neither attempt succeeds.

Federal courts apply a four-factor test to determine whether an entity is an arm of the State: (1) the state's potential liability for a judgment against the entity; (2) how state law defines the entity and the degree of state control over it; (3) whether state or local officials appoint the

---

[6] Plaintiffs name Shelby County Government and the Board of Commissioners of Shelby County, and MSCS and its board members in their official capacities, as separate plaintiffs but do not meaningfully distinguish them. Plaintiffs describe the County Commission as both the County's legislative body and as "the county government" itself. Sec. Am. Compl., ECF 57 at 2930–31, ¶¶ 9, 13. And they allege that MSCS's board members "exercise[] absolute governing authority" over MSCS. *Id.* ¶ 11. Whatever daylight exists between the County Government and its Commissioners, and between MSCS and its board members, that gap is not at issue here.

entity's board members; and (4) whether the entity's functions fall within the traditional purview of state or local government. *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994)). Each factor independently supports the conclusion that an educational oversight board created under Tenn. Code Ann. § 49-1-616 is an arm of the State.

The first factor, potential state liability, is the most important factor because it directly implicates the Eleventh Amendment's core concern. *Hess*, 513 U.S. at 48–51. Here, the General Assembly created a special account in the state treasury to fund the oversight board's operations. Tenn. Code Ann. § 49-1-616(f)(1)–(2). A judgment against the board would therefore necessarily implicate the state treasury. Thus, the oversight board carries a cognizable risk of liability to the state and so constitutes an arm of the State.

The remaining factors reinforce this conclusion. The State exercises comprehensive and exclusive control over the board: all nine members are appointed by state officials and may be removed by those officials at any time for any reason. *Id.* § 49-1-616(c). No member is appointed by, or accountable to, the county, the county legislative body, or the local board of education. The board's funding likewise flows exclusively through the state treasury, *id.* § 49-1-616(f)(1), and the statute expressly forecloses any local check on the board's authority: a local board of education may not assert, intervene in, or fund any cause of action challenging board action. *Id.* § 49-1-616(g). Finally, public education oversight has long been treated under Tennessee law as a matter of State, not local, concern—the General Assembly has "plenary and exclusive authority" over the structure, funding, and governance of local school systems. *S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 715 (Tenn. 2001). Measured against each

factor, educational oversight boards are arms of the State, and their members are state officials. Plaintiffs' contrary suggestion lacks merit.

So too does their attempt to establish third-party standing. To do so, the County and MSCS must show: (1) that they have their own Article III injury; (2) a close relationship between them and the students; and (3) a hindrance preventing the students from asserting their own claims. *Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402 (6th Cir. 2017).

The County and MSCS do not make that showing. "No practical barriers exist if the third party actually asserts his own rights." *Id.* at 403 (cleaned up). MSCS students face "no obstacle restrict[ing]" their "ability to protect their own rights" because their parents, Plaintiffs Otey and Murphy, "filed their suit" for them. *Digit. Media Solutions, LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772, 782 (6th Cir. 2023); Sec. Am. Compl., ECF 57 at 2932–33 ¶¶ 18–19, 21–22. That the students have themselves failed to establish a cognizable injury does not mean they are hindered from doing so. *See Moody*, 847 F.3d at 403 (holding that a primary party's lack of standing is not a hindrance for purposes of third-party standing). Since the students face no hindrance in asserting their own claims, the County and MSCS cannot step in for them. The Court should dismiss the County and MSCS.

**D. The Act passes rational-basis review.**

Even if Plaintiffs could overcome these jurisdictional hurdles, their claims should still be dismissed on their merits. Plaintiffs do not plausibly allege that the General Assembly passed the Act for a discriminatory purpose, and the Act satisfies rational-basis review.

The Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amdt. 14, § 1. In considering an equal protection claim, a court starts "from the presumption that legislatures act in good faith." *United*

*States v. Myrie*, 167 F.4th 876, 880 (6th Cir. 2026). When a law "neither burdens a fundamental right nor targets a suspect class," courts "afford such laws wide latitude" and will uphold it "so long as it bears a rational relation to some legitimate end." *United States v. Skrmetti*, 605 U.S. 495, 509–10 (2025) (quotations omitted). And a law will not be held unconstitutional "[s]olely because it has a racially disproportionate impact." *Washington v. Davis*, 426 U.S. 229, 239 (1976).

The Act comes to the Court "bearing a strong presumption of validity." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993). In passing the Act, the General Assembly could rationally conclude that an LEA combining low proficiency, failing schools, chronic absenteeism, prolonged priority status, management deficiencies, and leadership instability should receive heightened oversight. *See Mixon*, 193 F.3d at 403 ("State legislatures need the freedom to experiment with different techniques to advance public education and this need to experiment alone satisfies the rational basis test."). Indeed, Plaintiffs do not argue that the Act fails rational basis review.

Instead, they contend that although the Act is "facially neutral," it nevertheless "is subject to strict scrutiny" "because [it] disparately impacts minority schoolchildren." Sec. Am. Compl., ECF 57 at 2956 ¶ 201; *id.* at 2963 ¶ 244. That assertion puts the cart before the horse. Plaintiffs cannot simply identify a disparate impact and invite the Court to strictly scrutinize the Act for any possibility that racial discrimination was afoot. Disparate impact alone is not enough to trigger strict scrutiny. *Washington*, 426 U.S. at 239.

Rather, Plaintiffs must plausibly allege facts supporting their claim that the General Assembly had a racially discriminatory motive in voting for the Act. Sec. Am. Compl., ECF 57 at 2956–60 ¶¶ 201-19; *id.* at 2962–64 ¶¶ 240-45; *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264–68 (1977). Those facts must plausibly give rise to an inference that the

General Assembly enacted it "because of, not merely in spite of," its adverse effects on African Americans. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Relevant factors may include (1) the historical background of the decision to enact the law, (2) the specific sequence of events leading to the decision, (3) departures from the normal procedural sequence, (4) substantive departures from usual considerations that would strongly favor a contrary decision, and (5) legislative history. *Arlington Heights*, 429 U.S. at 267–68. Conclusory allegations of discriminatory purpose are not enough to survive dismissal. *See Iqbal*, 556 U.S. at 678. Neither are legal conclusions couched as factual allegations, or statements of fact that merely create a suspicion of discriminatory animus. *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614 (6th Cir. 2012).

Plaintiffs' improper purpose claim confronts a high bar. Courts generally "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). The Supreme Court has cautioned that "[i]nquiries into" legislative "motives or purposes are a hazardous matter," *id.*, and "the search for the 'actual' or 'primary' purpose of a statute is likely to be elusive." *Michael M. v. Superior Ct.*, 450 U.S. 464, 469–70 (1981) (plurality) (quotations omitted). Judicial attempts to ascertain legislative "motivation[s]" necessarily "represent a substantial intrusion into the workings of other branches of government." *Arlington Heights*, 429 U.S. at 268 n.18. That intrusion grows when it attempts to divine the motives underlying a state law, leaving federal courts "reluctan[t] to attribute unconstitutional motives to the states." *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983).

That means courts should generally decline to "peer past" statutory text to draw inferences from statements of individual legislators. *Bailey v. Callaghan*, 715 F.3d 956, 960 (6th Cir. 2013) (cleaned up). The motivations of "one legislator to make a speech about a statute is not necessarily

what motivates scores of others to enact it." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 254 (2022) (quotation omitted). And "the speculations and accusations" of a law's "few opponents simply do not support an inference of . . . animus." *Butts v. New York*, 779 F.2d 141, 147 (2d Cir. 1985); *see also Mich. State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 351 (6th Cir. 2018) (holding that courts "do not judge the intention of a bill's supporters by the characterization of its opponents").

Ultimately in equal protection cases, "[i]nstead of asking judges to read the hearts and minds of legislators, the inquiry asks whether the law at issue is 'inexplicable by anything but animus.'" *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 487 (6th Cir. 2023) (quoting *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)), *aff'd United States v. Skrmetti*, 605 U.S. at 526. This approach "eschew[s]" the "guesswork" associated with determining a statute's purpose. *O'Brien*, 391 U.S. at 384. It also respects the foundational "presum[ption] that a legislature acts . . . in good faith." *United States v. Des Moines Nav. & Ry. Co.*, 142 U.S. 510, 544 (1892); *see also Abbott v. Perez*, 585 U.S. 579, 603–04 (2018) (holding that presumption applies even if prior discrimination established). Even at the motion to dismiss stage, "the existence of obvious alternative explanations [to alleged discriminatory intent] simply illustrates the unreasonableness of the inference sought and the implausibility of the claims made." *16630 Southfield Ltd. P'ship. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 505 (6th Cir. 2013).

Against that backdrop, *Moore v. Detroit School Reform Board*, 293 F.3d 352 (6th Cir. 2002), is instructive. There, a facially neutral statute authorized an appointed school-reform board in qualifying districts; when enacted, only Detroit qualified. *Id.* at 354–55. Because Detroit's students and electorate were overwhelmingly African American, the plaintiffs alleged racial discrimination and attacked the legislative process, the rejection of alternatives, and the

chosen reform measures. *Id.* at 369. The Sixth Circuit held that those allegations reflected "general dissatisfaction with the legislative process," not discriminatory motive. *Id.* at 369–70.

*Moore* also relied on *Hearne v. Board of Education of City of Chicago*, 185 F.3d 770 (7th Cir. 1999), which affirmed dismissal on the pleadings of a discriminatory-purpose challenge to school-reform legislation directed at Chicago. *Moore*, 293 F.3d at 370. *Hearne* explained that merely saying the legislature "wanted to disadvantage African Americans" was not enough where "the legislation itself contains not a hint of an impermissible racial classification." 185 F.3d at 776. The same is true here.

Measured against *Moore* and the *Arlington Heights* factors, Plaintiffs do not plausibly allege discriminatory purpose.

**Disparate Impact.** Plaintiffs rely first on MSCS's majority-African American student population, board composition, and electorate, and that no white-majority district currently qualifies under the Act. Sec. Am. Compl., ECF 57 at 2956–57 ¶¶ 202-08; *id.* at 2963 ¶ 244. But the Act applies statewide to any LEA meeting four of six criteria tied to academic performance, chronic absenteeism, prolonged priority-school status, financial-control or mismanagement findings, and leadership instability. Tenn. Code Ann. § 49-1-616(a)(1)–(6). Those criteria are race-neutral and calibrated to identify districts exhibiting multiple forms of serious underperformance or instability. Indeed, for those districts currently meeting three of the Act's criteria, they "will get the same treatment" as MSCS once "they . . . meet a fourth." Legis. Rec., ECF 34-5 at 2504 (Sen. Taylor).

Nor is MSCS the only Tennessee LEA with a majority-African American student population, yet MSCS alone presently meets the statutory threshold.[7] That fact undercuts the inference that the criteria operate as a proxy for race: other majority-African American districts are not swept in merely because of their racial composition. The Act distinguishes among LEAs based on the specified performance and institutional criteria, not race. *See Mixon*, 193 F.3d at 402–03. In any case, identifying disparate impact alone "is not sufficient to state a plausible equal-protection claim." *Myrie*, 167 F.4th at 881.

**Historical Background.** Plaintiffs point to the Achievement School District created in 2012, the Shelby County Schools and Memphis City Schools merger in 2013, and the creation of suburban municipal school districts a year later, as the "relevant" background of the Act. Sec. Am. Compl., ECF 57 at 2957 ¶ 209. But the decade-old actions of different legislatures do not plausibly establish the intent of the General Assembly that enacted *this* Act. *Myrie*, 167 F.4th at 880 ("views of an earlier legislature are generally not probative of the intent of a later legislature" (quotations omitted)). Nor do Plaintiffs make any effort to allege that these prior acts were taken for an improper motive.

The more immediate sequence for the Act provides an "obvious alternative explanation" to Plaintiffs' purported racial discrimination. *See Iqbal*, 556 U.S. at 682 (quotation omitted). Shelby County Commissioners—elected by the same 60% minority electorate Plaintiffs invoke, Sec. Am. Compl., ECF 57 at 2956 ¶ 204—called on MSCS leadership to develop a comprehensive governance plan to "ensure public trust, accountability, and transparency." ECF

[7] *See* Tennessee Department of Education 2024-25 Report Card, *available at* tdepublicschools.ondemand.sas.com/* (listing Fayette County Schools, Hardeman County Schools, Haywood County Schools, Humboldt City Schools, and Madison County Schools as having majority African American student populations).

No. 34-2 at 1364. And the Interim Audit Report also identified management and internal-control deficiencies within MSCS. Report, ECF 33-2 at 335-38. The final legislation adopted statewide criteria incorporating those types of institutional failures. Plaintiffs' "general dissatisfaction with the legislative process" leading to the Act does not plausibly show that the General Assembly acted because of race. *See Moore*, 293 F.3d at 369-70.

**Sequence of Events.** Plaintiffs complain that concerns they documented themselves are reflected in the Act's criteria, protesting that the criteria were thus "calibrated" to MSCS. Sec. Am. Compl., ECF 57 at 2957–58, ¶¶ 210-15; 2963, ¶ 243. By resolution, the County Commissioners noted that MSCS had "four (4) different school superintendents" in "less than three (3) years" and requested MSCS undergo a forensic audit "to ensure that there has been no misuse of public-school funds." County Res., ECF 34-7 at 2608–09. The Act's fifth and sixth criteria measure precisely the County's concerns. *See* Tenn. Code Ann. § 49-1-616(a)(5)-(6).

Nor does the General Assembly addressing a problem arising from a single school district raise an equal protection concern. Both *Moore* and *Hearne* involved legislation more narrowly tailored to a single district than the Act's statewide application. In *Moore*, the statute applied only to districts with more than 100,000 students; Detroit's schools had approximately 180,000 students, 90% of which were African Americans; and the next closest school district had less than 30,000 students. 293 F.3d at 354, 369. And in *Hearne*, the statute applied only to cities with more than 500,000 inhabitants—a "euphemism" for Chicago. 185 F.3d at 772, 775-76. By contrast, the Act applies to any LEA that meets the criteria. *See* Tenn. Code Ann. § 49-1-616(a).

**Departures from Normal Procedure.** For this factor, Plaintiffs rely on the MSCS forensic audit, the General Assembly's rejection of an advisory board model formed in Hamilton County, and a purported "budget cascade" for the County. Sec. Am. Compl., ECF 57 at 2958, ¶

216. But none of that involves a "departure" as used in *Arlington Heights*. The example there was that, had a city proceeded under its normal course, it would have rezoned property to allow low-income housing. *Arlington Heights*, 429 U.S. at 267 n.17. Plaintiffs identify no similar example in the General Assembly. Nor could they. State legislatures "do[] not follow any standardized procedure to determine what legislation to pass," and "[i]t would be anti-democratic in the extreme" to cast a new law "into suspicion" because it "differed from previous legislation or legislated in new areas." *Walls v. Sanders*, 760 F. Supp. 3d 766, 809-10 (E.D. Ark. 2024).

Plaintiffs' examples also do not establish any departure. As explained earlier, Plaintiffs themselves requested a forensic audit of MSCS; the General Assembly's *response* to that request cannot constitute a racially motivated departure from normal procedure. The legislative path to the Act confirms the point: the measure was considered across two legislative sessions, refined through multiple bills and proposed amendments, and reconciled in conference committee. *See* Legis. Rec., ECF 34-5.[8] That is careful deliberation, not a procedural departure.

The comparison to Hamilton County Schools also does not aid Plaintiffs. The advisory board was a partnership between Hamilton County Schools and the Tennessee Department of Education and was created in 2018. *Seven Leaders Named to Hamilton County Partnership Network Advisory Board*, https://www.tn.gov/education/news/2018/5/2/seven-leaders-named-to-hamilton-county-partnership-network-advisory-board.html. The General Assembly was not involved in that partnership and had no obligation to pass a law requiring it for other LEAs. What

[8] Plaintiffs pointing to "worse audit findings" from Maury, Polk, and Overton counties does not help them here. Sec. Am. Compl., ECF 57 at 2958 ¶ 216(a). None of those counties were identified as one of the school districts meeting at least three of the Act's criteria. Legis. Rec., ECF 34-5 at 2382. So the audit-findings criteria applying to these counties would still not qualify them for oversight because they do not meet at least three others. *See* Tenn. Code Ann. § 49-1-616(a).

Plaintiffs protest reflects disagreement with the outcome of the legislative process, not evidence of unconstitutional motive. *See Moore* 293 F.3d at 369–70.[9]

And Plaintiffs' actions rebut their own claims that the Act will prevent Shelby County from "adopt[ing] its own budget." Sec. Am. Compl., ECF 57 at 2949, ¶ 146; 2958, ¶ 216. The County Commissioners adopted the County's budget on June 29, 2026, over a month after the Act went into effect. County Res., ECF 55-2 at 2898-05. The Commissioners did not consider MSCS's school budget until August 10, 2026. Committee Agenda, ECF 55-3 at 2919, 2921. Plaintiffs' "budget cascade" prediction remains illusory.

**Legislative History.** Finally, Plaintiffs fail to point to any statement in the Act's legislative record showing that an improper purpose motivated any legislator to vote for the Act, much less the motives for all of its supporters. Sec. Am. Compl, ECF 57 at 2959, ¶ 217; 2963, ¶ 243. Plaintiffs principally marshal statements by legislators who opposed the Act. *Id.* (citing statements from Senators Raumesh Akbari and Jeff Yarbro and Representatives Antonio Parkinson and Larry Miller).[10] But those legislators' speculations and accusations "in their zeal to defeat a bill" are entitled to "little weight." *Fieger v. U.S. Att'y Gen.*, 542 F.3d 1111, 1119 (6th Cir. 2008) (cleaned up); *see also Johnson*, 749 F. App'x at 351; *Butts*, 779 F.2d at 147. And most of those opposing legislators agreed that MSCS needed intervention anyway. Representative Parkinson acknowledged, "We know that [MSCS] needs an intervention. I think we all agree

[9] While Plaintiffs also assert that Hamilton County Schools are "majority white," Sec. Am. Compl, ECF 57 at 2958 ¶ 216(e), public data casts doubt on that allegation. *See* Hamilton County Schools, Tenn. Dep't Educ. 2024-25 Report Card, *available at* https://tdepublicschools.ondemand.sas.com/. When a "public record[]" refutes a plaintiff's allegation, "[f]airness and efficiency require" permitting a court to consider the document "in resolving the Rule 12(b)(6) motion." *In re Omnicare, Inc. Sec. Lit.*, 769 F.3d 455, 466 (6th Cir. 2014).

[10] *See also 114th General Assembly, SB 0714, Votes*, https://wapp.capitol.tn.gov/apps/BillInfo/Default?BillNumber=SB0714&ga=114.

with that. I think where we may disagree or differ a little bit is in how that intervention looks." Legis. Rec., ECF 34-5 at 2470. Senator Akbari also recognized "that [MSCS] needs a level of intervention." *Id.* at 2515. Concern for MSCS was bipartisan and openly acknowledged, foreclosing any plausible inference that the General Assembly's solution was "because of" an invidious motive. *Feeney*, 442 U.S. at 279. The General Assembly is entitled to a presumption of good faith that Plaintiffs' selective quotations of opposing legislators do not overcome. *See Abbott*, 585 U.S. at 603.

Nor do the "total takeover" or "Memphis School Takeover" labels move the needle. Sec. Am. Compl., ECF 57 at 2963 ¶ 243. Plaintiffs rely on a "Funded Amendments and Bills" summary that labels the appropriation by location. Sec. Am. Compl., ECF 57-1 at 2979, Ex. 1, l. 251. A label identifying the place where a law presently operates is not a racial classification. *See Hearne*, 185 F.3d at 772, 774–75. Nor does a "total takeover" description suggest a racial motivation when the State seeks to reform underperforming and mismanaged school districts; the Equal Protection Clause permits the State to step in for a school district rather than "continue with a system that appear[s] to be failing." *Moore*, 293 F.3d at 371-72. More importantly, the final appropriations language describes the Act as legislation "relative to state interventions for certain underperforming school districts"—neutral language tied to performance, not race. 2026 Tenn. Pub. Acts, ch. 1142, § 61, Item 12.

The essence of Plaintiffs' equal protection claim is that MSCS "is such a good proxy for African Americans" that the Act's regulation of MSCS must be "an obvious pretext for racial discrimination." *See Hearne*, 185 F.3d at 776 (quotation omitted). But Plaintiffs do not explain how any of the Act's criteria involving academic and school underperformance, internal mismanagement, or leadership instability is an obvious pretext to discriminate against African

Americans. *See id.* And the Tennessee Constitution tasks the General Assembly with "provid[ing] for the maintenance, support and eligibility standards of a system of free public schools." Tenn. Const. art. XI, § 12. That includes all of Shelby County's students. The General Assembly's determination that an appointed oversight board "would be better equipped to address [MSCS's] challenges" and those districts with similar problems is neither discriminatory nor "unreasonable." *See Moore*, 293 F.3d at 361.

In sum, Plaintiffs have not plausibly alleged that the General Assembly enacted the Act because of its effect on any racial group. *Arlington Heights* requires that much, and the Second Amended Complaint does not supply it. The Court should dismiss all of Plaintiffs' claims.

**CONCLUSION**

For these reasons, the Court should grant Defendants' motion to dismiss.

Respectfully submitted,

**JONATHAN SKRMETTI**
Attorney General and Reporter

s/ Robert W. Wilson
SHANNON HOFFERT TN BPR 28430
Deputy Attorney General

ROBERT W. WILSON TN BPR 34492
MATTHEW DOWTY TN BPR 36070
Senior Assistant Attorneys General

MARK WESTON TN BPR 038585
Assistant Attorney General

One Commerce Square
40 S. Main St., Suite 1014
Memphis, TN 38103
(901) 543-9039
Shannon.Hoffert@ag.tn.gov
Matthew.Dowty@ag.tn.gov
Mark.Weston@ag.tn.gov
Robert.Wilson@ag.tn.gov

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was served by operation of the Court's ECF/PACER system on this the 14th day of August 2026, upon:

**BAKER, DONELSON, BEARMAN**
**CALDWELL & BERKOWITZ, PC**

Bruce McMullen
Lori H. Patterson
Jerrick Murrell
Jennie Vee Silk

165 Madison Ave., Suite 2000
Memphis, TN 38103
bmcmullen@bakerdonelson.com
lpatterson@bakerdonelson.com
jmurrell@bakerdonelson.com
jsilk@bakerdonelson.com
*Counsel for Plaintiffs Shelby County Government & Shelby County Board of Commissioners*

**THE WADE LAW FIRM, PLLC**

Allan J. Wade
Brandy S. Parrish
5050 Poplar Ave., Suite 1028
Memphis, TN 38157
awade@thewadefirm.com
bparrish@thewadefirm.com
*Counsel for Plaintiffs Shelby County Board of Education, Michelle Robinson McKissack, Natalie J. McKinney, Stephanie P. Love, Sable Otley, Keith Williams, Towanna Murphy, Amber Huett-Garcia, Joyce Dorse Coleman, & Tamarques Porter*

s/ Robert W. Wilson
Robert W. Wilson
Senior Assistant Attorney General